## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **SAUL BRESALIER**, suing derivatively on behalf of **DUKE ENERGY CORPORATION**, | : |
| | : |
| Plaintiff, | :  CIVIL ACTION No.: |
| v. | : |
| | : |
| **LYNN J. GOOD; MICHAEL G. BROWNING; DANIEL R. DiMICCO; JOHN H. FORSGREN; ANN MAYNARD GRAY; JAMES H. HANCE, JR.; JOHN T. HERRON; JAMES T. RHODES; JAMES B. HYLER, JR.; HARRIS DE LOACH, JR.; CARLOS A. SALDRIGAS; WILLIAM E. KENNARD; E. MARIE McKEE; RICHARD A. MESERVE, JAMES E. ROGERS, G. ALEX BERNHARDT; E. JAMES REINSCH; WILLIAM BARNET, III; and PHILIP R. SHARP,** | :  Jury Trial Demanded. |
| | : |
| Defendants. | : |
| **and** | : |
| **DUKE ENERGY CORPORATION,** | : |
| Nominal Defendant. | : |

## COMPLAINT

Plaintiff Saul Bresalier ("plaintiff"), for his Complaint against the defendants, alleges as follows:

## GENERAL BACKGROUND

1.     Plaintiff brings this shareholder derivative suit against the defendants who are identified above and in ¶13 of this Complaint (collectively, "Individual Defendants"), each of whom is sued herein for wrongdoing which took place during the time he held office and/or served as a director of Nominal Defendant Duke Energy Corporation ("Duke" or the

"Company").  This action follows on the wrongful rejection of pre-suit demands set forth in a March 24, 2015 letter sent on plaintiff's behalf by his counsel, Richard D. Greenfield, Esq., to Duke's Board of Directors (the "Board") as required by Federal Rule of Civil Procedure 23.1, (the "Demand Letter"), a copy of which is attached hereto as Exhibit "A."

2.      Defendant Good is currently Duke's Vice Chairman, President and Chief Executive Officer.  Defendant Rogers served as Duke's Chairman of the Board and Chief Executive Officer of Duke at critical times during the period of the wrongdoing alleged herein.  All of the Individual Defendants are or were members of Duke's Board and have been responsible personally for stewardship of the Company at various points in time during the period from 2010 through the present.

3.      The Individual Defendants are responsible for and caused Duke massive financial and reputational damages including, *inter alia*, being charged criminally (to which the Board authorized management to plead guilty on the Company's behalf) with respect to the discharge of toxic coal ash and other alleged violations of the federal Clean Air Act in connection with the operation of Duke's Dan River and other North Carolina electrical generation plants; engaging in improper political machinations in connection with Duke's acquisition (the "Merger") of Progress Energy, Inc. ("Progress"); and breaching the duty of candor owed by them to Duke and its shareholders, as described below.

4.      During the period of the Individual Defendants' stewardship of Duke as members of its Board and as members of various of its committees, Duke's operations and business practices have been the subject of considerable scrutiny, investigation, and criticism by federal law enforcement officials, North Carolina regulatory authorities, private investors, and the financial press.  While the full details of the wrongful conduct of Board and senior officers that

has given rise to this scrutiny, and the full extent of the damages that the Company has sustained as a result, have not yet been made public, the information that has emerged reveals a deeply troubling pattern of highly questionable practices that have occurred on the Individual Defendants' watch.

5.     Such misconduct has demonstrated a long-term breach of the Individual Defendants' duty of care and other fiduciary duties owed to Duke which has caused, and will continue to cause, the Company massive expense, criminal and civil legal liability and damage to its reputation.

6.     Similarly, Duke's direct and indirect political contributions and other wrongdoing as referred to in the Demand Letter and herein, unless responsibly addressed as set forth below, are contrary to the Company's best interests and expose it to damage to its reputation and otherwise.

## JURISDICTION AND VENUE

7.     The claims asserted in this Complaint arise under and pursuant to the law of the State of Delaware, Duke's state of incorporation.

8.     This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1332(a)(2), based upon the diversity of citizenship of plaintiff, a citizen of New Jersey, on the one hand and all defendants on the other, citizens of states other than New Jersey, and because the amount in dispute exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this District because (a) Duke is incorporated in Delaware and, as such, conducts business in this District, and (b) substantial acts in furtherance of the wrongdoing alleged and its effects occurred in this District.

10.     Each of the Individual Defendants is or was a director of a Delaware corporation and, by reason thereof, is subject to the Court's *in personam* jurisdiction in this District.

## PARTIES

**Plaintiff**

11.     Plaintiff Saul Bresalier, a citizen of New Jersey, is currently a Duke shareholder (for his individual retirement account) and has been a shareholder continuously since before and during the wrongdoing alleged herein.

**Duke and its Subsidiaries**

12.     Duke is a corporation organized and incorporated under the laws of the State of Delaware.  Its stock trades on the New York Stock Exchange.  Its principal place of business is located in Charlotte, North Carolina.

13.     Duke is a holding company that operates through wholly-owned subsidiaries that are located throughout North Carolina and the United States.  The centralized control resides with one wholly-owned subsidiary, Duke Energy Business Services, LLC, which provides centralized legal, engineering, environmental, health and safety, ethics and compliance, and Coal Combustion Products services to Duke's affiliates nationwide.

14.     Plaintiff asserts no claims in this Complaint against Duke.

**The Individual Defendants**

15.     The Individual Defendants are or have been present or former members of the Board during the time period relevant to this lawsuit.

a.     Defendant William Barnet, III served as a director of Duke from 2005 until May 2014.  Defendant Barnet was a member of the Regulatory Policy and Operations Committee from July 2012 until May 2014, and was a member of the Finance and Risk

Management Committee from at least 2010 to May 2014, holding the position of Chairman of that committee from March 2010 to March 2012.

b.      Defendant G. Alex Bernhardt, Sr. is a current member of the Board, and has served as a director of Duke since 1991.  Defendant Bernhardt is a member of Duke's Regulatory Policy and Operations Committee and has been since at least March 2014.

c.      Defendant Michael G. Browning is a current member of the Board, and has served on the Audit, Corporate Governance, Finance & Risk Management board committees.

d.      Defendant Harris E. DeLoach, Jr. is a current member of the Board, and has served on the Corporate Governance and Nuclear Oversight Committees.

e.      Defendant John H. Forsgren is a current member of the Board, and has served on the Finance & Risk Management and Nuclear Oversight Committees.

f.      Defendant Lynn J. Good is a current member of the Board, and has served as the Vice Chairman of the Board and as Duke's President and CEO.

g.      Defendant Ann Maynard Gray is a current member of the Board, and has served on the Corporate Governance, Compensation, and Finance & Risk Management Committees.

h.      Defendant James H. Hance, Jr. is a current member of the Board, and has served on the Audit, Compensation, and Finance & Risk Management Committees.

i.      Defendant John T. Herron is a current member of the Board, and has served on the Nuclear Oversight and Regulatory Policy & Operations Committees.

j.      Defendant James B. Hyer, Jr. is a current member of the Board, and has served on the Audit, Finance & Risk Management, and Regulatory Policy & Operations Committees.

k.      Defendant William E. Kennard is a current member of the Board, and has served on the Corporate Governance, Finance & Risk Management, and Regulatory Policy & Operations Committees.

l.      Defendant E. Marie McKee is a current member of the Board, and has served on the Audit, Compensation, and Corporate Governance Committees.

m.      Defendant Richard A. Meserve is a current member of the Board, and has served on the Nuclear Oversight and Regulatory Policy & Operations Committees.

n.      Defendant E. James Reinsch served as a director of Duke since 2009. Defendant Reinsch is a member of Duke's Finance and Risk Management Committee and has been since at least March 2014 and was a member of that committee from at least March 2010 to at least March 2012.  Defendant Reinsch was also a member of Duke's Regulatory Policy and Operations Committee from July 2012 to at least March 2013.

o.      Defendant James T. Rhodes is a current member of the Board, and has served on the Nuclear Oversight and Regulatory Policy & Operations Committees.

p.      Defendant James E. Rogers served as Duke's President and CEO from 2006 to July 2013, with a one-day interruption in July 2012.  Defendant Rogers was also Chairman of the Board from 2007 to December 2013 and a director from 2006 to December 2013.

q.      Defendant Carlos A. Saldrigas is a current member of the Board, and has served on the Audit, Compensation, and Regulatory Policy & Operations Committees.

r.      Defendant Philip R. Sharp ("Sharp") served as a director of Duke from 2007 until May 2014.  Defendant Sharp was Chairman of Duke's Regulatory Policy and

Operations Committee from July 2012 until May 2014.  Defendant Sharp was also a member of the Audit Committee from March 2010 until March 2012.

## THE INDIVIDUAL DEFENDANTS' OBLIGATIONS TO DUKE

16.     Duke and its operating subsidiaries are regulated at the federal, state and local levels because their business activities potentially generate the risk of, among other things, environmental hazard in the form of toxic emissions into the air and the water supply.  If not properly and diligently operated and supervised, such operations have the potential to harm the environment, as well as the property and health, of the communities and populations that are potentially exposed.  Because the Company's securities are traded publicly, it is regulated by the Securities & Exchange Commission ("SEC"), to which it is required to report periodically, including, *inter alia*, filing  annual reports on Form 10-K and proxy statements.

17.     In Duke's Report on SEC Form 10-K for the years ended February 28, 2014 and February 28, 2015, this basic fact was acknowledged:

> The Duke Energy Registrants are subject to federal, state and local laws and regulations with regard to air and water quality, hazardous and solid waste disposal and other environmental matters.  Duke Energy is also subject to international laws and regulations with regard to air and water quality, hazardous and solid waste disposal and other environmental matters. Environmental laws and regulations affecting the Duke Energy Registrants include, but are not limited to…  The Clean Water Act which requires permits for facilities that discharge wastewaters into the environment.

18.     By reason of their positions as directors of Duke and because of their ability to control Duke's business activities, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to supervise and control the Company in a diligent and honest fashion. The Individual Defendants owed to the Company and its shareholders the fiduciary duty to

7

exercise good faith, prudence and diligence in the administration and supervision of the affairs of the Company and in the use and preservation of its property and assets, and to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company and to ensure that the Company operated in a legal manner.

19.     These obligations applied with particular force with respect to managing Duke's environmental policies, which given the nature of Duke's business, presented the greatest risk if not managed properly. Among their responsibilities, the Individual Defendants were (and are with respect to the sitting members of the Board) required to make timely and appropriate disclosures to Duke's regulators and to the Company's shareholders.

20.     Aware of the importance of managing the Company's operational risks properly, Duke and the members of the Board have consistently represented to shareholders and to the public at large that the members of the Board engaged in close oversight of Duke's operating risks generally, as well as the risks that Duke's operations could pose to the environment.

21.     Since at least 2012, there has been a Committee of the Board known as the "Regulatory Policy and Operations Committee" ("RPOC"), the responsibilities of which are said to include overseeing risk related to the Company's operations (including environmental health and safety), and whose activities (and the activities of other Board committees reportedly involved in overseeing risks) are regularly and periodically reviewed, monitored and managed by all members of the Board.

22.     Each of the Individual Defendants, while serving as senior officers and/or directors of the Company, owed to it fiduciary duties, including, in particular, the duty of loyalty. Moreover, each such defendant was or is bound to corporate policies and rules of corporate governance applicable to him or her.

8

23.     As each of the Individual Defendants was and is aware, each member of the Board and management is bound by the Company's Code of Business Ethics (the "Code"), which states in its introduction and thereafter:

> Integrity, like safety, is a core value at Duke Energy – and a non-negotiable expectation. That means we must be honest, transparent and genuine in our dealings with everyone inside and outside the company. Each of us needs to be focused on making the right ethical decisions, no matter what.
>
> By nature, almost everyone has an inherent sense of what's right and wrong, though sometimes we still struggle with our judgments. That's why we have a Code of Business Ethics. It details the ethical standards for all employees at Duke Energy, and it helps reduce the likelihood of unintentional misconduct.
>
> ………..
>
> At Duke Energy we're committed to doing the right thing. You could say we have a passion for it. It's easy to do the right thing when every employee of Duke Energy, its subsidiaries and its affiliates accepts personal responsibility to act ethically and legally when representing the company.
>
> …………
>
> Duke Energy builds relationships based on trust and respect with our customers, investors, suppliers, public officials and all of our stakeholders. To earn this trust, we conduct business legally and with integrity. Our business decisions are based on objective business-related facts; we do not let our personal interests keep us from making decisions that are in the best interest of the company.

24.     Management and each member of the Board are also bound by and have, by their actions as described herein, breached Duke's "Principles for Corporate Governance" (the "Principles") which address their responsibilities to the Company and its shareholders:

> An effective Board will positively influence shareholder value and enhance the reputation of Duke Energy Corporation (the "Company") as a constructive resource in the communities where it does business. Good governance practices will provide a framework for timely responses to issues affecting the Company

and thereby maximize the effectiveness of the Board. The Board of Directors of the Company adopts these Principles for Corporate Governance to signal its strong commitment to good corporate governance practices.

## THE INDIVIDUAL DEFENDANTS' WRONGDOING

### Criminal and Regulatory Investigations and Guilty Pleas (Dan River and Otherwise)

25.     On February 14, 2014, at Duke's Dan River, North Carolina energy plant, there was a substantial spillage of coal ash into the Dan River.  Federal, state and local investigations ensued.

26.     In February of 2015, Duke announced that federal grand juries had returned criminal informations for three of its wholly-owned divisions and affiliates (Duke Energy Carolinas, LLC, Duke Energy Services, LLC, and Duke Energy Progress, Inc.).  Duke further announced, on that same day, that these affiliates would plead guilty to nine-counts of violations of the Clean Water Act at several of its plants throughout North Carolina (Dan River, Eden, Montcore, Asheville, Goldsboro and Mt Holly), had agreed to pay fines and penalties exceeding $100 million, and had further agreed to the appointment of a Court Appointed Monitor to oversee Duke's environmental compliance.

27.     Duke's affiliates pleaded guilty to and were sentenced on these offenses on May 14, 2015 in the United States District Court for the Eastern District of North Carolina. According to the transcript of the sentencing hearing, federal prosecutors outlined the immense scope of the environmental misconduct as follows:

> … in the interest of brevity I just want to focus on the history that was set forth in the joint factual statement, because while this company has been around for 100 plus years, for 30 years, Your Honor, they have had failures in this company, they have failed to listen to their own engineers, they have failed to listen to recommendations, and they have failed to do inspections that they were required to do.

This started with Dan River in the '70s. In '79 they knew there were problems. You move into the '80s and their engineers are paying attention. Some of those engineers that went on the inspections in '84, '85 and '86 did inspections in 2008 and are still with the company today, so they had engineers with knowledge about what is at Dan River, what's in the basin, throughout this timeframe, but in the '80s they were recommending – their own engineers recommend that they install notches, basically measuring/sampling systems in the 48-inch pipe, in the 36inch pipe. They didn't do it, and then over time, as is set forth in the plea agreement, in the joint factual statement, there were other failures.

Their own engineers – this wasn't the erroneous error in 1991 by an independent consultant. The consultants did fails and made that erroneous classification, but Duke itself, its employees failed to take action as well. So it's a cumulative negligence, Your Honor, and it is that negligence, it's that offense conduct in allowing the negligent discharge of coal ash and coal ash wastewater into the waters of the United States, it's the failing to maintain equipment at Dan River and Cape Fear, it is the seeps and discharges that they allowed to be channelized through ditches and engineered conveyances, all of that conduct that warrants in this case the terms of that plea agreement, which because of the systemic historical problems with the company, there needs to be five years of solid oversight and supervision by this Court.

*See* Transcript of Proceedings, Plea to Criminal Information and Sentencing Hearing Before

Senior Judge Malcolm J. Howard, May 14, 2015, Greenville, North Carolina) ("Transcript").

28.     The prosecutor also stated:

It is the defendants' failure to listen to their employees and to rely on those employees' expertise, it is the historic systemic problems within the company that brought them here, but it is also, Your Honor, the breach of the public's trust. The public trusted Duke Energy for the last 30 plus years to manage its coal ash basins reasonably and with ordinary care, and they failed. They pled guilty to negligently handling its coal ash basins, the equipment there, and for allowing seeps and discharges into the waters of the United States.

29.     The prosecutor went on to state:

11

> The fact that the defendants were aware that their earthen coal ash basins would inevitably have seeps and did not take precautions to ensure that those seeps were not being channeled through ditches and other conveyances constructed by its employees to nearby rivers, which was in fact allowed to occur for a period of years at each of those facilities, is again indicative of a need for change in the culture of the defendants and their management of the coal ash basins.

30.     After the Sentencing Hearing, a document entitled a "Joint Statement of Facts" was filed with the Court. This Joint Statement of Facts contains numerous and highly material facts to which Duke's General Counsel admitted on behalf of the Company and its Board, whose members authorized and directed such admissions.

31.     The Individual Defendants' failure to properly supervise and monitor Duke's environmental risks has also given rise to the Company being cited for a substantial number of violations of North Carolina state law by the State's Department of Environmental and Natural Resources ("DENR") and enforcement actions brought by the DENR on May 24, 2013, August 16, 2013, and March 22, 2013 that remain pending before the Honorable Paul C. Ridgeway of the North Carolina Superior Court.

32.     The DENR's enforcement actions seek to hold the Company accountable for the cleanup costs as Duke's 14 coal ash sites throughout the State, the costs of which have been estimated at a staggering $10 billion.

33.     The DENR has reportedly already assessed fines exceeding $25 million for groundwater contamination at Duke's Sutton plant (which Duke has reportedly appealed) and other substantial fines appear likely to be assessed

34.     According to recent press reports, the parties to the DENR enforcement actions and various other lawsuits brought by environmental advocacy groups are presently engaged in

12

settlement discussions toward attempting to utilize the remediations that will likely have to be made at each of the Company's North Carolina plants.

35.     Further, in 2014 alone, the DENR issued no less than 37 Notices of Violation highlighting significant flaws and failings at Duke's facilities throughout North Carolina:

| DATE | SUBJECT |
|---|---|
| March 20, 2014 | Cape Fear Stem Electric Power Plant<br>DPDES Permit No. NC0003433<br>Chatham County |
| June 13, 2014 | Buck Steam Station Basin 2 to Basin 3 Dam<br>ROWAN-070 – High Hazard Potential<br>Yadkin – Pee Dee River Basin<br>Rowan County |
| June 13, 2014 | Buck Steam Station Basin 1 to Basin 2 Dam<br>ROWAN-069 – High Hazard Potential<br>Yadkin – Pee Dee River Basin<br>Rowan County |
| June 13, 2014 | Cliffside Active Ash Basin Downstream Dam<br>CLEVE-049 – High Hazard Potential<br>Broad River Basin<br>Cleveland County |
| June 13, 2014 | Riverbend Ash Basin Dam 2 (Secondary)<br>GASTO-098 – High Hazard Potential<br>Catawba River Basin<br>Gatson County |
| June 13, 2014 | Allen Active Ash Basin Dam<br>GASTO-061 – High Hazard Potential<br>Catawba River Basin<br>Gaston County |
| June 13, 2014 | Riverbend Ash Basin Intermediate Dam<br>GASTO-099 – High Hazard Potential<br>Catawba River Basin<br>Gaston County |
| June 13, 2014 | Cliffside Steam Station Inactive Ash Basin #5 Main Dam<br>RUTHE-070 – High Hazard Potential<br>Broad River Basin<br>Rutherford County |
| June 13, 2014 | Allen Retired Ash Basin Dam<br>GASTO-016 – High Hazard Potential<br>Catawba River Basin<br>Gaston County |

13

| | |
|---|---|
| June 13, 2014 | Marshall Active Ash Basin Dam<br>CATAW-054 – High Hazard Potential<br>Catawba River Basin<br>Catawba County |
| June 13, 2014 | Buck Steam Station Main Dam<br>ROWAN-047 – High Hazard Potential<br>Yadkin – Pee Dee River Basin<br>Rowan County |
| June 13, 2014 | Cliffside Inactive Ash Basin 1 – 4 Main Dam<br>CLEVE-047 – High Hazard Potential<br>Broad River Basin<br>Cleveland County |
| June 16, 2014 | Asheville Steam Electric Plant; Coal Ash Dams<br>1982 Ash Pond (State ID No. – BUNCO-089)<br>1964 Ash Pond (State ID No. – BUNCO-097)<br>High Hazard Potential<br>French River Basin<br>Buncombe County |
| June 17, 2014 | Sutton Steam Plant 1984 Ash Pond Dam, NEWHA-005<br>Sutton Steam Plant 1971 Ash Pond Dam, NEWHA-004<br>Video provided of April 10 and 11 outfall pipe inspection |
| June 17, 2014 | Weatherspoon 1979 Ash Pond Dam, ROBES-009<br>Video provided of March 28 pipe inspection |
| June 26, 2014 | H.F. Lee Ash Pond<br>WAYNE-022 – High Hazard Potential<br>Neuse River Basin<br>Wayne County |
| June 26, 2014 | Roxboro West Ash Pond South Rock Filter Dam<br>PERSO-039 – Intermediate Hazard Potential<br>Roanoke River Basin<br>Person County |
| June 26, 2014 | 1956 Ash Pond Dam<br>CHATH-075 – High Hazard Potential<br>Cape Fear River Basin<br>Chatham County |
| June 26, 2014 | 1970 Ash Pond Dam<br>CHATH-077 – High Hazard Potential<br>Cape Fear River Basin<br>Chatham County |
| June 26, 2014 | 1978 Ash Pond Dam<br>CHATH-078 – High Hazard Potential<br>Cape Fear River Basin<br>Chatham County |
| June 26, 2014 | 1985 Ash Pond Dam<br>CHATH-079 – High Hazard Potential |

| | Cape Fear River Basin<br>Chatham County |
|---|---|
| June 26, 2014 | Belew's Creek Ash Pond<br>STOKE-116-H, High Hazard Potential<br>Roanoke River Basin<br>Stokes County |
| August 6, 2014 | Asheville Steam Electric Plan; 1982 Ash Pond<br>BUNCO-089 – High Hazard Potential<br>French Broad River Basin<br>Buncombe County |
| August 6, 2014 | H.F. Lee Ash Pond<br>WAYNE-022<br>Wayne County<br>Neuse River Basin |
| August 11, 2014 | Notice of Deficiency Issued June 13, 2014<br>Allen Retired Ash Basin Dam<br>GASTO-016 – High Hazard Potential<br>Catawba River Basin<br>Gaston County |
| August 11, 2014 | Notice of Deficiency Issued June 13, 2014<br>Buck Steam Station Main Dam<br>ROWAN-047 – High Hazard Potential<br>Yadkin – Pee Dee River Basin<br>Rowan County |
| August 11, 2014 | Notice of Deficiency Issued June 13, 2014<br>Cliffside Active Ash Basin Downstream Dam<br>CLEVE-049 – High Hazard Potential<br>Broad River Basin<br>Cleveland County |
| August 11, 2014 | Marshall Active Ash Basin Dam<br>CATAW-054 – High Hazard Potential<br>Catawba River Basin<br>Catawba County |
| August 11, 2014 | Notice of Deficiency Issued June 13, 2014<br>Allen Active Ash Basin Dam<br>GASTO-061 – High Hazard Potential<br>Catawba River Basin<br>Gaston County |
| August 11, 2014 | Notice of Deficiency Issued June 13, 2014<br>Buck Steam Station Basin 1 to Basin 2 Dam<br>ROWAN-069 – High Hazard Potential<br>Yadkin – Pee Dee River Basin<br>Rowan County |
| August 11, 2014 | Buck Steam Station Basin 2 to Basin 3 Dam<br>ROWAN-070 – High Hazard Potential |

| | Yadkin – Pee Dee River Basin<br>Rowan County |
|---|---|
| August 11, 2014 | Notices of Deficiency Issued March 5, 2014 and June 13, 2014<br>Cliffside Steam Station Inactive Ash Basin #5 Main Dam<br>RUTHE-070 – High Hazard Potential<br>Broad River Basin<br>Rutherford County |
| August 11, 2014 | Riverbend Ash Basin Intermediate Dam<br>GASTO-099 – High Hazard Potential<br>Catawba River Basin<br>Gaston County |
| August 12, 2014 | Dan River Secondary Ash Pond<br>ROCKI-238-H, High Hazard Potential<br>Roanoke River Basin<br>Rockingham County |
| August 13, 2014 | N/A |
| August 13, 2014 | Notice of Regulatory Requirements<br>Title 15A North Carolina Administrative Code (NCAC)<br>02L.0106<br>14 Coal Ash Facilities in North Carolina |
| February 25, 2015 | NOTICE OF VIOLATION AND NOTICE OF INTENT TO<br>ENFORCE<br>NOV-2015-LV-0080<br>15A NCAC 02L Classifications and Water Quality Standards<br>Applicable to the Groundwaters of North Carolina<br>Asheville Plant<br>Permit No. NC0000396<br>Buncombe County |
| August 28, 2014 | 60 Day Notice of Intent to Sue Letters<br>Cape Fear Steam Electric Plant<br>H.F. Lee Steam Electric Plant<br>Buck Steam Station |

36.     The DENR's extensive docket of enforcement actions and related proceedings in recent years is a testament to the Company's woeful environmental record, and the extent to which Duke's Board has failed in its obligation to effectively oversee Duke's operations and manage its environmental risks.  Upon information and belief, such practices are ongoing and the Board has not taken or caused Duke's management to take appropriate corrective action.  *See* http://portal.ncdenr.org/web/guest/enforcement-information.

16

37.     The members of the Board and the Company's senior officers have been on notice of the severity and pervasiveness of the Company's environmental crimes, offenses, and violations over a substantial period of time and likely as early as 2010.  Despite such knowledge, there is no public record that its members have caused Duke to take any legal action against those individuals personally responsible for the serious environmental offenses (and potential other offenses relating to "the nature of Duke Energy's contacts with the DENR with respect to [Duke's North Carolina] facilities").  The Board not only did not take any direct or affirmative actions, but also consciously disregarded known risks and deficiencies and failed to adequately monitor and supervise the Company's operations. The Board members have, for years, despite their personal knowledge of the risks faced by Duke, ignored "red flags" regarding such risks, thereby exacerbating the Company's damages.

38.     The Board's inaction and failure to protect the Company's interests in the wake of the environmental matters referred to above, despite the passage of more than two years, reflects its members' self-protective attitude. Exposure of the wrongdoing referred to above would have exposed each of the Individual Defendants to not only criticism but personal liability to Duke's shareholders and those who invested in its securities.  By not having caused the Company to seek redress for the very substantial financial and other damages sustained by Duke and its shareholders, the members of the Board have breached their duty of loyalty to the Company and wasted its assets (i.e. the non-pursuit of Duke's valuable claims).

**Malfeasance Relating to the Duke-Progress Merger**

39.     The Individual Defendants' orchestration of the scheme in connection with Duke's 2012 Merger with Progress has been aptly described as "an incredible act of bad faith,"

"the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street," and "one of the greatest corporate hijackings in U.S. business history."[1]

40.    The lurid facts and circumstances concerning the Merger are chronicled in exacting detail in the Consolidated Complaint for Violation of the Federal Securities Laws, dated and filed on January 29, 2013, in the lawsuit styled *Nieman v. Duke Energy Corporation, et al.*, in the United States District Court for the Western District of North Carolina (Charlotte Division), Civil Action No. 3:12-cv-00456-MOC-DSC (Consolidated with 3:12-cv-00474 and no. 3:12-cv-00624) (the "*Nieman* Litigation").   The *Nieman* Litigation is a shareholder lawsuit brought by on behalf of those who acquired shares of Duke stock in connection with the Merger.

41.    By way of summary, while Duke, its senior officers and directors as well as the Board's financial and legal advisors were courting Progress in anticipation of the Merger (a merger from which Duke officers and directors expected to derive significant personal benefit), they realized that they stood no little or no chance of securing the approval of Progress shareholders for the Merger if defendant Rogers, Duke's then-Chief Executive Officer, would run the combined companies after the Merger because of defendant Rogers' alleged ethical lapses while running the Company.[2]

---

[1]    *See* Letter from John H. Mullin, III a former Lead Director of Progress Energy) dated July 5, 2012. *See also* "Duke Energy Power Play Provokes an Uproar," *New York Times*, July 6, 2012)(quoting Mr. Mullin, former director of Progress Energy).

[2]    Defendant Rogers' long history of inattentiveness to environmental issues appears to have been one of the principal reasons why Mr. Johnson was deceptively put forward as the post-Merger leader of Duke-Progress, and his orchestrated replacement by defendant Rogers within hours after consummation of the Merger left defendant Rogers in control of the Company and free to continue, after the Merger, the same course of environmental recklessness and other *laissez-faire* governance that permeated the Board before the Merger.

42.     In order to induce Progress shareholders to proceed with the Merger, defendant Rogers, certain of the Individual Defendants then on the Board and outside counsel orchestrated a scheme to defraud Progress shareholders into believing that Bill Johnson, Progress' pre-Merger Chief Executive Officer (who had a far better reputation for integrity and accomplishment than did defendant Rogers) would be the CEO of the combined, post-Merger company.

43.     To that end, the Board, with the active assistance of legal counsel, proceeded with a charade of giving Mr. Johnson a multi-year, multi-million dollar contract (the "Johnson Contract") to run the combined companies after the Merger, only to orchestrate Mr. Johnson's firing within hours after the Merger closed, replacing him with defendant Rogers.   This incredibly foolish conduct on the part of defendant Rogers and his colleagues on the Board not only subjected Duke to a reported potential liability of more than $40 million in breach of contract damages to Mr. Johnson, but enormous cost, expense and potential legal liability to Progress shareholders and other investors who agreed to the Merger on the basis of the materially false and misleading portrayal of Mr. Johnson as the post-Merger CEO.

44.     By using the Johnson Contract as "bait" to induce Progress and its board of directors to approve the Merger, defendant Rogers, the other Duke Board members and those who aided and abetted them caused the Company to breach such contract, thereby exposing Duke to very substantial damages.

45.     On March 10, 2015, Duke issued a press release announcing that it reached an agreement to settle the *Nieman* Litigation by paying approximately $146 million, suggesting that "insurance coverage would apply to most of the settlement amount" and suggesting that $26 million of the settlement amount was actually paid by the Company, stating that "[p]reviously the company recorded a $26 million reserve for the estimated portion not covered by insurance."

Neither the release nor any public disclosure has revealed the total cost (believed to be approximately $80 million or more) of the Rogers-Johnson debacle in which each of the then-sitting members of the Duke Board actively participated in breach of their fiduciary duties owed to the Company.

46.     Since that debacle, Duke's directors, who orchestrated the breach of the Johnson Contract and related events, have never held any of the culpable officers, directors and legal counsel accountable for the Company's direct or indirect damages (including substantial legal and expert fees paid to those who aided and abetted the Board in its wrongdoing in connection with "sandbagging" Mr. Johnson and Progress shareholders), any future increased insurance premiums which will have to be paid by Duke in the wake of the carriers' payment of approximately $120 million, or the intangible damages caused the Company.

**Political Contributions**

47.     Duke's Board has taken the position that the Company should engage in "political participation."  In that regard, the Company's website proclaims that Duke:

> strongly supports individual participation in the political process in our communities, including involvement with political parties, candidates or issues, and participation by eligible employees in Duke Energy's political action committee, DUKEPAC. Such activities demonstrate that we care about the communities in which we live and work.

48.     Through DUKEPAC, the Individual Defendants have put into place an apparently innocuous but ambiguous group of candidate selection criteria pursuant to which DUKEPAC's Board of Trustees purportedly evaluates candidates:

> The candidate/public official represents part or all of an area in which Duke Energy, or its subsidiaries, conduct business.

> The candidate/public official serves as a member of leadership or a committee with jurisdiction over matters that impact our business.

> The candidate/public official demonstrates support for public policy issues that are important to our business, customers, and communities.
>
> The candidate/public official is an emerging public policy leader.

49. The Individual Defendants have also caused the Company to enact a so-called "Political Activity Policy" which states:

> Statement of Purpose and Philosophy:
>
> The purpose of this Political Activity Policy (the "Policy") is to promote compliance with applicable laws and regulations surrounding political contributions, government contacts and lobbying ("Laws") by Duke Energy Corporation and its subsidiaries ("Duke Energy" or the "Company"), and all directors, employees and agents thereof, in order to preserve the reputation and integrity of Duke Energy as well as that of all persons affiliated with it.

50. Upon information and belief, direct or indirect political contributions have been and are being made using Duke's funds and those in DUKEPAC and from Company employees that have no conceivable benefit for the Company. Upon information and belief, such contributions only serve to provide personal contact with politicians and further the personal political preferences of Board members and those of senior management. Such contributions are a waste of the Company's corporate assets and not a proper use of DUKEPAC or any of the other political funds under the control of the Board and/or senior officers. Moreover, such activities amount to a breach of the fiduciary duties (including the duty of loyalty) owed by the Individual Defendants to the Company.

51. In light of such wrongful conduct, there must be a culture of complete transparency with respect to the Company's use of its funds when making political or similar contributions so that the nature, extent and relationship of such contributions to Duke's business operations can be viewed and assessed with the sanitizing benefit of bright sunlight.

52.     As it now stands, most of the Company's political contributions are not readily visible to Duke shareholders; indeed, most such contributions can only be determined, if at all, after extensive research.   Even then, reliance on publicly available data does not provide a complete picture of the Company's direct and indirect political spending or the beneficiaries thereof.

53.     Disclosure is in the best interest of the Company and its shareholders and critical for compliance with federal ethics laws.   The Supreme Court's *Citizens United* decision recognized the importance of political spending disclosure for shareholders when it said, "[D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way.   This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."   Gaps in transparency and accountability have exposed the Company to reputational and business risks that threaten it as well as long-term shareholder value. As stated below, after plaintiff brought this wrongdoing to the Board's attention in his Demand Letter, the Board would not even address the issue.

54.     In order to avoid illegal or otherwise improper political contributions made for the sole benefit of Duke's Board members and senior executives, it has become necessary for the Board to be required by the Court to:  (a) retain an expert approved by the Court to conduct an independent review of the Company's direct and indirect political contributions historically to identify any contributions of Duke's funds (including those of DUKEPAC) to any actual or potential political candidate, political organization, and/or any other entity formed to benefit any actual or potential political candidate or organization or to promote any issue benefitting the foregoing where there is no direct actual or potential benefit to Duke therefrom; (b) cease and desist any such improper activities; (c) formulate a comprehensive and effective plan to disclose

to Duke shareholders the details of its political contributions; (d) formulate clear policies and procedures to govern when Duke's, DUKEPAC's or other funds controlled by the Board or Duke executives may be expended for politically-related purposes including, *inter alia,* sponsorship of events; and, (e) to the extent the question of political contributions are brought before Duke shareholders for a vote, cause the Company's proxy statements to disclose permitted politically-related contributions including the amount (or the value, if in kind), the recipient, the date, the identity of the Duke employee or Director who sought or solicited the contribution and the specific benefit the Company expected to obtain as a result of the contribution.

55.    There is presently an investigation touching on this issue.   The governmental investigations into these matters apparently began shortly after the Dan River leak occurred in February 2014 and have included not only the federal criminal proceedings summarized above, but also regulatory actions and investigations of Duke and its corporate affiliates by North Carolina's Department of Environment and Natural Resources ("DENR") that are likely to result in substantial exposure as well as claims.

56.    There is also a cryptic suggestion in Duke's Report on Form 10-Q for the quarter ended September 30, 2014 that there is an ongoing investigation not only into the environmental offenses themselves, but also into "the nature of Duke Energy's contacts with the DENR with respect to [Duke's North Carolina] facilities," and that this is a "multidistrict investigation that also involves state law enforcement authorities."

57.    The subpoenas issued to the DENR seek detailed information concerning contacts and communications between Duke and the DENR including information concerning gifts or other items of value given by Duke officials to DENR officials.

23

**Breach of the Duty of Candor**

58.    The Individual Defendants have repeatedly breached their duties of candor owed by them to both the Company and its shareholders as a means to, *inter alia*, retain their directorships together with the perquisites and emoluments attendant thereto.  In doing so, each year, they caused the Company to be subjected to securities fraud litigation such as in connection with the Merger and to issue and disseminate in their names false and misleading proxy statements that, in the context of what was disclosed therein, failed to disclose material facts bearing upon the wrongdoing alleged in the Demand Letter and herein.

59.    The repeated breaches of candor (as well as breaches of duty of loyalty) by the Individual Defendants have led to, among other things, their re-election, thus permitting them to retain their positions despite causing very substantial damages to Duke and to continue to be compensated for their service, despite the compensation being undeserved.

60.    Most recently, in the wake of multi-year breaches of the Individual Defendants' breach of their duty of candor owed to Duke and its shareholders, the members of the Board issued and disseminated in the Company's name a materially deceptive proxy statement in connection with Duke's 2015 annual meeting of shareholders.  As a direct consequence thereof, the members of the Board have been named as defendants in *Greenberg v. Browning, et al*, Case No. 4:15-cv-82 in the United States District Court for the Eastern District of North Carolina-Greenville Division ("*Greenberg* Litigation").

61.    The operative complaint in the *Greenberg* Litigation accuses the members of Duke's Board of violating Section 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder in connection with their issuance and dissemination of Duke's 2015 proxy statement based upon, *inter alia*, omissions of material facts therefrom.

62.     The Individual Defendants' breaches of their respective duties of candor, in addition to the commencement of the *Nieman* Litigation referred to above, resulted in the commencement of the *Greenberg* Litigation.   These actions have damaged the Company and caused it incur defense expenses as well as the ultimate expenses of resolving the pending claims.   Such damages were directly caused by the Individual Defendants, who should be held accountable.

## DERIVATIVE ALLEGATIONS

**General Derivative Allegations**

63.     Plaintiff brings this action derivatively in the right and for the benefit of Duke to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants as alleged herein.   Plaintiff currently owns and has continuously owned common stock in the Company beneficially during the wrongdoing alleged herein.

64.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

65.     Plaintiff will adequately and fairly represent the interests of Duke and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting stockholder derivative litigation.

66.     The wrongful conduct referred to herein has taken place over many years.   None of the publicly available information states or suggests, or leads to the reasonable conclusion, that the Board (or anyone acting with its authority) adequately (if at all) investigated the wrongdoing referred to herein or in plaintiff's Demand Letter in a disinterested and unbiased

manner or took any steps to preserve the Company's ability to seek recovery from responsible persons on account of the misconduct that has taken place over many years.

67.    To the extent that the Company's ability to pursue such claims was not properly preserved, such as by obtaining agreements tolling the running of applicable statutes of limitation, the Individual Defendants, their subordinates and others (including Duke's counsel) are responsible for permitting any such lapses to occur.

**Plaintiff has made Pre-Suit Demand Pursuant to Rule 23.1**

68.    On March 24, 2015, plaintiff, through his counsel, sent the Demand Letter to the Board.  It stated:

> This letter is being sent solely for the purpose of demanding that you cause Duke to finally, at long last, commence litigation against any and all persons and entities who are responsible for the transgressions, violations of law, and damages sustained by the Company as a result of the misconduct summarized in this letter.

69.    In making the demands set forth in the Demand Letter, plaintiff was in no way conceding the disinterestedness or independence of any of the Company's directors for all purposes and for all time.   Rather, his pre-suit demands were made to give the Board the opportunity to cause the Company to assert directly, in the first instance, the claims that plaintiff now asserts derivatively on its behalf.  In the Demand Letter, plaintiff stated:

> The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, disinterested or can properly and objectively deal with such demands, which you cannot. Although it will be argued by your counsel that, in sending this letter, our client has conceded your independence, he does not concede your independence for all purposes or going forward (*see Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70 (Del. 1997)).

**The "Demand Review Committee" and its Counsel**

70.     Indeed, in response to the sending of earlier pre-suit demands by another shareholder of the Company (and later, those set forth in the Demand Letter)**,** the Board appointed a so-called "Demand Review Committee" (the "Committee" or "DRC") consisting of defendants Kennard, Forsgren, de Loach and Gray, each of whom was personally responsible for at least some of the alleged wrongdoing.  This approach, recommended by counsel to the Board and accepted by it, was part of a sham proceeding, putting form before substance, with the objective of "whitewashing" the wrongdoing of the Individual Defendants and the Company's senior officers responsible for the conduct described herein, those alleged by the unnamed shareholder and in the Demand Letter.

71.     Integral to the process was the selection of legal counsel for the DRC, which counsel was supposed to be (as the DRC members themselves were obligated to be) independent, disinterested and objective.  The law firm of Gibson, Dunn & Crutcher, LLP ("Gibson") was selected to represent the DRC, which nominally retained such firm.  However, upon information and belief, Gibson was put forth and contacted about representing the DRC by the Board's counsel in collaboration with Duke's in-house counsel even before the DRC was constituted or had its first meeting.  Gibson was selected as counsel to the DRC due to, in substantial part, its long history of opposition to shareholder claims in litigation, special investigations and otherwise and because it would likely do as expected; *i.e.* direct its efforts unfavorably to shareholders' demands and the best interests of Duke.[3]

---

[3]     Gibson, a "go to" expert in the defense of officers and directors, proclaims on its website: "Gibson, Dunn & Crutcher is a recognized leader in defending and handling securities class action litigation, derivative litigation, M&A litigation, internal investigations, and investigations and enforcement actions by the SEC, DOJ and state attorneys general.  When a company and its

72.     In light of the fact that Gibson, a hardly unbiased firm, was selected to, *de facto*, investigate the claims set forth in the Demand Letter, plaintiff's counsel, Mr. Greenfield, wrote to Gibson senior partner, F. Joseph Warin, Esq.[4], on May 15, 2015 (attached hereto as Exhibit "B") stating:

> As a threshold matter, your letter does not identify the members of the so-called Demand Review Committee ("DRC") or provide any information as to what has been done to date by the Board, the Company, the DRC or their counsel with regard to the evaluation/investigation that you suggest is underway.
>
> You ask for additional information from me and/or my client with respect to the Demand Letter and the issues referred to therein. In that regard, I will be pleased to communicate with you further once the *bona fides* of the selection and work of the DRC and counsel can be established. To facilitate this, I would appreciate it if you would provide me with copies of any Board resolutions applicable to the establishment of the DRC, the appointment of your firm as its counsel and the referral of the Demand Letter to you and/or the DRC. I would appreciate your also sending me a copy of the earlier letter to which you refer sent by a "purported shareholder of the Company" (the "Earlier Letter"), as well as a summary of what, if anything, has been done in response to that Earlier Letter."

---

directors and officers experience an unexpected crisis, they usually face a perplexing array of challenges. In these circumstances, there is no substitute for experience and integrated multi-disciplinary solutions. Gibson Dunn has handled hundreds of such cases and investigations and has a proven track record of successful results…. Securities litigation is sometimes preceded by or occurs in parallel with an internal investigation by a special committee of the Board of Directors. Our lawyers are frequently called upon to advise "special committees" in conducting internal investigations into alleged…..breaches of fiduciary duty and violations of federal and state statutes…..In recent years, we have conducted independent investigations for the audit committees of numerous Fortune 500 companies."

[4]     Mr. Warin personally cites his substantial experience in representing defendants in fighting off shareholder demands and litigation, such as his taking credit for having "Defended executives of a top technology company and obtained dismissal of a derivative lawsuit alleging options backdating" and having "[o]btained dismissal of numerous lawsuits brought against the largest securities self-regulatory organization during course of almost 20 years."

73.     Mr. Greenfield also asked Mr. Warin a number of questions therein that, if answered, would provide evidence, if there was any, of the *bona fides* of the "investigation" purportedly being carried out by Gibson and the DRC as well as the appointment of Gibson as counsel to the DRC.

74.     On May 25, 2015, after Duke's guilty pleas and after receiving no response to Mr. Greenfield's May 15, 2015 letter, Mr. Greenfield wrote to Mr. Warin again.  (*See* Exhibit "C" hereto).  Mr. Warin responded on May 31, 2015, refusing to provide any of the information requested by Mr. Greenfield in May 15, 2015 letter.  Mr. Greenfield then e-mailed Mr. Warin on July 3, 2015 (*see* Exhibit "D" hereto) and stated:

> As a follow-up to your letter of May 31, 2015, and notwithstanding the failure of you and the Committee to establish your bona fides with respect to Dr. Bresalier's 'Demand Letter,' I will am willing to meet with the members of the Committee and answer any questions that they may have as well as provide them with the additional information that you have requested. While I would understand your being present at such a meeting, I am not prepared to communicate with the Committee members through you...at least until your bona fides in this matter are established.
>
> I also reiterate my request whatever resolutions of the Board exist with respect to Dr. Bresalier's 'Demand Letter' and/or any others that have been sent to Duke's Board, as well as copies of any such other demands. Please tell me, as well, when the Committee's investigation began and your present estimate as to when it will conclude it.

75.      Mr. Warin never responded to this e-mail nor provided any information that would establish the *bona fides* of the purportedly independent and objective investigation he and his firm had undertaken on behalf of the DRC and, ultimately, the Board.

76.     The DRC's members were personally given responsibility by the Board for the "investigation of the allegations" in the earlier shareholder demands and, thereafter, in the Demand Letter.  In fact, Gibson took over from the DRC the entirety of the "investigation,"

including gathering all neutral facts and selectively summarizing such facts for the Committee members.  In doing so, for the protection of the Individual Defendants, Gibson made sure that there was as little evidence as possible that would be uncovered for Duke to use in pursuit of any potential claims in litigation by Duke or derivatively, by plaintiff or any other Duke shareholder. In that regard, Gibson avoided taking any testimony of witnesses under oath and, incredibly, even intentionally avoided having transcripts made of the testimony of witnesses.[5]

**Other Factors Relevant Bearing Upon the Legitimacy of the "Investigation"**

77.     In the formation of the DRC, neither the Board nor the DRC had even the slightest interest in the possibility that any shareholder claims of wrongdoing on their part would proceed to litigation, whether brought directly by Duke or by any of its shareholders suing derivatively.  In selecting Gibson to oversee the purported investigative process, the Individual Defendants and their counsel were assured that their interests would be fully protected, as Gibson had previously done for other corporate officers and directors in similar circumstances involving shareholder demands and derivative litigation.

78.     As part of their tailoring the "investigation" of plaintiff's demands to the Board's pre-determined outcome, the DRC and Gibson intentionally did not address substantively all of plaintiff's claims as set forth in the Demand Letter nor was evidence sought from material witnesses including, upon information and belief, each of the Individual Defendants.  It is simply incredible that Gibson would purport to conduct a meaningful and objective investigation without even interviewing the majority of the Individual Defendants to determine what they

---

[5]     If Gibson and the DRC had any serious interest in gathering evidence that could potentially be used by or on behalf of Duke in future litigation, at a minimum, they would have preserved such testimony for future use.  In fact, these circumstances and others suggest that they knew at the outset that the prospect of any such potential future litigation would be rejected.

knew, when they knew it and the level of their individual responsibility for the wrongdoing alleged in the Demand Letter.

79.     The Board members and their legal counsel have also gone to significant lengths to frustrate the efforts of shareholders seeking accountability by suing derivatively.  Indeed, the Board secured the dismissal of a shareholder derivative lawsuit on the non-substantive, procedural grounds that the shareholders' did not first demand that the Company's directors institute legal proceedings against those responsible for the Johnson Contract fiasco.  *See Joel Krieger, Derivatively On Behalf of Duke Energy Corporation v. William Johnson, et al.*, 12 CVS 13727 (North Carolina General Court of Justice, Superior Court Division, Slip Op., April 30, 2014).

80.     It has been reported that, as with the environmental matters referred to above, several shareholder derivative lawsuits were commenced and consolidated in the Delaware Court of Chancery, styled *In re Duke Energy Corporation Derivative Litigation*.  It has further been reported that such derivative litigation seeks recovery on behalf of Duke arising from the Individual Defendants' breach of fiduciary duties of loyalty and care in connection with Duke's change of Chief Executive Officer following the Merger.  It has been further reported that the case has been stayed pending resolution of the *Nieman* Litigation.

**The Rejection of Plaintiff's Pre-Suit Demands**

81.     Gibson drafted a Report and Recommendation for the DRC which, in turn, presented it to the Board on or before August 27, 2015.

82.     After having given the Demand Letter the most cursory consideration, and based upon a narrowly circumscribed "investigation" subject to pre-conceived conclusions of the DRC

and its counsel, upon the advice of counsel, the Board "rubber stamped" the DRC's recommendation and rejected Plaintiff's demands on August 27, 2015.

83.     The Board's rejection of such demands was and is wrongful and wholly unjustified given the serious nature of the wrongdoing of the Individual Defendants and the process employed by Gibson, the DRC and the Board purportedly to "investigate" all the claims in the Demand Letter as detailed above. The Board's members are not only exposed to substantial personal liability due to the wrongdoing alleged herein and its cover-up but also thereafter when they set in motion a corrupt process with a foregone conclusion; *i.e.* the rejection of plaintiff's demands.

84.     The Board should have considered the Demand Letter objectively and in Duke's sole interests but, instead, put their own self-protective interests first.  They have unjustly received substantial benefits from Duke notwithstanding their personal wrongdoing as alleged herein.  Further, they have engaged in conduct to protect themselves from personal liability for their acts of mismanagement and for their breach of the duties they owe to the Company including, in particular, instituting the above-described sham investigative proceeding with a predictable result.[6]

85.     Taken together with the Individual Defendants' efforts, through their counsel, to delay and derail efforts by other Duke shareholders to seek such redress derivatively on the Company's behalf in Delaware and North Carolina courts, it is obvious that the Board does not have nor ever had the slightest interest in pursuing Duke's claims against themselves and their subordinates in the Company's management.

---

[6]     Upon information and belief, Gibson charged Duke millions of dollars in fees to carry out the "investigation," which produced not the slightest benefit for the Company.

86.     In particular, and as further evidence that the Board had no interest at the outset in investigating and acting upon plaintiff's pre-suit demands, its members, who have been named as defendants in shareholder derivative action commenced in the Delaware Court of Chancery (alleging that the members of the Board breached their fiduciary and other obligations to the Company by failing to properly supervise its operations broadly and also with respect to individual management issues as set forth herein),[7] have taken affirmative steps to delay that action with threshold motions to stay and to dismiss.  By so causing Duke to file such motions, with full knowledge of the underlying wrongdoing, the Board has sought to avoid being held to account for what appears to be at least years of neglect of the Company's environmental practices and operations generally, which neglect has already cost the Company dearly, and threatens to cause it potentially substantial fines, penalties, environmental remediation costs and other expenses.  Many or most of such expenses are not likely to be recoverable in rate-setting proceedings.

87.     Not only has the Board, to date, successfully avoided personal accountability for its members' wrongdoing, but also the Board has not put in place a sufficiently comprehensive environmental risk management plan designed to address appropriately the root causes of the wrongful practices referred to above and protect against their recurrence; and has not seriously addressed the political contributions issues confronted by Duke or otherwise taken action to avoid a repetition of the Board's *laissez-faire* oversight of the Company's operations.  As such, there is substantial evidence that the Board's rejection of the claims set forth in the Demand Letter was and is wrongful.

---

[7]     This action is styled *In re Duke Energy Corporation Coal Ash Derivative Litigation*, and is pending in the Delaware Court of Chancery at Civil Action No. 9682-VCN.

## COUNT I
(Breach of Fiduciary Duty and Waste of Corporate Assets)

88.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

89.     The Individual Defendants all owed and/or owe fiduciary duties to Duke and its shareholders including the duty to exercise candor, good faith, and loyalty.  By reason of their fiduciary relationships to Duke, the Individual Defendants specifically owed and owe it and its shareholders the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company.

90.     In acting as they did to protect their positions as officers and/or directors (and the financial and other benefits flowing therefrom) notwithstanding the serious wrongdoing each of them committed, each such defendant breached his or her duty of loyalty to the Company as well as, more broadly, breached the fiduciary duties owed to it.

91.     The Individual Defendants consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Duke by failing to address and covering up known material environmental risks of the Company, and by failing to timely or at all address adverse events and take corrective action including failing to implement policies, procedures, and controls ensuring management's compliance with environmental and other laws, rules and regulations, and by failing to take appropriate action, when informed of management's willful non-compliance with mandatory legal and regulatory reporting requirements and addressing the environmental risks described above.

92.     The Individual Defendants breached their fiduciary duties including, in particular, their duty of candor, by providing materially false and misleading statements in the Company's SEC filings, public statements, and in proxy statements issued to Duke's shareholders. The

34

members of Duke's Board also breached their fiduciary duties to the Company and its shareholders in connection with the Merger.

93.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations as set forth herein, they have caused the Company to waste valuable corporate assets and expend its corporate funds unnecessarily by forming the DRC and setting forth a purported "investigation" which was, in fact, a scheme to place form over substance in dealing with plaintiff's pre-suit demands.

94.     Such costly process, for which Gibson was paid millions of dollars, was for the sole benefit of the Board as a means of attempting to shield its members from liability; it provided absolutely no benefit to the Company.

95.     As a result of the misconduct alleged herein, Duke has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

96.     As a result of the misconduct alleged herein, the Individual Defendants are personally liable to the Company in an amount which cannot presently be determined.

## COUNT II
(Unjust Enrichment)

97.     Plaintiff repeats and re-alleges each of the allegations as set forth above as if fully set forth herein.

98.     Each of the Individual Defendants was or is being unjustly and excessively compensated by the Company with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

99.     By acting as described herein, the Individual Defendants were unjustly enriched.

35

100.    Each of the Individual Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should be required to account for and repay the Company therefor together with their earnings thereupon.

### COUNT III
(Breach of the Duty of Loyalty)

101.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

102.    Each of the Individual Defendants was paid, directly and indirectly, substantial compensation and, as well, received other benefits not disclosed in order to retain the prequisites and emoluments of office.  They put their own personal interests before those of the Company and its shareholders and concealed from them the wrongdoing alleged herein.  They so acted against Duke's interests in order that they be re-elected as directors.

103.    The members of the Board, in order to frustrate the prosecution of Duke shareholder claims against themselves, set in motion the sham DRC "investigation" referred to above and, at its conclusion, used its pre-determined conclusions to justify their rejection of plaintiff's demands.

104.    By acting wrongfully as they did, the Individual Defendants breached their respective duties of loyalty to Duke and, as such, should be held accountable to it for the wrongful conduct described herein.

105.    Defendants' failure to properly supervise and monitor Duke's environmental risks has also given rise to the Company being cited for a substantial number of violations of North Carolina state law by the State's DENR and enforcement actions brought by the DENR that remain pending before the Honorable Paul S. Ridgeway of the North Carolina Superior Court.

36

106.    The DENR's enforcement actions seek to hold the Company accountable for the cleanup costs at Duke's 14 coal ash sites throughout the State, the costs of which have been estimated at $10 billion.

107.    The DENR has already assessed fines exceeding $25 million for groundwater contamination at Duke's Sutton plant (which Duke has reportedly appealed) and other substantial fines appear likely to be assessed.

108.    According to recent press reports, the parties to the DENR enforcement actions and various other lawsuits brought by environmental advocacy groups are presently engaged in settlement discussions attempting to prioritize the remediations that will have to be made at each of the Company's 14 North Carolina plants.

109.    By reason of their positions as directors of Duke and because of their ability to control Duke's business activities, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to supervise and control the Company in a diligent and honest fashion. The Individual Defendants owed to the Company and its shareholders the fiduciary duty to exercise good faith, prudence and diligence in the administration and supervision of the affairs of the Company and in the use and preservation of its property and assets, and to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company and to ensure that the Company operated in a legal manner.  These obligations applied with particular force with respect to managing Duke's environmental policies, which given the nature of Duke's business presented the greatest risk if not managed properly.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment as follows:

A.      Requiring the Individual Defendants to repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

B.      Ordering the Board to take all necessary actions to reform and improve Duke's corporate governance, compliance and internal control procedures for the purpose of not only preventing a recurrence of the wrongdoing detailed above, but to optimize such procedures in light of relevant and current best practices;

C.      Awarding Duke restitution from the Individual Defendants for the damages they caused in and/or the conduct they tolerated;

D.      Awarding plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses;

E.      Appointing a Special Master to oversee the manner in which the Board is addressing the environmental, disclosure and other issues and claims since its members are incapable of acting independently and solely in Duke's interests; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


OF COUNSEL:

Richard D. Greenfield
Ann M. Caldwell
**Greenfield & Goodman, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
(917) 495-4446


Dated:  October 29, 2015

**MONTGOMERY McCRACKEN
WALKER & RHOADS, LLP**

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman (DE ID #3702)
Lisa Zwally Brown (DE ID #4328)
Montgomery McCracken
Walker & Rhoads LLP
1105 North Market St., Suite 1500
Wilmington, DE  19801
(302) 504-7800

*Counsel for Plaintiff*