# EXHIBIT A

**GREENFIELD & GOODMAN LLC**
ATTORNEYS AT LAW
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
email: whitehatrdg@earthlink.net

**Richard D. Greenfield**
*Also admitted to the Maryland
and Pennsylvania Bars*

March 24, 2015

Board of Directors
Duke Energy Corporation
550 South Tryon Street
Charlotte, NC 28202

Via FedEx Tracking # 8066-1839-2100

Members of the Board:

    I am writing to you on behalf of my firm's client, Dr. Saul Bresalier, in connection with the matters referred to below. Dr. Bresalier is presently, and has at relevant times been, a shareholder of Duke Energy Corporation ("Duke" or the "Company"). In that regard, we have enclosed herewith a redacted copy of Dr. Bresalier's brokerage statement as of February 28, 2015, which reflects such ownership.

    During the period of your stewardship, Duke's operations and business practices have been the subject of considerable scrutiny, investigation, and criticism by federal law enforcement officials, North Carolina regulatory authorities, private investors, and the financial press. While the full details of the wrongful conduct of management that has given rise to this scrutiny, and the full extent of the damages that the Company has sustained as a result, have not yet been made public, the information that has emerged reveals a deeply troubling pattern of highly questionable practices that have occurred on your watch and that have caused, and will continue to cause, the Company significant expense, legal liability (apparently including potential criminal exposure) and damage to its reputation. Similarly, Duke's direct and indirect political contributions may, unless responsibly addressed as set forth below, may also be contrary to the Company's best interests and expose it to damage to its reputation and otherwise.

    As you are undoubtedly aware, each member of the Board and management is bound by the Company's Code of Business Ethics (the "Code"), which states in its introduction and thereafter:

> "Integrity, like safety, is a core value at Duke Energy – and a non-negotiable expectation. That means we must be honest, transparent and genuine in our dealings with everyone

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 2

inside and outside the company. Each of us needs to be focused on making the right ethical decisions, no matter what.

By nature, almost everyone has an inherent sense of what's right and wrong, though sometimes we still struggle with our judgments. That's why we have a Code of Business Ethics. It details the ethical standards for all employees at Duke Energy, and it helps reduce the likelihood of unintentional misconduct.

...........

At Duke Energy we're committed to doing the right thing. You could say we have a passion for it. It's easy to do the right thing when every employee of Duke Energy, its subsidiaries and its affiliates accepts personal responsibility to act ethically and legally when representing the company.

...........

Duke Energy builds relationships based on trust and respect with our customers, investors, suppliers, public officials and all of our stakeholders. To earn this trust, we conduct business legally and with integrity. Our business decisions are based on objective business-related facts; we do not let our personal interests keep us from making decisions that are in the best interest of the company."

You are also bound by and have breached Duke's "Principles for Corporate Governance" (the "Principles") which address your responsibilities to the Company and its shareholders:

"An effective Board will positively influence shareholder value and enhance the reputation of Duke Energy Corporation (the "Company") as a constructive resource in the communities where it does business. Good governance practices will provide a framework for timely responses to issues affecting the Company and thereby maximize the effectiveness of the Board. The Board of Directors of the Company adopts these Principles for Corporate Governance to signal its strong commitment to good corporate governance practices."

The Board and senior management have not "done the right thing" consistent with the Code and Principles in connection with serious issues that have arisen as set forth herein. I have summarized below certain of the wrongdoing of management and the Board and the other issues requiring its attention so as to place this letter and the demands made herein, in their proper context. I refer, in no particular order, to the following:

### Criminal and Regulatory Investigations and Related
### Financial Exposure Relating to Environmental Offenses

According to very recent press reports, Duke is presently in discussions with the United States Attorneys' Offices in three federal districts in North Carolina to plead guilty to federal criminal charges arising from the discharge of toxic coal ash and other alleged violations of the Clean Air Act in connection with the operation of Duke's North Carolina electrical generation plants.

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 3

      Although the federal criminal investigation that resulted in these extremely serious charges reportedly began shortly after, and a result of, a leak of toxic coal ash into the Dan River in February of 2014, federal prosecutors now allege, based on their investigation since the Dan River spill in 2014, that the Company's illegal dumping went on for years in multiple locations throughout the State, since at least 2010 and possibly earlier. Indeed, three separate criminal informations were filed against Duke affiliates in February of 2015 in the United States District Court for the Middle District of North Carolina (Docket No. 1:15-cr-00051), the Eastern District of North Carolina (Docket No. 5-15-cr-68-H), and the Middle District of North Carolina. (Docket No. 5-15-cr-0062, 67 and 68). Collectively, these three criminal proceedings allege criminal violations of the Clean Water Act arising from Duke's engaging in unlawful dumping of toxic ash at its plants located in Eden, Moncure, Asheville, Goldsboro, and Mt. Holly, North Carolina). In addition to these criminal cases, there are reportedly related civil cases pending in the North Carolina state and federal courts arising from these activities.

      Such activities reflect an abdication by the Board and senior management of not only their oversight responsibilities but, undoubtedly, acquiescence in an "anything goes" environmental policy.

      The governmental investigations into these matters are reported to have began in shortly after the Dan River leak occurred in February of 2014 and have included not only the federal criminal proceedings summarized above, but also regulatory actions and investigations of Duke and its corporate affiliates by North Carolina's Department of Environment and Natural Resources ("DENR") that are likely to result in substantial exposure as well as claims by those damaged by the Company's wrongful conduct. There is also a cryptic suggestion in Duke's Report on Form 10-Q for the quarter ended September 30, 2014 that there is an ongoing investigation not only into the environmental offenses themselves, but also into "the nature of Duke Energy's contacts with the DENR with respect to [Duke's North Carolina] facilities," and that this is a "multidistrict investigation that also involves state law enforcement authorities."

      Just last week, the Company disclosed that it is close to reaching an agreement to resolve the federal criminal charges whereby the Company would plead guilty to the charges and in connection therewith agree to pay a criminal in excess of $100 million as part of the agreement. Indeed, last week, Duke's President and CEO, Lynn Good is quoted to have stated that "[w]e are close to an agreement that, if approved by the Court, would resolve the U.S. government's ongoing grand jury investigation into the February 2014 Dan River coal ash spill and ash basin operations at other North Carolina coal plants." Mr. Good is also quoted as having stated that "[w]e also strengthened our coal ash management practices in response to the Dan River coal ash incident." No mention is made in this (or, to our knowledge, any release), as to the disposition of the previously disclosed "multidistrict investigation that also involves state law enforcement authorities" into "the nature of Duke Energy's contacts with the DENR with respect to [Duke's North Carolina] facilities."

      The severity and pervasiveness of the Company's actions have not gone unnoticed. Indeed, an environmental watchdog group was recently reported to have aptly observed that "It's

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 4

not just a slap on the wrist. A $100 million fine is a significant one. It confirms what we've been saying all along. It's good to finally have somebody say, 'you're right. Duke was illegally polluting waterways across North Carolina and it was criminal. It wasn't an accident."

      You, the members of the Board, have been on notice of the events underlying these environmental crimes, offenses, and violations, for over a year now, and likely as early as 2009-10. Yet, there is no public record that you have taken any legal action against those responsible for the environmental offenses (and potential other offenses relating to "the nature of Duke Energy's contacts with the DENR with respect to [Duke's North Carolina] facilities"), either through their direct and affirmative actions, or, in the case of you, the Board, by either consciously disregarding known risks and deficiencies, and/or failing to adequately monitor and supervise the Company's operations. It further appears that you and your representatives have sought to delay and derail efforts by other Duke shareholders to seek such redress derivatively on the Company's behalf and, thus, have breached your duty of loyalty to Duke and its shareholders.

      In Duke's Report on Form 10-K for the year ending December 31, 2014, that was filed with the SEC in March, 2015, Duke represents that, on May 28, 2014, a Duke shareholder demanded that the Company pursue members of the Board and certain officers of the Company and that the Board take action against itself and other responsible parties to recover any damages sustained by the Company on account of these actions. The Company also represents in its 10-K that, on July 3, 2014, the Company advised counsel for this shareholder that the Board of Directors had appointed a "Demand Review Committee" to evaluate the shareholder's demand. There is no public record that either the Board, or the so-called "Demand Review Committee" has taken any action to assert or preserve the Company's claims against those responsible.

      In a similar vein, certain members of the Board who have been named in a shareholder derivative action filed in the Delaware Court of Chancery, alleging that the members of the Board breached their fiduciary and other obligations to the Company by failing to properly supervise its operations,[1] appear to be attempting to delay that action with threshold motions to stay and to dismiss. The Board has not called itself to account for what appears to be at least years of neglect of the Company's environmental practices, which neglect has already cost the Company dearly, and threatens to cause it potentially substantial fines, penalties, environmental remediation costs and other expenses. Many or most of such expenses are not likely to be recoverable in rate-setting proceedings.

      Over a year has passed since the Dan River leak, and nearly nine months have passed since the original demand letter identified in Duke's 10-K Report. Significant, environmental offenses are alleged to have occurred at least as early as 2009-10. There has been more than an ample opportunity and time to investigate these matters. Yet, the Board has not held itself and management accountable for such actions and has delayed and stonewalled the efforts of others

---

[1]     This action is styled *In re Duke Energy Corporation Coal Ash Derivative Litigation*, and is pending in the Delaware Court of Chancery at Civil Action No. 9682-VCN.

[2]     *See* Letter from Mr. John H. Mullin, III a former Lead Director of Progress Energy) dated July 5, 2012 (copy attached). *See also* "Duke Energy Power Play Provokes an Uproar," *New*

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 5

to do so. Aside from accountability, at least based upon the public record, you have not put in place a sufficiently comprehensive environmental risk management plan designed to address appropriately the root causes of the wrongful practices referred to above and protect against their recurrence. Beyond these environmental offenses, there is no further mention, disclosure or further elaboration with respect to the cryptic reference in Duke's Report on Form 10-Q for the quarter ended September 30, 2014 that there is an ongoing investigation not only into the environmental offenses themselves, but also into "the nature of Duke Energy's contacts with the DENR with respect to [Duke's North Carolina] facilities," which is reported to a "multidistrict investigation that also involves state law enforcement authorities."

The Company's environmental woes appear to be a wide-ranging disregard of the law by senior management in which you have acquiesced that has cost and will cost the Company significantly. Such costly multi-year misconduct has taken place during your stewardship of the Company and reflects a breakdown of your oversight of management and the absence of effective operational controls. Such misconduct has already caused considerable damage to the Company in the nature of the significant time, expense of responding to the governmental inquiries and investigations they have spawned and subjected the Company to further contingent damages that are not readily ascertainable.

Under the circumstances, based on the substantial delay without any meaningful action by the Board to seek redress for these matters, one can reasonably question whether the work of the so-called "Demand Review Committee" established by the Board in response to a shareholder demand made in May of 2014 will be anything other than a likely "whitewash" of the culpable persons' conduct.

### Malfeasance Relating to the Duke-Progress Merger

Similarly to your inaction to protect the Company's interests in the wake of the environmental matters referred to above, despite the passage of more than two years, you have not caused the Company to seek redress for the very substantial financial losses sustained the Company and its shareholders suffered as a result of their orchestration of a scheme that has been aptly described as "an incredible act of bad faith," "the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street," and "one of the greatest corporate hijackings in U.S. business history" in connection with Duke's 2012 merger with Progress Energy, Inc. ("Progress").[2] And that it was.

The lurid facts and circumstances concerning the Progress affair are chronicled in exacting detail in the Consolidated Complaint for Violation of the Federal Securities Laws, dated and filed on January 29, 2013, in the lawsuit styled *Nieman v. Duke Energy Corporation, et al.*, in the United States District Court for the Western District of North Carolina (Charlotte Division), Civil Action No. 3:12-cv-oo456-MOC-DSC (Consolidated with 3:12-cv-00474 and

---

[2]   *See* Letter from Mr. John H. Mullin, III a former Lead Director of Progress Energy) dated July 5, 2012 (copy attached). *See also* "Duke Energy Power Play Provokes an Uproar," *New York Times*, July 6, 2012)(quoting John Mullin III, former director of Progress Energy).

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 6

no. 3:12-cv-00624)(the "*Nieman* Litigation"). The *Nieman* Litigation is a shareholder lawsuit filed arising from the merger of Duke and Progress (the "Merger") The litigation was brought by on behalf of those who acquired shares of Duke stock in connection with the Merger.

By way of summary, while Duke, its senior officers and directors as well as your financial and legal advisors were courting Progress in anticipation of the Merger (a merger from which the officers and directors expected to derive significant personal benefit), they realized that they stood no little or no chance of securing the approval of Progress shareholders for the Merger if James Rogers, Duke's then-CEO, would run the combined companies after the Merger because of Mr. Rogers' alleged ethical lapses while running Duke.

In order to induce Progress shareholders to proceed with the Merger, Mr. Rogers and Duke's other corporate officers and directors orchestrated a scheme to defraud Progress shareholders into believing that Bill Johnson, Progress' pre-Merger CEO, who had a far better reputation for integrity and accomplishment than did Mr. Rogers, would be the CEO of the combined, post-Merger company. To that end, they orchestrated the charade of giving Johnson a multi-year, multi-million dollar contract (the "Johnson Contract") to run the combined companies after the Merger, only to orchestrate Mr. Johnson's firing within hours after the Merger closed, replacing him with Mr. Rogers. This not only subjected Duke to a reported potential of over $40 million in breach of contract damages to Mr. Johnson, but enormous cost, expense and potential legal liability to Progress shareholders who agreed to the Merger and other investors on the basis of the materially false and misleading portrayal of Mr. Johnson as the post-Merger CEO.

On March 10, 2015, Duke issued a press release announcing that it reached an agreement to settle the *Nieman* litigation by paying approximately $146 million, suggesting that "insurance coverage that would apply to most of the settlement amount" and suggesting that $26 million of the settlement amount was actually paid by the Company, stating that "[p]reviously the company recorded a $26 million reserve for the estimated portion not covered by insurance." You have held any of the culpable officers and directors accountable for this $26 million being paid by the Company, any future insurance premiums which will have to be paid by Duke in the wake of the carriers' payment of approximately $120 million, or the intangible damages caused the Company.

Duke's directors, who orchestrated this scheme, have not held those responsible – including themselves – accountable for the Company's damages arising from the circumstances surrounding the Johnson Contract. The Board and their legal counsel have also gone to significant lengths to prevent shareholders seeking accountability by suing derivatively from doing so. Indeed, the Board secured the dismissal of a shareholder derivative lawsuit on the non-substantive, procedural grounds that the shareholders' did not first demand that the Company's directors institute legal proceedings against those responsible for the Johnson Contract fiasco. See *Joel Krieger, Derivatively On Behalf of Duke Energy Corporation v. William Johnson, et al.*, 12 CVS 13727 (General Court of Justice, Superior Court Division, Slip Op., April 30, 2014).

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 7

  It has been reported that, as with the environmental matters referred to above, several shareholder derivative lawsuits were filed and consolidated in the Delaware Court of Chancery, styled *In re Duke Energy Corporation Derivative Litigation*. It has further been reported that this derivative litigation seeks recovery on behalf of Duke arising from the director defendants' breach of fiduciary duties of loyalty and care in connection with Duke's change of CEO following the Merger. It has been further reported that the case has been stayed pending resolution of the case styled *Nieman Litigation*.

  The facts and circumstances surrounding the touting of, and withdrawal of Mr. Johnson as CEO of the Company in order to facilitate the Merger have cost the Company dearly. Such conduct exposed the Company to substantial liability to Mr. Johnson for breach of contract damages with respect to a contract that, by all reasonable indicia, was designed to orchestrate a fraud upon shareholders in order to approve the Merger. Mr. Rogers and the Board also exposed Duke and its shareholders to the substantial expense and distraction of the *Nieman* Litigation, the allegations of which appear to have been very well founded.

  The time for delay has passed. On behalf of our client, we demand that you, as members of the Board, exercise your fiduciary obligation to the Company and cause it to institute litigation against all responsible parties to recover for the damages incurred and to be incurred by Duke on account of the Johnson Contract, the expense of defending and settling the *Nieman* litigation, and any other expenses caused by the foregoing wrongdoing.

  I note, parenthetically, that the issues raised in this letter and referred to above are related in the same sense that Mr. Rogers' long history of inattentiveness to environmental issues appears to have been one of the principal reasons why Mr. Johnson was misleadingly put forward as the post-merger leader of Duke-Progress, and his orchestrated replacement by Mr. Rogers within hours after consummation of the merger left Mr. Rogers in control of the Company and free to continue, after the Duke-Progress merger, with the same course of environmental recklessness that permeated at Duke before the merger.

***************

  The wrongful conduct referred to herein has taken place over many years. None of the publicly available information states or suggests, or leads to the reasonable conclusion, the Board (or anyone acting with its authority) adequately (if at all) investigated such wrongdoing in a disinterested and unbiased manner or took any steps to preserve the Company's ability to seek recovery from responsible persons on account of the misconduct that is summarized in this letter. To the extent that the Company's ability to pursue such claims was not properly preserved, such as by obtaining agreements tolling the running of applicable statutes of limitation, we demand that you cause the Company to commence suit against yourselves and those other persons responsible for permitting any such lapses to occur. To the extent that claims against other persons and parties who are also responsible for the wrongdoing summarized in this letter have been properly preserved, we demand that the Board authorize such claims to be asserted, both against present or former Board members and culpable management.

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 8

Given the fact your personal errors, omissions and negligence have been a major contributing cause of the wrongdoing alleged herein due to, in part, your failure to provide appropriate direct and indirect necessary oversight of the Company's operations to ensure that Duke's business was carried out honestly, ethically, and in conformity with all applicable laws, regulations and protocols, I agree with the plaintiffs in the shareholder derivative actions referred to in this letter that no pre-suit demand on the Board is legally required under the circumstances, particularly where, as here, the efforts of other shareholders of the Company to hold you to account derivatively have been met with stonewalling and delay.

Notwithstanding such facts and circumstances, this letter is being sent since, if a pre-suit demand had not been made, you and your counsel would no doubt cause the Company to seek the dismissal of a shareholder's derivative suit based upon such an argument, such as occurred in other shareholder derivative litigation. You have had ample opportunity to investigate the facts and circumstances referred to herein and have not done so. The efforts of other shareholders to do so derivatively have been and continue to be frustrated by delay. In the meantime, valuable time is passing, with no assurance that the Company's rights to seek recovery from you and other responsible parties has been or will be preserved from the standpoint of the passage of any and all statutes of limitations.

This letter is being sent solely for the purpose of demanding that you cause Duke to finally, at long last, commence litigation against any and all persons and entities who are responsible for the transgressions, violations of law, and damages sustained by the Company as a result of the misconduct summarized in this letter.

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, disinterested or can properly and objectively deal with such demands, which you cannot. Although it will be argued by your counsel that, in sending this letter, our client has conceded your independence, he does not concede your independence for all purposes or going forward (*see Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70 (Del. 1997)).

In addition to the misconduct referred to above, it is appropriate to raise another issue which I believe, relates, in part, to the environmental and similar operational risks to which you and your predecessors have exposed the Company.

### Political Contributions

As you are aware, the Board has taken the position that Duke should engage in "political participation." In that regard, the Company's website proclaims that Duke

> "strongly supports individual participation in the political process in our communities, including involvement with political parties, candidates or issues, and participation by eligible employees in Duke Energy's political action committee, DUKEPAC. Such activities demonstrate that we care about the communities in which we live and work."

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 9

Through DUKEPAC, you have put into place an apparently innocuous but ambiguous group of candidate selection criteria pursuant to which DUKEPAC's Board of Trustees purportedly evaluates candidates:

> "The candidate/public official represents part or all of an area in which Duke Energy, or its subsidiaries, conduct business.
>
> The candidate/public official serves as a member of leadership or a committee with jurisdiction over matters that impact our business.
>
> The candidate/public official demonstrates support for public policy issues that are important to our business, customers, and communities.
>
> The candidate/public official is an emerging public policy leader."

You have also caused the Company to enact a so-called "Political Activity Policy" which states:

> "Statement of Purpose and Philosophy:
> The purpose of this Political Activity Policy (the "Policy") is to promote compliance with applicable laws and regulations surrounding political contributions, government contacts and lobbying ("Laws") by Duke Energy Corporation and its subsidiaries ("Duke Energy" or the "Company"), and all directors, employees and agents thereof, in order to preserve the reputation and integrity of Duke Energy as well as that of all persons affiliated with it."

As I am sure you would agree, any direct or indirect political contributions using Duke's funds and those in DUKEPAC to make political contributions that can have no conceivable benefit for the Company would be demonstrably improper. Such contributions would only serve to provide personal contact with politicians and further the personal political preferences of Board members and those of senior management. Such contributions would clearly be a waste of the Company's corporate assets and not a proper use of DUKEPAC. Because of that, there must be a culture of complete transparency of the Company's use of its funds when making political or similar contributions so that the nature, extent and relationship of such contributions to Duke's business operations can be viewed and assessed with the sanitizing benefit of bright sunlight.

As it now stands, most of the Company's political contributions are not readily visible to Duke shareholders; indeed, most such contributions can only be determined, if at all, after extensive research. Even then, reliance on publicly available data does not provide a complete picture of the Company's political spending. Disclosure is in the best interest of the Company and its shareholders and critical for compliance with federal ethics laws. Moreover, the Supreme Court's *Citizens United* decision recognized the importance of political spending disclosure for shareholders when it said, '[D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.' Gaps in transparency and

Board of Directors
DUKE ENERGY CORPORATION
March 24, 2015
Page 10

accountability may expose the company to reputational and business risks that could threaten long-term shareholder value.

In light of the foregoing, in order to avoid illegal or otherwise improper political contributions, we hereby demand that: (a) you formulate a comprehensive and effective plan to disclose to your shareholders the details of the Company's political contributions; (b) you conduct an independent review of the Company's political contributions historically to identify any direct or indirect contributions of Duke's funds (including those of DUKEPAC) to any actual or potential political candidate, political organization, and/or any other entity formed to benefit any actual or potential political candidate or organization or to promote any issue benefitting the foregoing where there is no direct actual or potential benefit to Duke therefrom, and cease and desist any such activities immediately; (c) you formulate clear policies and procedures to govern when Duke's and/or DUKEPAC's funds may be expended for politically-related purposes including, *inter alia*, sponsorship of events; and (d) you cause the Company's Proxy Statements to disclose permitted politically-related contributions including the amount (or the value, if in kind), the recipient, the date, the identity of the Duke employee or Director who sought or solicited the contribution and the specific benefit the Company expected to obtain as a result of the contribution.

It is obviously the intention of this letter to summarize accurately the factual background of the matters referred to in this letter. If you believe that any of the facts stated herein are erroneous, I request that you, or your counsel, as the case may be, so advise me.

I look forward to hearing from you or your counsel promptly.

Sincerely yours,

Richard D. Greenfield

RDG:gw
Enclosure

# Morgan Stanley

**CLIENT STATEMENT** | For the Period February 1-28, 2015

Page 8 of 22

## Account Detail

Choice Select Retirement Account

SAUL BRESALIER

TRADITIONAL IRA

### STOCKS
#### COMMON STOCKS (CONTINUED)

| Security Description | Quantity | Total Cost | Market Value | Unrealized Gain/(Loss) | Estimated Annual Income | Current Yield % |
|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | 17,116.31 | 2,662.00 | 7.66 |
| **DUKE ENERGY CORP NEW (DUK)** | 500.000 | 29,060.36 | 39,275.00 | 10,214.64 | 1,590.00 | 4.04 |
| Share Price: $78.550; Rating: Morgan Stanley: 2, S&P: 2; Next Dividend Payable 03/16/15 | | | | | | |
| ENBRIDGE ENERGY MANAGEMENT LLC (EEQ) | [illegible] | [illegible] | n/a | n/a | | |