# EXHIBIT A

# Norway's Wealth Fund Dumps Duke Energy on Environmental Risk

**Mikael Holter**
@mikaelholter
September 7, 2016 — 5:07 AM EDT
Updated on September 7, 2016 — 9:04 AM EDT

Norway's $900 billion sovereign wealth fund, the world's biggest, excluded Duke Energy Corp. and some units from its investments because of a risk of "severe environmental damage."

The executive board of Norges Bank, which oversees the fund, decided to exclude the largest U.S. utility owner by market value and its wholly-owned subsidiaries Duke Energy Carolinas LLC, Duke Energy Progress LLC, and Progress Energy Inc. after an April 5 recommendation from its Ethics Council, Norges Bank Investment Management said in a statement on Wednesday.

"For many years, these companies have among other things repeatedly discharged environmentally harmful substances from a large number of ash basins at coal-fired power plants in North Carolina," the Ethics Council said in a separate statement. While court rulings have ordered the removal or sealing of the basins, the planned measures won't be fully implemented for another 10 to 15 years, it said.

The fund owned a $304 million stake in Duke at the end of 2015, or 0.62 percent, according to NBIM's **website**. The fund also held bonds in Duke and the three subsidiaries valued at $245 million at the end of last year. It always exits investments before announcing exclusions, Norges Bank spokesman Runar Malkenes said, declining to provide details on sale dates or prices.

## Action Signaled

"Norges Bank has been signaling this action for some time, so while we are disappointed, we are not surprised by their decision," Duke said in an e-mailed statement. "It is unfortunate that Norges Bank did not consider Duke Energy's proactive actions to enhance our environmental stewardship and close ash basins across our jurisdictions."

Norway's fund excludes companies based on ethical rules including human rights, some weapons production, environmental risk and tobacco production. It has dropped more than 60 companies after recommendations from the council, most recently oil explorers Cairn Energy Plc and Kosmos Energy Ltd. amid concerns over their activities in Western Sahara.

The fund also started excluding some coal producers and coal-consuming utilities this year, dumping more than 50 companies earlier this year and announcing more exclusions to come based on those criteria.

The North Carolina Department of Environmental Quality said in a **proposal** in May that Duke must dig up and close coal-ash pits at eight sites by 2019 and at 25 locations by 2024. In July, North Carolina Governor Pat McCrory (R) signed a **law** that gives the power company more time to submit closure plans for coal ash impoundments and allows certain "low risk" ponds to be capped in place.

---

**Terms of Service Trademarks Privacy Policy**

©2016 Bloomberg L.P. All Rights Reserved

**Careers Made in NYC Advertise Ad Choices Website Feedback Help**

**VIDEO**

**Marc Benioff:**

AUD

**Odd Lots: The Unbearable Brightness of Being a Shadow Bank**

Bloomberg Business



Sep 13, 2016

**Vladimir Putin Just Wants to Be Friends**

Subscribe

| Stocks | Silicon | U.S. Supreme Court Won't Reinstate Ohio's Voting 'Golden Week' | Top Sommelier Reveal the 20 Wines You Need to Drink This Fall | The Creation of an American Eggpocalypse | Regulators Dictated the Unusual Design of Bacon Packaging |
|---|---|---|---|---|---|
| Currencies | Valley | | | | |
| Commodities | Global | | | | |
| Rates + | Tech | | | | |
| Bonds | Venture | | | | |
| Economics | Capital | | | | |
| Magazine | Hacking | | | Sep 13, 2016 | |
| Benchmark | Digital | | | View | Sep 13, 2016 |
| Watchlist | Media | | | Gadfly | |
| Economic | Bloomberg | | | | Subscribe |
| Calendar | West | Sep 13, 2016 | | | Cover Stories |
| | | | Sep 13, 2016 | | Opening Remarks |

‹     ›

| With All | Cars & | Etc |
|---|---|---|
| Due | Bikes | Features |
| Respect | Style & | 85th |
| Delegate | Grooming | Anniversary |
| Tracker | Spend | Issue |
| Culture | Watches & | Behind The |
| Caucus | Gadgets | Cover |
| Podcast | Food & | |
| Masters In | Drinks | |
| Politics | Travel | |
| Podcast | Real Estate | |
| What The | Art & | |
| Voters Are | Design | |
| Streaming | | |
| Editors' | | |
| Picks | | |

| Science + Energy | Graphics | Game Plan | Small Business | Personal Finance | Inspire GO | Board Directors Forum | Sponsored Content |
|---|---|---|---|---|---|---|---|

# EXHIBIT B

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

http://www.wsj.com/articles/norway-sovereign-wealth-fund-to-no-longer-invest-in-duke-energy-1473271601

BUSINESS

# Norway's Sovereign-Wealth Fund to No Longer Invest in Duke Energy

Sovereign fund cites utility's environmental record



The headquarters of Norges Bank. Norway's central bank controls the country's sovereign-wealth fund *PHOTO: BLOOMBERG NEWS*

By KJETIL MALKENES HOVLAND

Sept. 7, 2016 2:06 p.m. ET

OSLO—Norway's sovereign-wealth fund, the world's largest, said it would no longer invest in Duke Energy Corp. over the Charlotte, N.C.-based utility's environmental record, a rare move against a specific company to penalize conduct.

Norway has made similar judgments to divest from global giants like Wal-Mart Stores Inc. over human-rights allegations and Rio Tinto PLC over accusations of environmental damage. The fund manages more than $900 billion, amassed from the country's oil wealth, and enforces a set of ethical standards for its investments.

The decision regarding Duke and three of its subsidiaries was over the company's discharges from ash basins—ash left over from burned coal mixed with water and stored at coal-fired power plants in North Carolina, said Norway's central bank, which controls the fund. Several U.S. court rulings have ordered Duke to remove or seal the ash basins in North Carolina, but Duke Energy earlier this year told the Norway fund's Council on Ethics that plans to secure the basins wouldn't be fully in place for another 10 to 15 years.

"The companies have been very reticent about implementing measures and have still not agreed on binding plans to remove all the ash basins," the Council on Ethics said. "The companies have been repeatedly fined for leaks and pollution."

The ethics council said it had been talking with Duke about the coal-ash basins and ultimately saw the long-lasting and extensive breaches of U.S. environmental legislation as a considerable risk factor that could lead to more discharges and penalties.

Advertisement

Duke has a market capitalization of $52.1 billion, and a power generating capacity of nearly 53,000 megawatts. In addition to the parent company, the fund also banned investment in subsidiaries Duke Energy Carolinas LLC, Duke Energy Progress LLC, and Energy Progress Inc.

At the end of 2015, Norway's fund held $304 million of Duke Energy Corp. shares, or 0.62%, as well as $77 million of Duke Energy corporate bonds. It also held $85 million of corporate bonds in subsidiary Duke Energy Carolinas LLC.

Duke said it has made strides in its environmental record and was disappointed that Norway's central bank didn't take that into consideration.

Amid a switch to natural gas and renewable energy, Duke has retired more than 40 coal units from its generation fleet in the last five years, reducing carbon emissions in 2015 by 28% from a decade earlier, it said.

"We have made significant progress closing ash basins in ways that put safety first, protect the environment and minimize the impact to local communities," the utility said.

---

'*We have made significant progress closing ash basins in ways that put safety first, protect the environment and minimize the impact to local communities.*'

—Duke Energy

---

When Norway's parliament set up ethical guidelines for investing more than a decade ago and started excluding companies, it was an outlier among investment funds. Other investing groups have since begun highlighting the financial risks of putting money into fossil-fuel businesses.

Moody's Investors Service said in June that it would begin analyzing what it terms "credit transition risk" as part of its credit assessments. It singled out coal, coal infrastructure and unregulated power utilities as sectors most immediately at risk of being affected by climate change and related regulation.

On Tuesday, asset manager BlackRock Inc. said in a report that investors "can no longer ignore climate change" as they face a flood of new regulations and technological changes.

The ban on Duke Energy, a heavy consumer of coal, wasn't part of the Norwegian sovereign-wealth fund's recent exclusion of 52 coal-exposed mining companies and utilities from investments, following a coal prohibition imposed by Norway's parliament.

Duke Energy was excluded instead because of its conduct, based on the Council on Ethics's assessment that its operations risk causing severe damage to the environment.

Norway also bans investments in companies that it deems a risk to human rights, corruption and other alleged ethical breaches. The fund has a list of 33 companies whose conduct risked breaching its ethical standards, and excludes companies whose products are seen as unacceptable, including tobacco, nuclear weapons and land mines.

In 2006, the fund divested from retail giant Wal-Mart, citing the risk of human rights violations amid allegations of child labor and dangerous working conditions in its supply chain, unequal pay for women, and the prohibition of trade unions. Wal-Mart at that time didn't respond to the council's requests. On Wednesday, the retailer declined to comment.

In 2008, the fund excluded mining company Rio Tinto, citing risks of environmental damage at its joint-venture Grasberg copper mine in Indonesia, including the potential contamination of ground and water by acid-rock drainage from mining-waste dumps. Ahead of the divestment, Rio Tinto told the council that it maintained the highest environmental standards at all its operations. It is a position that Rio Tinto maintains, a spokesman said Wednesday.

—*Sarah Nassauer in New York contributed to this article.*

Write to Kjetil Malkenes Hovland at kjetilmalkenes.hovland@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

# EXHIBIT C

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE DUKE ENERGY ) | |
| CORPORATION DERIVATIVE ) C.A. No. 7705-VCG | |
| LITIGATION ) | |

## MEMORANDUM OPINION

Date Submitted: May 9, 2016
Date Decided: August 31, 2016

Ronald A. Brown, Jr. and Marcus E. Montejo, of PRICKETT JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: John W. Haley and Bruce J. McKee, of HARE WYNN NEWELL & NEWTON LLP, Birmingham, Alabama; Frank P. DiPrima of THE LAW OFFICE OF FRANK DiPRIMA, P.A., Morristown, New Jersey, *Attorneys for Plaintiff Richard A. Bernstein.*

Kenneth J. Nachbar, Susan W. Waesco, and Alexandra M. Cummings, of MORRIS, NICOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Jack B. Jacobs, of SIDLEY AUSTIN LLP, Wilmington, DE, *Attorneys for Defendants James E. Rogers, William Barnet, III, G. Alex Bernhardt, Sr., Michael G. Browning, Daniel R. DiMicco, John H. Forsgren, Ann Maynard Gray, James H. Hance, Jr., E. James Reinsch, James T. Rhodes, and Philip R. Sharp, and Nominal Defendant Duke Energy Corporation.*

GLASSCOCK, Vice Chancellor

In 2011, Duke Energy Corp. ("Duke" and prior to July 2, 2012, "Old Duke") entered a merger agreement with another electric utility company, Progress Energy, Inc. ("Progress"). Old Duke and Progress were both large regional utilities, with significant operations in North Carolina, among other states. Under the agreement, the successor company would also be known as Duke Energy Corp. (in context, "New Duke"). The initial board of directors of New Duke would be composed of eleven legacy Old Duke directors, and six legacy Progress directors. Important to this case is another negotiated provision of the agreement: the CEO of Progress, William Johnson, would serve as CEO of New Duke, and the CEO of Old Duke, James Rogers, would be appointed "executive chairman" of New Duke. This information was conveyed to stockholders of both entities in SEC filings. It was also communicated by Old Duke to the regulatory body overseeing Duke in North Carolina, the North Carolina Utilities Commission (the "NCUC"), in seeking NCUC's approval of the merger. The merger was conditioned on this approval. Consideration of the merger by the NCUC was stayed after a hearing, pending another required approval, that of the Federal Energy Regulatory Commission (the "FERC"). Pursuit of the regulatory approvals on which the merger was conditioned caused a substantial delay in its consummation, a period of eighteen months.

According to the complaint, during this eighteen-month period, the Old Duke board of directors had second thoughts about the agreement to name Johnson CEO

of New Duke. This put the Old Duke directors in a bind. They could renounce the merger agreement, or attempt to renegotiate it, both courses that could lead to breach of the agreement and loss of the merger, together with liability for a substantial break-up fee. They could simply comply contractually with the requirement to employ Johnson as CEO, but they had already decided that he was unfit for that position. Or they could technically comply with the agreement, appoint Johnson as CEO, then immediately use their numerical superiority on the New Duke board to fire and replace him. The complaint alleges that the Old Duke directors (the "Director Defendants") chose the latter path. They elected to make it appear that they were going to comply with the merger agreement, when in fact they had decided to fire Johnson immediately post-merger and replace him with Old Duke CEO Rogers. The "walk-away" date by which the merger must close was July 8, 2012. Shortly before that deadline, on June 27, 2012, the Defendants signed Johnson to a Duke CEO agreement, with a lucrative severance fee. Once the FERC agreed to the merger, Old Duke sought expedited approval from the NCUC, representing that nothing had changed from the initial hearing that would require further hearings before that body—thereby concealing from the NCUC (as well as Progress and the public) the decision to fire Johnson and replace him with Rogers. The NCUC approved the transaction, and the merger closed July 2, 2012.

Shortly thereafter, on the same day, the New Duke board met telephonically

and appointed Johnson CEO pursuant to the merger agreement and the June 27 CEO agreement. Then, at the request of Director Defendant Ann Gray, the board went into executive session. Johnson was requested to stay available to the board pending the outcome of the session. Gray, in the executive session, then told the legacy Progress directors of the New Duke board that she believed Johnson was "not a good fit" to serve as CEO, and should be fired. The legacy Progress directors were "shocked," and attempted to dissuade the Director Defendants from their decision to fire Johnson, to no avail. After a rather lengthy and one-sided discussion (except for Gray's statement that Johnson was a poor "fit," none of the Director Defendants spoke), the board voted to discharge Johnson and replace him with Old Duke CEO Rogers. The vote broke down entirely by legacy; all Director Defendants (legacy Old Duke) present voted to discharge Johnson, and all legacy Progress directors present voted against discharge. The executive session was then concluded. Gray immediately thereafter met with Johnson at Duke headquarters and notified him of the board's decision, a result entirely unexpected by him.[1] Rogers was installed as New Duke CEO.

According to the complaint, several bad results followed from the decision to fire Johnson and its concealment until after the merger. Among a number cited in

---

[1] As the complaint memorably puts it, "[e]ven Julius Caesar had more notice" before the shiv was slipped in. Pl's Am. Compl. (the "Complaint" or "Compl.") ¶ 10.

the complaint[2], two are particularly relevant: Johnson was entitled to a large severance package although he served as New Duke CEO only for a matter of minutes, and the NCUC, believing itself to have been misled by false representations by Old Duke concerning who would serve as New Duke CEO, took action against the company, resulting in damages.

Lawsuits by Old Duke stockholders followed, notably a North Carolina action, styled *Krieger v. Johnson*.[3] That matter involved a derivative claim: that the actions of the Director Defendants, in firing Johnson and incurring contractual liability thereby, constituted breaches of the duty of loyalty and waste. The *Krieger* court dismissed the action, finding that under controlling Delaware law, demand on the board was not excused. The Plaintiffs here also seek to sue derivatively, on behalf of Duke.

The matter is before me on a motion to dismiss. The Defendants allege the matter is barred by collateral estoppel. I find that the *Krieger* decision collaterally estops these plaintiffs, but only to the extent they seek to proceed on a claim for breach of fiduciary duty in connection with the damages and contractual obligations flowing from the firing of Johnson itself; under the *Krieger* decision, that is a matter

---

[2] The Plaintiffs allege that the NCUC commissioners stated that they had been misled and called public hearings. Securities fraud class actions have been filed against Duke. Standard & Poors Bond Rating Service ("S&P") put its rating for Duke on negative watch because of the "sudden shift in management," and subsequently, on July 25, 2012, downgraded Duke's debt. The Attorney General of North Carolina and the Florida Public Service Commission began investigations.
[3] 2014 WL 1759054 (N.C. Super. Ct. Apr. 30, 2014).

to which the board may apply its independent business judgement. *Krieger* does not address the primary cause of action that the Plaintiffs advance here, however: that the Old Duke board made up its mind to install Rogers rather than Johnson as CEO *prior* to the merger, but neglected to inform the public and, importantly, the NCUC of this determination, in violation of positive law. This action and inaction, according to the Plaintiffs, was undertaken in bad faith. I find that the Plaintiffs have pled specific facts that, if true, and together with the reasonable inferences therefrom, indicate that the Old Duke board's failure to correct its representations to the NCUC was intentional and in bad faith, sufficient to withstand a motion to dismiss under Rule 23.1, and that these allegations are not barred by collateral estoppel.

To decide who will serve as chief executive of a corporation is a quintessential board function. Once the Old Duke board realized that they had improvidently bound the company contractually to employ a CEO they found unfit, there were surely several courses—each no doubt problematic—available to them, within their business judgement, to remedy the situation. They could choose among them. What they could not do, consistent with their duty of loyalty to Duke, was what the complaint alleges they did here: choose a path that caused Duke to violate positive law.

This Complaint raises other arguments that may be subsumed under my

analysis here.  Rather than apply my findings below to the many allegations of the Complaint, I find it most efficient to have the parties notify me as to which causes of action and requests for relief remain in light of my decision here, and to what extent further review under Rules 12(b)(6) and 23.1 is warranted.

# I. BACKGROUND[4]

## A. The Parties

Plaintiffs Lesley C. Rupp and Richard A. Bernstein are representative stockholders of Duke Energy Corporation.[5]   They both have held shares continuously at all times relevant to liability.[6]

Nominal Defendant Duke is a large utility company, incorporated in Delaware and headquartered in North Carolina.[7]  Common shares of Duke trade on the New York Stock Exchange ("NYSE") under the symbol "DUK."[8]  Duke is in the business of "generating, transmitting, distributing and selling electrical power, both through nuclear and coal-fired plants, and selling the power primarily for commercial and residential consumption in [Duke's] regulated service areas."[9]  Pre-merger, Old Duke's primary service areas included central and western North Carolina, western

---

[4] The facts are drawn from the well-pled allegations of Plaintiff's Complaint and documents incorporated by reference therein, and are presumed true for purposes of evaluating Defendants' motion to dismiss.

[5] Compl. ¶¶ 1, 14.

[6] *Id.* at ¶ 14.

[7] *Id.* at ¶¶ 2, 13.

[8] *Id.* at ¶ 13.

[9] *Id.*

South Carolina, central and southern Indiana, and northern Kentucky.[10] Old Duke served over four million customers, and 12 million people, covering 50,000 square miles.[11] In 2011, it achieved operating revenues of $14.6 billion and net income of $1.7 billion across its three reporting business segments.[12]

Pre-merger, Progress was another large utility company, incorporated and headquartered in North Carolina, and primarily serving customers in North Carolina, South Carolina, and Florida.[13] In 2011, Progress achieved operating revenues of $8.9 billion and net income of $582 million.[14] Following the merger, Progress is now a wholly owned subsidiary of Duke, and Duke is the nation's largest utilities company in terms of both revenues and power-generation capacity, with 45% of its rate-regulated revenues coming from customers in North Carolina.[15]

Defendants James E. Rogers, William Barnet, III, G. Alex Bernhardt, Sr., Michael G. Browning, Daniel R. DiMicco, John H. Forsgren, Ann Maynard Gray, James H. Hance, Jr., E. James Reinsch, James T. Rhodes, and Philip R. Sharp collectively are referred to as the "Director Defendants." Rogers is a director of Duke, which position he has held continuously since Duke's merger with Cinergy

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at ¶¶ 2, 13.
[14] *Id.* at ¶ 13.
[15] *Id.*

Corporation in 2006, and has served as Chairman of the Duke board since 2007.[16] Rogers also served as CEO of Duke from 2006 through the filing of this action, except for the evening of July 2, 2012, as discussed further below.[17]  Barnet is President and CEO of Barnet Development Corporation, a real estate development firm, and has served as a director of Duke since 2005.[18]  Bernhardt is Chairman and past CEO of Bernhardt Furniture Company, and has served as a director of Duke since 1991.[19]  Browning is Chairman and President of Browning Investments, a real estate development company, and has served as a director of Duke since 1990.[20] DiMicco is Chairman and CEO of Nucor Corporation, a manufacturer of steel and steel products, and has served as a director Duke since 2007.[21]  Forsgren is the former Executive Vice President and Chief Financial Officer ("CFO") of Northeast Utilities, and has served as a director of Duke since 2009.[22]  Gray is the former President of Diversified Publishing Group, and has served as a director of Duke since 1997, and the "Lead Director" since 2004.[23]  Hance is the former CFO of Bank of America Corp., and has served as a director of Duke since 2006.[24]  Reinsch is the

---

[16] *Id.* at ¶ 15.
[17] *Id.*
[18] *Id.* at ¶ 16.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

former Senior Vice President and Partner of Bechtel Group and past President of Bechtel Nuclear, and has served as a director of Duke since 2009.[25]  Rhodes is the former Chairman and CEO of the Institute for Nuclear Power and CEO of Virginia Electric and Power Company, and has served as a director of Duke since 2001.[26] Finally, Sharp is the President of Resources for the Future, a non-profit organization that conducts research into energy, environmental issues, and resource economics; a former Indiana Congressman; and has served as a director of Duke since 2007.[27]  In other words, the Director Defendants were each directors at all times pertinent to liability, and remained so through the filing of the complaint.

   B. Significant Non-Parties

   William D. Johnson served as President of Progress from 2005 until his promotion to Chairman and CEO in 2007.[28]  Prior to holding these roles, he served in a variety of top management positions at Progress, including roles as General Counsel, Executive Vice President, Corporate Secretary, and president of Progress's core business units.[29]  Pursuant to the merger, Johnson was appointed CEO and a member of the Duke board, which positions he held for only a few hours on July 2,

---

[25] Id.
[26] Id.
[27] Id.
[28] Id. at ¶ 18.
[29] Id.

2012.[30]

John H. Mullin III was a pre-merger member of the Progress board of directors, who served from 1999 until July 2, 2012.[31] He acted as Progress's lead director at all times, pre-merger, relevant to liability.[32]

John D. Baker II, Harris E. DeLoach, Jr., James B. Hayler, E. Marie McKee, Carlos A. Saladrigas, and Theresa M. Stone collectively are the legacy Progress directors. Baker and Stone served on the Progress board beginning in 2009 and 2005, respectively, and both joined the New Duke board pursuant to the merger and subsequently resigned on July 27, 2012, in protest of the events complained of in this action.[33] DeLoach, Hyler, McKee, and Saladrigas were pre-merger members of the Progress board—who began serving in 2006, 2008, 1999, and 2001, respectively—who now serve on the New Duke board.[34]

The New Duke board, as of the date this action commenced, consisted of 15 members: the 11 Director Defendants and the four of six legacy Progress directors who did not resign in July 2012.[35]

---

[30] *Id.* at ¶¶ 3, 18. As discussed *infra*, on July 2, 2012, Johnson resigned from his position as CEO and a Duke director. *Id.* at ¶ 20.

[31] *Id.* at ¶ 19.

[32] *Id.*

[33] *Id.* at ¶ 20.

[34] *Id.* I take judicial notice of the publicly available press release announcing the appointment of Saladrigas as a Progress director in 2001, available at https://www.progress-energy.com/company /media-room/news-archive/press-release.page?title=Carlos+Saladrigas+elected+to+Progress +Energy+Board+of+Directors&pubdate=08-20-2001.

[35] *Id.* at ¶ 22.

*C. Factual Overview*

   1. Events Leading Up to the Merger

In June 2010, the Old Duke board authorized management to explore a possible merger with Progress.[36]  Rogers, CEO of Old Duke, and Johnson, CEO of Progress, met to discuss strategic aspects of the proposed merger on July 18, 2010.[37] At that initial meeting, Rogers told Johnson that Old Duke was receptive, post-merger, to a greater emphasis on the regulated-utilities business and to Johnson becoming CEO.[38]  Mullin, Progress's lead director, authorized Johnson to meet with the Old Duke board to advance discussions on the merger.[39]  On July 19, 2010, Johnson ceased negotiations on behalf of Progress with a third party concerning an alternative deal.[40]  Progress and Old Duke signed a non-disclosure agreement with an 18-month standstill provision on July 29, 2010.[41]

Johnson met separately with groups of Old Duke directors on July 29 and August 2, 2010, as "an opportunity for the directors to get to know Mr. Johnson."[42] Around the same time, the two companies began exchanging financial information.[43]

---

[36] *Id.* at ¶ 26.
[37] *Id.* at ¶ 30.
[38] *Id.*
[39] *Id.*
[40] *Id.* at ¶ 31.
[41] *Id.* at ¶ 32.
[42] *Id.* at ¶ 33 (quoting Duke Energy Co., Registration Statement (Form S–4), Am. No. 5 (July 7, 2011)) (emphasis omitted).
[43] *Id.* at ¶ 34.

Negotiations, diligence, and meetings between the CEOs continued through December 2010.[44] On October 2, 2010, Rogers and Johnson met to discuss proposed terms of the deal, including that Johnson would serve as CEO of the post-merger company.[45] They met again on November 15, 2010, along with the two lead directors of the companies, to discuss strategy and management design of the new company.[46] On December 18, 2010, Rogers and Johnson met to discuss a revised term sheet, including the roles of Rogers and Johnson post-merger and the composition of the New Duke board, which was to include 11 Old Duke designees (including Rogers) and seven Progress designees (including Johnson).[47]

2. Certain Material Provisions of the Merger Agreement

The boards of both companies unanimously approved the merger on January 8, 2011.[48] The companies executed the merger agreement and announced the merger on January 10, 2011.[49]

Pursuant to the merger agreement, each share of Progress stock was to be converted into a right to receive 2.615 shares of Duke common stock, before giving

---

[44] *Id.* at ¶¶ 36–40.
[45] *Id.* at ¶ 37.
[46] *Id.* at ¶ 38.
[47] *Id.* at ¶ 40.
[48] *Id.* at ¶ 41.
[49] *Id.*

effect to a Duke one-for-three reverse stock split.[50]   The merger was subject to approval by the stockholders of both companies and certain regulatory authorities, including, among others, the Federal Energy Regulatory Commission ("FERC"), the North Carolina Utilities Commission ("NCUC"), and the South Carolina Public Service Commission ("SCPSC").[51]  Johnson was to become the New Duke CEO and Rogers its Executive Chairman, and headquarters were to be located in Charlotte, North Carolina, while maintaining a significant presence in Raleigh.[52]

The merger agreement included a condition precedent to close that none of the regulatory approvals would require either party to conduct its business in a way that, or to agree to an order or condition that, would have a material adverse effect on that party's expected benefits from the merger.[53]  The merger agreement also included a walk-away date of January 8, 2012, with a possible six-month extension to accommodate pending regulatory approvals,[54] and a termination fee.[55]

### 3.  Events Following Execution of the Merger Agreement

Following execution of the merger agreement, Duke and Progress formed an "Integration Team," headed by Johnson and Rogers, to facilitate the combination of

---

[50] *Id.* at ¶ 42.  This represented a premium of approximately 7.1% over the closing price of Progress common stock on January 5, 2011, and total consideration for Progress stockholders of approximately $13.7 billion. *Id.*
[51] *Id.* at ¶¶ 43, 46.
[52] *Id.* at ¶¶ 44–45.
[53] *Id.* at ¶ 47.
[54] *Id.* at ¶ 48.
[55] *Id.* at ¶ 49.

the two companies.[56]  Progress's Chief Integration and Innovation Officer, Paula Sims, played a large role on this team.[57]

The companies filed an application with the NCUC to approve the merger on April 4, 2011, later filing in support thereof written testimony of Johnson and Rogers.[58]  On September 20, 2011, Johnson and Rogers appeared before an NCUC panel to testify.[59]  In all three of these interactions with the NCUC, the companies represented that Johnson would be CEO of post-merger Duke; they testified on September 20, 2011, for example, that "Johnson would lead the New Duke Energy," and "would set the tone for the direction . . . that the new company is going to take."[60]  The NCUC hearings closed on September 22, 2011, and the NCUC withheld final approval pending FERC approval.[61]  Stockholders of both companies approved the merger at separate meetings on August 23, 2011.[62]

On September 30, 2011 FERC conditionally approved the merger, subject to both companies filing a mitigation plan that would reduce the new company's combined market power and include the formation of a regional transmission organization to help coordinate the transmission of electricity, the sale of Duke

---

[56] *Id.* at ¶ 52.
[57] *Id.*
[58] *Id.* at ¶¶ 53–54.
[59] *Id.* at ¶ 54.
[60] *Id.*
[61] *Id.*
[62] *Id.* at ¶ 56 (citing Duke Energy Co., Registration Statement (Form S–4), Am. No. 5 (July 7, 2011)).

power plants, the transfer of rights to generated electricity, and the construction of new transmission lines.[63] FERC's approval of the merger was subject to its approval of this mitigation plan.[64] The companies filed a mitigation plan with FERC on October 17, 2011 (the "First Mitigation Plan").[65] FERC rejected the First Mitigation Plan on December 14, 2011, but gave the companies the opportunity to file a new plan.[66] The Defendants, according to the Plaintiffs, thereafter soured on the merger and tried to get out of it without paying a termination fee.[67] Progress retained litigation counsel to enforce the merger agreement, if needed.[68] Johnson, meanwhile, kept soliciting regulatory approvals in anticipation of the fast-approaching July 8, 2012 walk-away date.[69] The Defendants knew the status of each required regulatory approval, as they were widely reported in the trade press, the daily press, on the Internet, and in an SEC Form 8-K filed on the day of each approval, conditional approval, or rejection of each regulatory body.[70]

The companies filed a second mitigation plan on March 26, 2012 (the "Second Mitigation Plan") and, expecting favorable FERC action, filed with the NCUC on May 8, 2012 a supplemental stipulation to reopen hearings on an emergency basis,

---

[63] *Id.* at ¶ 57.
[64] *Id.*
[65] *Id.* at ¶ 58.
[66] *Id.* at ¶¶ 59–60.
[67] *Id.* at ¶ 60.
[68] *Id.* at ¶ 62.
[69] *Id.* at ¶¶ 61–62.
[70] *Id.* at ¶ 66.

advising NCUC that the two companies wanted to close the merger by July 1, 2012.[71] FERC approved the Second Mitigation Plan on June 8, 2012, subject to certain conditions that required no further FERC action, and the parties informed NCUC of this progress.[72] On June 13, 2012, the NCUC Public Staff (the consumer-advocate arm of the NCUC) agreed not to oppose the companies' stipulation on how they planned to comply with the FERC order;[73] however, another advocacy group, "NC-WARN," opposed final NCUC approval and demanded the opportunity to cross-examine Duke, Progress, and NCUC Public Staff witnesses.[74]

On June 25, 2012, the companies again represented to the NCUC that its approval was an emergency because of the impending walk-away date; based upon this representation, the NCUC reopened the hearings that same day.[75] Duke represented to the Commission that "there were no changes justifying reopening the hearings."[76] The NCUC proceeded with the hearings to give NC-WARN an opportunity to object.[77] On June 29, 2012, the NCUC issued its final order, approving the merger.[78] The SCPSC, which had withheld approval awaiting NCUC

---

[71] *Id.* at ¶¶ 63–64.
[72] *Id.* at ¶ 65.
[73] *Id.* at ¶ 68.
[74] *Id.* at ¶ 69.
[75] *Id.* at ¶ 70.
[76] *Id.*
[77] *Id.* at ¶ 71.
[78] *Id.* at ¶ 72.

final action, gave its approval of the merger at noon on July 2, 2012.[79]  The merger

closed at 4:02 pm that day (the "Closing"), right after the close of financial markets.[80]

### 4. Johnson to Become CEO of Duke

Declarations of both companies—including press releases, petitions to the

NCUC and other regulators to approve the merger, testimony to the NCUC,

Securities & Exchange Commission ("SEC") filings, proxies soliciting stockholder

approval, and the merger agreement—all stated that, following consummation of the

merger, Johnson, CEO of Progress, would become CEO of New Duke, and Rogers,

CEO of Old Duke, would become its Executive Chairman.[81]  This arrangement,

according to Plaintiffs, aligned with the companies' stated strategy to "concentrate

on the regulated delivery of power to consumers, where [Progress] was strongest,

rather than energy trading, a [Duke] specialty."[82]  The merger agreement explicitly

stated that Johnson was to lead implementation of that strategy.[83]  An SEC Form S-

4, filed July 7, 2011, stated that the companies "viewed having Mr. Johnson as the

chief executive officer of the combined company as an important element in

ensuring implementation of [the] strategy" of the combined company: to place

---

[79] *Id.* at ¶¶ 73–74.
[80] *Id.* at ¶ 74.
[81] *Id.* at ¶ 3.
[82] *Id.*
[83] *Id.*

"strategic emphasis on the regulated utility business."[84]   The Plaintiffs contend that this evinces that Director Defendants "plainly <u>knew</u> that to [Progress], Johnson becoming CEO was a material term of the Merger Agreement."[85]

### 5. The Night of the Closing

At the time of the Closing, Rogers and Johnson were together in Charlotte at Duke's headquarters.[86]   Just before 4:20 pm, Rogers informed Johnson that they needed to call into a telephonic board meeting, and at 4:30 pm the newly constituted New Duke board convened its first meeting, by telephone.[87]   Over the next 20 minutes, the board passed various resolutions, including the election of Johnson as CEO and of Rogers as Executive Chairman.[88]   At 4:50, Gray announced that the board was going into executive session, and Rogers and Johnson left the call.[89] Three minutes later, Johnson received an email from Gray asking that he wait for her before returning to his home in Raleigh.[90]

Reading from a prepared script, Gray introduced a motion to remove Johnson and to re-install Rogers as CEO.[91]   No written notice, information packets, or board

---

[84] *Id.* at ¶ 35 (citing Duke Energy Co., Registration Statement (Form S–4), Am. No. 5 (July 7, 2011)).
[85] Pls' Answering Br. 24 (citing Compl. ¶ 35).
[86] Compl. ¶ 92.
[87] *Id.* at ¶¶ 93–94.
[88] *Id.* at ¶ 95.
[89] *Id.*
[90] *Id.* at ¶¶ 95–96.
[91] *Id.* at ¶ 97.

books were distributed in advance of or at the meeting to advise of the proposed CEO switch.[92]  Gray asked for discussion.[93]  In the discussion that ensued, none of the Director Defendants spoke at all, until each eventually voted.[94]  The legacy Progress directors, stunned by the proposal, tried to persuade the legacy Old Duke directors from voting out Johnson.[95]  Gray, when asked by them to explain her reasons, only cited Johnson's "style" and kept repeating that Johnson was not a good fit to lead the combined company.[96]  After roughly an hour, one of the legacy Progress directors called for a vote; the ten legacy Duke directors voted in favor of Gray's motion, and each of the five legacy Progress directors in attendance voted against.[97]

Within the hour, Gray went to Duke headquarters with a lawyer and notified Johnson of the decision.[98]  She asked for his resignation, advising him that he was still entitled to his severance package, and requested a decision by 7:00 am the following morning.[99]  Johnson flew back to Raleigh, then resigned as CEO and director of Duke effective 12:01 am on July 3, 2012.[100]  At 7:00 am, Duke announced

---

[92] *Id.*
[93] *Id.*
[94] *Id.* at ¶¶ 98, 122.
[95] *Id.* at ¶ 99.
[96] *Id.* at ¶¶ 99, 122.
[97] *Id.* at ¶¶ 99, 101.  One legacy Progress director, Baker, was out of the country and unable to dial in for the board meeting. *Id.* at ¶ 95.
[98] *Id.* at ¶ 102.
[99] *Id.*
[100] *Id.*

in a press release and Form 8-K that Duke had completed the merger and that Rogers had been re-installed as CEO.[101]

### 6. Duke Directors Decision to Terminate Johnson

Prior to Closing, none of the Director Defendants had ever expressed concern to anyone at Progress about Johnson's management style, Progress's financial results, or whether Johnson was the right person to lead post-merger Duke.[102] The Plaintiffs allege that, starting in May 2012, the Defendants planned to fire Johnson upon completion of the merger, without allowing the input of the legacy Progress directors.[103] They also allege that the Defendants knew that they had represented to regulators, including the NCUC, that Johnson would be CEO.[104] The Plaintiffs allege that by failing to inform the regulators that they had changed their mind about the CEO position, a term the merger agreement deemed material, they were "materially misleading" those bodies.[105]

In support of the allegations that the decision to terminate Johnson was reached in May 2012, the Plaintiffs point to a series of actions taken by the Defendants.[106] On May 3, 2012, the Old Duke board went into executive session to discuss the possibility of removing Johnson as CEO of the post-merger New

---

[101] *Id.*
[102] *Id.* at ¶ 76.
[103] *Id.* at ¶ 77.
[104] *Id.* at ¶ 78.
[105] *Id.* at ¶¶ 79–80.
[106] *Id.* at ¶¶ 81–85.

21

Duke.[107]  Between May 3 and May 17, 2012, Gray discussed the possibility of

Johnson's removal with each Defendant.[108]  Between May 3, and May 21, 2012,

Gray engaged outside counsel and a communications firm, and chaired a Board

Governance Committee meeting, for the purpose of orchestrating the CEO switch.[109]

On May 30, 2012, the Defendants, again in executive session, further discussed a

CEO switch, deciding not to discuss the matter with the Progress board and to defer

Johnson's removal.[110]  Gray had further discussions with each of the Defendants in

mid-June regarding Johnson's removal as CEO.[111]  Rogers was advised by Gray on

June 23, 2012, and Browning on June 24, 2012, that the Old Duke board had

concluded Johnson was not the best person to lead post-merger New Duke, and they

asked Rogers if he would accept the position of CEO if asked; Rogers said "yes."[112]

The Plaintiffs contend that Defendants' failure to notify the regulatory

agencies of the planned CEO switch constituted a violation of North Carolina law,

which prohibits giving false information or "willfully withhold[ing] clearly specified

and reasonably obtainable information" from the NCUC.[113]  In support of this

accusation, the Plaintiffs point to Rogers's admission that the issue of what would

---

[107] *Id.* at ¶ 81.
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.* at ¶ 84.
[113] *Id.* at ¶ 86 (citing N.C.G.S.A. § 62-326).

be the regulators reaction a CEO switch came up in the Old Duke board's discussion of Johnson's removal.[114]   The Defendants, according to the Plaintiffs, also concealed their intentions from the investing public by releasing on June 29, 2012 a press statement and filing an 8-K with the SEC, omitting the planned CEO switch.[115]

### 7. Regulators' Reactions to the Change in CEO

Following the CEO change, three top legacy Progress executives resigned in protest, including Paula Sims, who was to have played a key role on the Integration Team.[116]   Standard & Poors Bond Rating Service ("S&P") placed Duke's debt on "watch for a possible downgrade" because of the "abrupt change in executive leadership," and negatively changed its outlook on a possible upgrade of Progress debt based on the "sudden shift in management."[117]   On July 25, 2012, S&P lowered Duke's credit rating from A- to BBB+ with a negative outlook, based on heightened regulatory risk.[118]

The NCUC began a highly publicized investigation into Duke on July 6, 2012, requiring testimony from several key players, including Rogers, Gray, Johnson, McKee, and Hyler.[119]   The North Carolina Attorney General also commenced an

---

[114] *Id.* at ¶ 88.
[115] *Id.* at ¶ 87.
[116] *Id.* at ¶ 111.
[117] *Id.* at ¶ 113.
[118] *Id.* at ¶ 120.
[119] *Id.* at ¶ 114.

investigation.[120]   In his testimony before the NCUC, Rogers revealed that the question of what would be the reaction of regulators to the CEO switch had come up in discussion among the Old Duke board members prior to the Closing.[121]

Gray, in her testimony before the NCUC, gave additional reasons for her motion to remove Johnson as CEO, beyond the sole reason recited before the July 2, 2012 vote, that is, that Johnson was not a "good fit" to run the combined company.[122] The first additional reason for removing Johnson was his handling of repairs and an insurance claim related to Progress's Crystal River 3 nuclear facility in Florida.[123] The Plaintiffs point to differing testimony from Gray and Rogers regarding the problem Duke had with Crystal River 3.[124]   Rogers testified that Johnson was spending Progress funds on repairing the plant, which compromised Duke's ability to make a "repair versus retire" decision.[125] Gray testified that the problem was that the repair itself was behind schedule in getting back to power production, and that Johnson was slow to act regarding an insurance claim for the facility.[126] Gray's second stated reason for moving to remove Johnson as New Duke CEO was the condition of the rest of Progress's nuclear fleet, other than the Crystal River 3

---

[120] *Id.*
[121] *Id.* at ¶ 116.
[122] *Id.* at ¶¶ 99, 122.
[123] *Id.* at ¶ 105.
[124] *Id.*
[125] *Id.*
[126] *Id.*

facility.[127]   The final reason was Progress's financial results, which were slightly below the projections they had previously provided to Duke.[128]   The Plaintiffs contend that these additional reasons are merely "pretexts" that are "made up now as self-justification for [the Defendants'] wrongdoing."[129]   On July 27, 2012, legacy Progress directors Baker and Stone resigned in protest over the actions of the Director Defendants on the evening of the Closing.[130]   Stone, in her resignation letter, expressed her view that the decision by the Director Defendants to remove Johnson as CEO was premeditated.[131]

### D. Procedural History of this Action

The Plaintiffs filed their initial complaint on July 17, 2012 and an amended complaint (the "Complaint") on July 30, 2012.   In Count One of their Complaint, the Plaintiffs allege that the Director Defendants breached their fiduciary duties of loyalty and care through a series of acts: conspiring to breach the merger agreement, and concealing that planned breach, until consummation of the merger; knowingly permitting the Company to conceal its planned switch in CEO from Progress and the NCUC and other governmental and regulatory bodies; knowingly violating the laws of North Carolina and other laws; and "failing, through fear, sloth, cronyism,

---

[127] *Id.* at ¶ 106.
[128] *Id.* at ¶ 107.
[129] *Id.* at ¶ 104.
[130] *Id.* at ¶ 121
[131] *Id.* at ¶ 122.

misplaced collegiality, or other insupportable motives, to resolve at an earlier date, any issues or misgivings that they had with Johnson's prospective leadership."[132]

In Count Two, the Plaintiffs allege that the Director Defendants breached their fiduciary duties of loyalty and care through the following acts: knowingly disregarding those fiduciary duties by shutting off input from the legacy Progress directors regarding Johnson; knowingly breaching the merger agreement in furtherance of the conspiracy pled in Count One; knowingly violating representations made to Duke stockholders and the NCUC and other regulatory bodies; knowingly and recklessly jeopardizing Duke's standing and reputation with credit agencies, the NCUC, and other regulatory bodies; knowingly incurring liability for severance pay; and "recklessly incurring public opprobrium, injuring the public reputation of [Duke] and subjecting it to public ridicule."[133]

As of the date the Complaint was filed, the New Duke board consisted of 17 members, 11 of which are named as defendants in this action. Accordingly, the Plaintiffs allege that a pre-suit demand on the board would have been futile.

On August 13, 2012, Defendants filed a motion to dismiss the Complaint. Before briefing commenced, the Plaintiffs engaged in a leadership contest with the plaintiffs of several other derivative suits filed in Delaware based on the same core

---

[132] *Id.* at ¶ 133.
[133] *Id.* at ¶ 136.

set of facts. Ultimately, the Court appointed Bernstein as sole lead plaintiff by order entered August 12, 2013.

On December 23, 2013, the Court stayed this action pending resolution of a factually related consolidated federal securities suit (the "*Nieman* Action")[134] before the United States District Court for the Western District of North Carolina. On November 6, 2015, following resolution of the *Nieman* Action,[135] the Court entered an order lifting the stay and governing briefing on Defendants' motion to dismiss. The case was reassigned to me on March 9, 2016, due to Vice Chancellor Noble's retirement, and I heard oral argument on May 9, 2016. This Memorandum Opinion addresses Defendants' motion.

### E. Actions in Other Courts

Derivative suits concerning the same core set of facts were also filed in other jurisdictions: (1) the *Neiman* Action, described above; (2) two suits in U.S. District Court, Delaware District, consolidated as *Tansey v. Rogers*, C.A. No. 12-1049-RGA (the "*Tansey* Action");[136] and (3) one suit in North Carolina state court (the "*Krieger* Action").

Joel Krieger, a Duke stockholder, filed the *Krieger* Action in the Superior

---

[134] *Nieman v. Duke Energy Corp.*, Civ. Docket No. 312-cv-00456-MOC-DSC (W.D.N.C.)

[135] The *Nieman* Action settled and was resolved by order entered on November 2, 2015. Duke paid $146 to the stockholder class pursuant to the settlement agreement.

[136] The proceedings in the *Tansey* Action were also stayed pending resolution of the *Nieman* Action.

Court of North Carolina on July 20, 2012. The case was designated to the North Carolina Business Court, a specialized forum for complex commercial and corporate litigation. In that action, Krieger alleged breaches of the fiduciary duties of loyalty and good faith and corporate waste by the ten Director Defendants, unjust enrichment by Johnson, and aiding and abetting breaches of fiduciary duty by Rogers.[137] As in this action, Krieger did not make a demand on the board. Instead he alleged that a majority of the board was incapable of "disinterestedly and independently considering a demand" because the director defendants faced a substantial likelihood of personal liability "for breaching their fiduciary duties and wasting corporate assets by terminating Johnson and paying him a $44 million severance package," and because the facts raised a "reasonable doubt" as to whether the decision was a valid exercise of business judgment.[138]

The *Krieger* defendants moved to dismiss the complaint for failure to make a demand and failure to state a claim.[139] The *Krieger* court issued an opinion in April 2014, applying Delaware law, granting the defendants' motion to dismiss, holding that "[p]laintiff's failure to make a presuit demand relative to any derivative claims in [*Krieger*] was not excused."[140]

---

[137] *Krieger*, 2014 WL 1759054, at *1.
[138] Defs' Opening Br., Transmittal Aff. of Susan Waesco, Esq., Ex. D (*Krieger* complaint) ¶ 62.
[139] *Krieger*, 2014 WL 1759054, at *3.
[140] *Id.* at *8

The court closely analyzed Krieger's demand futility arguments under Delaware law. The basis for Krieger's argument that the director defendants were interested or lacked independence due to a substantial likelihood of personal liability, was the amount and timing of the severance payment made to Johnson.[141] The court found that it could not "conclude that the amount of Johnson's severance and its timing give rise to a substantial likelihood of director liability."[142] The basis for the argument that the director defendants' actions were not a valid exercise of business judgment was "that the decision by the Director Defendants to approve the severance payments to Johnson could not have been the product of a valid exercise of business judgment because those payments amount to corporate waste."[143] After discussing Delaware's standard for waste, the court found that conclusory allegations that Duke received nothing of value from Johnson were insufficient, especially in light of the fact that the severance provided for "(a) a release of claims against Duke; (b) an agreement to cooperate with Duke in respect to transition matters and (c) non-competition, non-solicitation, non-disparagement and confidentiality covenants."[144] The court found it could not conclude "that what Duke received in consideration for the severance payments to Johnson was so inadequate

---

[141] *See id.* at *5.
[142] *Id.*
[143] *Id.* at *7. "Thus, according to Plaintiff, reasonable doubt as to whether the severance payments to Johnson were the product of a valid exercise of business judgment may be raised by its allegations that those payments amounted to waste." *Id.*
[144] *Id.* at *7–8.

that no person of ordinary, sound business judgment would deem it worth the amount paid."[145]   Finally, the court found that "in the context of the [*Krieger*] action, Plaintiff's *allegations of waste* do not provide sufficient basis to doubt that the action was taken honestly and in good faith."[146]

## II. ANALYSIS

The Defendants move to dismiss the Complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6).   The Defendants first argue that the Plaintiffs are collaterally estopped from relitigating the demand-futility issue, as it was previously determined against the plaintiff in the *Krieger* Action, who stands in privity with the Plaintiffs here.   As a result, according to the Defendants, I must find that the Plaintiffs lack standing here and dismiss.   Because it is potentially dispositive, I consider this collateral estoppel argument first.

### A. Collateral Estoppel and the Krieger Action

The preclusive effect of an earlier judgment is determined by the law of the forum in which the judgment was entered.[147]   Accordingly, because the *Krieger* Action was adjudicated in North Carolina, the Court must apply that state's law to determine the preclusive effect of the dismissal order in that case.

---

[145] *Id.* at *8.
[146] *Id.* (emphasis added).
[147] *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 617 (Del. 2013).

30

Under North Carolina law, "the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding."[148]  "Like *res judicata*, collateral estoppel only applies if the prior action involved the same parties or those in privity with the parties and the same issues."[149]

Here, the Plaintiffs, like the plaintiff in the *Krieger* Action, seek to sue derivatively on behalf of Duke, a right adjunct to their status as common stockholders of Duke.  They purport to act for the corporation of which they are part owners, and their interests in recovery on behalf of that corporation, which would indirectly inure to their benefit as stockholders, are identical.  The Defendants concede that the issue of privity among common stockholders bringing separate derivative claims has not been decided in North Carolina,[150] but point out that the courts of that state find that "[p]rivity exists where one party is so identified in interest with another that [it] represents the same legal right [as the other]."[151]  The Defendants argue, and I agree, that application of such a policy necessarily would lead to a finding of privity between the Plaintiffs here and the plaintiff in the *Krieger*

---

[148] *Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 880 (N.C. Ct. App. 2004).

[149] *Cline v. McCullen*, 557 S.E.2d 588, 590 (N.C. Ct. App. 2001).

[150] Defs' Opening Br. 19.

[151] *Id.* at 20. (citing *Brower v. Killens*, 472 S.E.2d 33, 35 (N.C. Ct. App. 1996) (internal quotation marks omitted); *see generally State v. Summers*, 528 S.E.2d 17 (N.C. 2000) (discussing theory of privity in context of issue preclusion).

Action.   Such a finding would be consistent with the case law from numerous

jurisdictions that have addressed the issue.[152]   Having found privity, I apply the

North Carolina analysis of collateral estoppel.

Under North Carolina law, issue preclusion only obtains where the issues

presented are common in both actions.  This "identity of issues" requires that:

> (1) [t]he issues to be concluded [are] the same as those involved in the
> prior action; (2) in the prior action, the issues [were] raised and actually
> litigated; (3) the issues must have been material and relevant to the
> disposition of the prior action; and (4) the determination made of those
> issues in the prior action [was] necessary and essential to the resulting
> judgment.[153]

If any of the four prongs are not satisfied, collateral estoppel does not apply.  Here,

the Defendants argue that the issue of whether demand was futile with respect to the

allegations of wrongdoing in the instant complaint was presented to the *Krieger*

court and was actually litigated, and that the court found that demand was not

excused, which is both material to, and necessary and essential to, the resulting

judgment.  I find the Defendants correct in part.

The *Krieger* complaint sought to recover for waste or breach of duty in

connection with the entry of an employment agreement with Johnson shortly before

the merger, and the discharge of Johnson immediately thereafter, resulting in

---

[152] *See Pyott*, 74 A.3d at 617 n.18 (aggregating cases).
[153] *King v. Grindstaff*, 200 S.E.2d 799, 806 (N.C. 1973); *see Summers*, 528 S.E.2d at 20 (stating test).

millions of dollars of contractual obligation to Johnson. Any cause of action relating to those facts was an asset of Duke, which the *Krieger* plaintiff sought to bring derivatively. The discretion to pursue choses in action, however, resides with the board of directors, and Court of Chancery Rule 23.1 provides that demand must be made on the board before a stockholder has standing to proceed derivatively.[154] Where—as in the *Krieger* Action and the instant case—the stockholder–plaintiff forgoes demand and seeks to proceed with derivative litigation nonetheless, the action will be dismissed unless the plaintiff can demonstrate that demand is futile.[155] The *Krieger* court, addressing Duke's motion to dismiss, considered demand futility under Delaware law. The court noted that under the applicable rule announced in *Aronson v. Lewis*,[156] demand will be excused where particular facts pled raise a reasonable doubt of director independence or disinterestedness, or reasonable doubt that the directors exercised proper business judgement in making the decision challenged.[157] With respect to the first prong, the *Krieger* plaintiff argued that the director defendants were substantially likely to be held liable for breach of duty or waste for "terminating Johnson and paying him a $44 million severance package."[158]

---

[154] *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago v. Smith*, 2016 WL 3223395, at *8 (Del. Ch. May 31, 2016).

[155] *Id.*

[156] 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[157] *Krieger*, 2014 WL 1759054, at *5.

[158] *Id.* (quoting the *Krieger* complaint).

The court found, however, that it could not conclude that "a substantial likelihood of director liability" arose under those facts.[159] Turning to the "business judgement" prong of *Aronson*, the court addressed the plaintiff's argument that the decision to approve a severance payment for Johnson, then fire him, was waste, and by definition outside of business judgement. The court found that plaintiff's waste allegations—arising from the firing of Johnson, resulting in the obligation to pay him millions of dollars severance—"do not provide sufficient basis to doubt that the action [by the defendants] was taken honestly and in good faith."[160] The *Krieger* court accordingly dismissed the complaint under Rule 23.1. To the extent the instant complaint seeks to recover for waste or breach of duty arising from the decisions by the Director Defendants to enter a contract with Johnson, under which discharge would obligate Duke to the payment of millions of dollars in severance—and, shortly thereafter, to fire him[161]—the Plaintiffs' argument that demand is excused with respect to such claims is estopped by the court's decision in *Krieger*. I find that all factors of the North Carolina collateral-estoppel test are satisfied, and that such claims must be dismissed here, for lack of standing under Rule 23.1.

---

[159] *Id.* The *Krieger* court also rejected an argument that failure to follow aspirational employment goals stated in a Duke proxy posed a reasonable likelihood of direct liability. *Id.* at *6.
[160] *Id.* at *8.
[161] *See* Compl. ¶¶ 131, 136.

Substantial allegations of the instant complaint do not involve that issue, however. The Plaintiffs here allege that, before the merger, the Director Defendants had reached a conclusion that—despite the contractual obligations of the merger agreement, and despite contrary representations, including to the NCUC—Rogers, and not Johnson, was to be CEO of New Duke. Nonetheless, the Director Defendants concealed this fact, did not correct the now-misleading disclosure to the NCUC, and represented to that body that no facts had changed requiring a further hearing. According to the Complaint, the NCUC approved the merger, presumably in reliance on these misrepresentations, with damages resulting once the facts came out shortly after. According to the Complaint, at least with respect to the failure to correct the misrepresentation to the NCUC, the Director Defendants violated positive law. Thus, argue the Plaintiffs, the actions and inaction of the Director Defendants in this regard were in bad faith, and demand on these Defendants is accordingly excused.

I find that the Plaintiffs here are not collaterally estopped from litigating that issue under the decision in the *Krieger* Action. The issue of demand excusal arising from violation of positive law was not decided by that court. The parties argue whether this bad-faith ground to avoid demand was raised and litigated in *Krieger*.[162]

---

[162] The Defendants argue that directorial bad faith was raised, at least obliquely, in the Complaint. The Plaintiffs assert that, in any event, the defendants argued in the *Krieger* Action that the court should focus only on the allegations of that complaint alleging waste/breach of duty with respect

I need not resolve that issue, because, under North Carolina law, issues are not precluded in subsequent litigation unless "the determination made of those issues in the prior action was necessary and essential *to the resulting judgment*."[163] As I have described above, the *Krieger* court did not address this ground in dismissing the action under Rule 23.1.

Contrasting the claims in the *Krieger* Action and here makes that clear. The waste/breach-of-duty claim in the *Krieger* Action occurred when Johnson was terminated, and New Duke incurred loss or liability thereby. No positive law was implicated by that board action, but common-law duties, allegedly, were violated. In that context, the *Krieger* court evaluated whether the Director Defendants could exercise business judgment in determining whether to pursue that claim. The *Krieger* claim accrued at the time of the firing, on July 2, 2012.[164] With respect to the claim here that the Director Defendants violated positive law, the scenario is different. The gravamen of this portion of Plaintiff's Complaint is that the Director Defendants came to a decision to fire Johnson, but failed to inform the NCUC that prior facts represented to that body were now, accordingly, false; further, they

---

to damages resulting from Johnson's discharge, and that the *Krieger* court's opinion did just that; as a result, the Plaintiffs argue, the defendants should be judicially estopped from arguing that other issues were considered in the *Krieger* Action for purposes of issue preclusion. In light of my decision that collateral estoppel does not apply to the claim of violation of positive law, I need not reach this contention.

[163] *King*, 200 S.E.2d at 806 (emphasis added).

[164] As stated above, to the extent this Complaint seeks to vindicate a similar claim, no matter how much better or persuasive the pleadings, the Plaintiffs are collaterally estopped.

caused Duke to represent positively to the NCUC that no facts had changed. Presumably, that claim accrued when the latter false representation was made, or at least when the NCUC approved the merger in reliance on the false representation. The issue of whether demand is excused in connection with this scenario turns on director bad faith (as discussed below), not on potential liability for waste or breach of duty as formed the decision of the *Kreiger* court. The cases are not "grounded on the same gravamen of the wrong," and the issues presented are not identical.[165]

I note that this is a different situation from recent cases where this Court has found prior dismissals under Rule 23.1 preclusive.[166] Those cases involved complaints with much more persuasive or factually dense pleadings regarding potential underlying liability than in the similar actions previously dismissed. The resulting decisions hold that where an issue was presented, and rejected, by a first court, the issue is precluded before a second tribunal, regardless of the fact that the second complaint may plead facts that make the proposition advanced more likely

---

[165] *Laborers' District Council Constr. Indus. Pension Fund and Hallandale Beach Police Officers and Firefighters' Personnel Ret. Fund v. Bensoussan*, 2016 WL 3407708, at \*9 (Del. Ch. June 14, 2016) (quoting Robert L. Haig, *Commercial Litigation in New York State Courts* § 93:3 (4th ed. 4C West's N.Y. Prac. Series 2015).

[166] *See e.g.*, *Bensoussan*, 2016 WL 3407708, at \*9; *In re Wal-Mart Stores, Inc. Delaware Derivative Litig.*, 2016 WL 2908344, at \*10–11 (Del. Ch. May 13, 2016) (rejecting plaintiffs' attempt to relitigate demand futility on the theory that the "allegations in the Delaware Complaint are more detailed, specific, and extensive than those in the Arkansas Complaint"); *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at \*15–20 (Del. Ch. May 21, 2015) (finding that adding additional or more compelling facts to the same underlying claim does not allow a plaintiff to relitigate demand futility).

or persuasive.   While state laws vary on application of issue preclusion, the overarching theory is that efficiency and fairness preclude serial litigation of a single issue. Here, by contrast, although the causes of action arise, in the instant case and in the *Krieger* Action, from facts related to the Duke–Progress merger and the discharge of Johnson, the cause of injury alleged here is discrete from that in the *Krieger* Action, and argument that demand is excused proceeds on unique grounds. In this particular scenario, under North Carolina law, the issues decided there are not identical to those here, and collateral estoppel does not apply to this subset of the Plaintiffs' claims.

The Chancellor's recent decision in *In re Wal-Mart Stores, Inc.*[167] is illustrative by contrast. That case involved Arkansas law, which imposed a test for collateral estoppel similar to the North Carolina test. The issue in the dismissed Arkansas action, considered in *Wal-Mart*, was whether demand would be futile with respect to litigation concerning oversight of the so-called "WalMex bribery," based on allegations of director liability due to knowledge of the bribery cover-up and related actions. "Although certain factual details surface in one complaint and not the other, the core demand futility issue . . . is the same. [Both actions] focus on

---

[167]2016 WL 2908344 (Del. Ch. May 13, 2016).

whether the Demand Board is disabled from deciding whether to initiate litigation .
. . in the WalMex bribery scheme and cover-up . . . ."[168]

Similarly, in *Asbestos Workers v. Bammann*,[169] this Court addressed another
oversight claim, there asserted against directors who had failed to curb risky trading
by a unit of J.P. Morgan Chase & Co.  A prior New York action had dismissed a
similar action for failure to demonstrate demand futility.  The court identified the
issue decided in New York thus: "whether a majority of the [c]ompany's directors
face a substantial likelihood of personal liability for failure to oversee risk
undertaken by the [unit]."[170]  The court found the same issue in the Delaware matter
precluded, notwithstanding an expanded and more persuasive factual pleading in the
Delaware complaint.

By contrast, the allegations in the instant case involve whether the Director
Defendants made a conscious decision to mislead regulators in violation of positive
law, and are able to evaluate whether to authorize their corporation to pursue
damages therefrom.  The *Krieger* Action, however, involved whether the defendants
could independently consider a waste claim.  To my mind, although the replacement
of Johnson as CEO underlies both, and unlike the issues in the cases discussed above,

---

[168] *Id.* at *10.
[169] 2015 WL 2455469 (Del. Ch. May 21, 2015).
[170] *Id.* at *17.

these are fundamentally different issues.  There is insufficient identity to invoke the doctrine of collateral estoppel.

I note that this decision should not open the door to artful crafting by plaintiffs of new causes of action based on a single factual scenario in an attempt to avoid collateral estoppel.  The interests of efficiency and finality (and, with respect to litigation in different jurisdictions, comity) require a practical view of the issues presented, to preclude such gamesmanship.[171]  This unusual case pushes the limits of such an analysis.

Based on the findings above, I must now evaluate the Defendants' motion to dismiss for failure to make a demand.

*B. The Demand Requirement Under Rule 23.1.*

I have already alluded above to the purposes and requisites of establishing standing in compliance with Rule 23.1.  Briefly, under Delaware law, a corporation's "directors, rather than [its] stockholders, manage the business and affairs of the corporation."[172]  This control extends to a corporation's assets, including its choses in action.  Accordingly, an "individual stockholder intending to bring a suit derivatively on behalf of his corporation [must] first make a demand that the board of directors pursue the cause of action, or demonstrate that the board, as then

---

[171] *See Bensoussan*, 2016 WL 3407708, at *6–9 (discussing limits of issue preclusion).
[172] *Aronson*, 473 A.2d at 811.

constituted, would be incapable of acting in the corporate interest, thus excusing demand."[173]

The Plaintiffs here have alleged that making a demand on the New Duke board was futile, and the Company opposes their efforts to pursue this litigation. Therefore, to avoid dismissal under to Rule 23.1, the Plaintiffs' Complaint must "allege with particularity . . . the reasons . . . for not making the effort [to make the litigation demand],"[174] and the Court, in turn, must determine based on those allegations whether the board is able to exercise its business judgment in determining if it is in the corporate interest to pursue the litigation.[175]

The Delaware Supreme Court has established two tests for assessing demand futility, applicable depending on the facts of the case, as set out in *Rales v. Blasband*[176] and *Aronson v. Lewis*; fundamentally, however, both tests address the same question of whether the board can exercise its business judgment on the corporate behalf.[177] The parties agree in briefing that the test articulated in *Aronson*, which applies "when a derivative plaintiff challenges *an earlier board decision*

---

[173] *Park Emps.*, 2016 WL 3223395, at *1.

[174] Ct. Ch. R. 23.1.

[175] *See In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *14 (Del. Ch. May 21, 2013) (following *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006)).

[176] 634 A.2d 927 (Del. 1993).

[177] *Park Emps.*, 2016 WL 3223395, at *8 n.73 (citing *Sandys v. Pincus*, 2016 WL 769999, at *6 (Del. Ch. Feb. 29, 2016)); *China Agritech*, 2013 WL 2181514, at *16 ("The *Aronson* and *Rales* [tests] have been described as complementary versions of the same inquiry.").

made by the same directors who remain in office at the time the suit is filed,"[178] is

the proper test to apply under the facts of this case. It is unclear how I can apply

*Aronson* here, however. The allegations of the Complaint (to the extent not

collaterally estopped) state that the Director Defendants caused Duke to make

representations, including to NCUC, that Johnson would be CEO of New Duke.

This "decision," if it can be characterized as such, is not alleged to have been

wrongful when made. At some point prior to the merger, according to the

Complaint, the Director Defendants decided—without a formal meeting—that

Johnson was unfit to serve, and that they would install Rogers instead. Again, this

is not in itself wrongful. It is failing to correct the now inaccurate former disclosures

and representations, and informing the NCUC that "there were no changes justifying

reopening the hearings"[179]—knowing nonetheless that Johnson would be removed—

that the Plaintiffs allege amounted to bad faith.

Our case law indicates that where *Aronson* is inapplicable, the test in *Rales*

applies to the demand-excusal analysis.[180]  Because, as a fortuity, *Aronson* was

decided before *Rales*, and because *Aronson* was applicable to only a subset of

demand-excusal situations, our Supreme Court filled the void—where *Aronson* by

its terms was not rationally applicable—with the test in *Rales*. As a matter of

---

[178] *China Agritech*, 2013 WL 2181514, at *15 (emphasis added).
[179] Compl. ¶ 70.
[180] *Rales*, 634 A.2d at 933–35.

doctrine, *Rales* is better thought of as the general test, with *Aronson* indicative of its application in a specific context.[181]  The struggle to categorize the board actions and inactions alleged here—as better considered under *Aronson* or under *Rales*—shows, to my mind, the folly of regarding those two analysis as the components of a binary choice.[182]  Demand is excused where the particularized facts pled raise a reasonable doubt that the board on which demand would be made could exercise its business judgment on behalf of the company in evaluating the demand.  That is the test set out in *Rales*: "whether there is a reason to doubt the impartial[ity] of the directors, who hold the authority under 8 Del. C. section 141(a) to decide [for the corporation] whether to initiate, or refrain from initiating, litigation."[183]  I employ that test here, although the outcome would be no different if I employed the second prong of *Aronson*.

Under the business judgment rule, directors may act on behalf of the corporation, free of judicial second-guessing and resulting liability, so long as they act within the constraints of their fiduciary duties.  Actions of disinterested directors are presumed under the rule to have been taken in the corporate interest and in good faith, unless that presumption of business judgment is rebutted.  This is true with respect to the decision that would have faced the Director Defendants had demand

---

[181] *See Sandys*, 2016 WL 769999, at *11–13 (discussing utility of *Aronson* and *Rales*).
[182] *See id.*
[183] *Id.* at *13 (internal quotations omitted) (alterations in original).

been made, as well as their underlying decisions[184] involved in the demand. A director cannot exercise business judgment, however, where she is asked to authorize litigation in which her prior actions will be scrutinized for liability, *and* where those actions were *not* entitled to the protection of the business judgment rule. Actions taken in bad faith are not entitled to such protection. As a result, "it is generally accepted that a derivative suit may be asserted by an innocent stockholder on behalf of a corporation against corporate fiduciaries who knowingly caused the corporation to commit illegal acts" causing corporate harm.[185] Here, the Plaintiffs argue, with respect at least to the representations by Duke to the NCUC, that the Director Defendants are without business-judgement protection. I agree that, as pled, a reasonable doubt exists that the business-judgment presumption applies, and thus that demand would be futile here.

It is a rare case where directors who are disinterested and independent have acted in a way which deprives them of business-judgement protection; nonetheless, such a case is pled here. The pertinent facts as alleged, supported by reasonable inferences therefrom, are as follows. The Director Defendants caused Old Duke to enter a merger agreement with Progress, a material and negotiated term of which was that the CEO of Progress, Johnson, would serve as CEO of New Duke. The

---

[184] There is no allegation that the independent Director Defendants had any pecuniary interest in the decision to discharge Johnson.
[185] *In re Am. Int'l Grp., Inc. Consol. Derivative Litig.*, 976 A.2d 872, 889 (Del. Ch. 2009).

Director Defendants allowed Duke to disseminate this fact, including via a representation to the NCUC that Johnson would serve as CEO. Permission for the merger from the NCUC, as well as other regulatory bodies, was a condition of the merger. The Director Defendants were aware that, via testimony at a hearing before the NCUC or otherwise, the representation concerning Johnson as CEO was communicated to the NCUC.

During the eighteen-month period in which regulatory approval, and thus the merger itself, was pending, the Director Defendants had second thoughts regarding Johnson. They concluded he was unfit to serve as New Duke CEO. This undoubtedly put the Old Duke board in a bind. At stake was a $13.7 billion merger, of which CEO designation was a material and negotiated term. According to the Director Defendants, they took their responsibilities seriously, hiring counsel to represent them as they considered their alternatives.[186] Those alternatives, I assume, included an attempt to renegotiate or avoid the merger—risking loss of merger benefits and liability for a break-up fee—and accepting the unfit Johnson as CEO, among perhaps other unpalatable paths available. Ultimately, the Complaint alleges that the Director Defendants made a decision to replace Johnson with their own

---

[186] The Director Defendants cite to a matter outside the Complaint, an affidavit filed by Ann Gray with the NCUC as part of the hearings investigating the alleged misrepresentations to that body. The parties hotly dispute whether and to what extent evidence presented in that proceeding can be relied on here, but I do not find it necessary to my decision in any event.

CEO, Rogers. To minimize the risk of that decision on the merger itself, the Director Defendants did not announce their decision to Progress or to the public. They did not amend their proxy statements,[187] nor did they inform the regulatory bodies whose approval was a requisite to the merger. They met with Johnson and negotiated an employment agreement, presumably to conceal the fact that he would not be employed post-closing, while at the same time ensuring that Rogers was willing to serve as CEO. Once the merger was consummated, the New Duke board, controlled by the Director Defendants, met and officially appointed Johnson as CEO, as required by the letter of the merger agreement. Immediately thereafter, Gray called the meeting into executive session, and Johnson was instructed to remain available. For the first time, the legacy Progress directors, who composed a minority of the New Duke board, were told that Johnson was unacceptable to the Director Defendants. They reacted with shock. An hour or more of discussion ensued, during which the legacy Progress directors attempted to make the case for Johnson as CEO. The Director Defendants, according to the Complaint, did not participate, and the only reason given for Johnson's discharge was that he was not a "good fit." Ultimately, the New Duke board voted, strictly along legacy lines, to discharge

---

[187] It is an oddity of this case, involving a merger of two utilities, that the stockholders of both companies approved the merger on August 23, 2011, but that closing, reliant as it was on regulatory approval, did not take place until July 2, 2012. In other words, the decision by the Director Defendants to employ Rogers and not Johnson as CEO was made *after* the stockholders vote, and the proxies were not misleading as of that time.

46

Johnson. Within an hour of the meeting, Gray met Johnson at Duke headquarters to advise Johnson of the board's decision and demand his resignation. Johnson's resulting resignation took effect at one minute past midnight.

The merger could not proceed without permission from, among others, the FERC and the NCUC. The NCUC deferred action until the FERC agreed to the merger. By the time that permission was forthcoming, the "walk-away" date—after which the merger could terminate—was fast approaching. After the FERC agreed to the merger, in light of the exigencies of time, Duke requested expedited action from the NCUC. On the eve of the merger, it represented that "there [had been] no changes justifying reopening the hearings" following the initial public hearings, which closed on September 22, 2011; the company did not otherwise disclose the Director Defendants' decision to replace Johnson with Rogers as CEO.[188] The NCUC gave permission for the merger, which then closed.

By North Carolina statute, entitled "Furnishing false information to the [North Carolina Utility] Commission; withholding information from the Commission":

> (a) Every person, firm or corporation operating under the jurisdiction of the Utilities Commission or who is required by law to file reports with the Commission who shall *knowingly or willfully file or give false information* to the Utilities Commission *in any report, reply, response, or other statement or document* furnished to the Commission shall be guilty of a Class 1 misdemeanor.

---

[188] Compl. ¶¶ 69–70.

(b) Every person, firm, or corporation operating under the jurisdiction of the Utilities Commission or who is required by law to file reports with the Commission *who shall willfully withhold clearly specified and reasonably obtainable information from the Commission in any report, response, reply or statement filed with the Commission* in the performance of the duties of the Commission or who shall fail or refuse to file any report, response, reply or statement required by the Commission in the performance of the duties of the Commission shall be guilty of a Class 1 misdemeanor.[189]

After the substitution of Rogers for Johnson was made public, shortly after the merger, the NCUC, believing itself traduced, commenced hearings into the representations at issue here. The North Carolina Attorney General also began an investigation. Damages, reputational and financial, allegedly resulted.

Directors in Delaware corporations are presumed to act in good faith, for the benefit of their corporation. It is never good faith, however, to knowingly cause a Delaware corporation to violate positive law.[190] "Although directors have wide authority to take lawful action on behalf of the corporation . . . . Delaware corporate law has long been clear on this rather obvious notion; . . . it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully."[191] The particularized allegations here, together with the reasonable inferences therefrom, if true, raise a reasonable probability that Duke violated the law, and thus demonstrate bad faith. Energy utilities are heavily regulated concerns,

---

[189] N.C. Gen. Stat. Ann. § 62-326 (emphasis added).

[190] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66–67 (Del. 2006).

[191] *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007).

as illustrated by the fact that this merger required approval of both federal (FERC) and state (among others, NCUC) regulatory bodies. It is a reasonable inference that the Director Defendants knew that the NCUC would consider the identity of the initial chief executive of the combined entity material to its decision, as its subsequent reaction to being misled demonstrates. The Director Defendants knew that Duke had represented that that person would be Johnson.

The Complaint alleges that, before the merger, the Director Defendants had decided to discharge Johnson, and thus knew that the uncorrected representation concerning the CEO (and the representation that "there were no changes justifying reopening the hearings")[192] to the NCUC were false, and in violation of positive law, including Section 62-326 quoted above. The Director Defendants argue that this pleading is merely conclusory, and suggest that they had not decided to strong-arm the New Duke board into firing Johnson. Instead, they genuinely desired the input of their fellow directors—the Progress legacy directors—before making this decision. Of course, if that is true, it would have been wise to give those directors some indication that this subject would be broached, rather than blind-siding them as actually occurred.[193] At any rate, this is a motion to dismiss. It is entirely possible

---

[192] Compl. ¶ 70.

[193] To the extent that the Plaintiffs attempt to argue that the Director Defendants acted with bad faith based on lack of notice to the legacy Progress directors that the CEO issue would be raised at the first New Duke board meeting, that cause of action is not sufficiently alleged in the Complaint, and I do not consider it here.

that, upon a developed record, the true actions of the Defendants will be vindicated. The pleadings are sufficient, at this stage, however, to support the inference that the Director Defendants' decision had been made well before the merger closed. Members of the Old Duke board had contacted Rogers to ensure that he was willing to serve as CEO. As mentioned, the legacy Progress directors were given no opportunity to prepare information supportive of Johnson. Tellingly, the Director Defendants offered no explanation—beyond expressing that Johnson was a "bad fit"—and offered no persuasion during the executive session, then voted unanimously to discharge Johnson.

Finding at this pleading stage, based on facts pled and reasonable inferences, that the Director Defendants knew a material representation to the NCUC was false at the time that body approved the merger, it is reasonably conceivable that the Director Defendants each caused Duke to violate Section 62-326.[194] If so, and corporate damages resulted, the Director Defendants would be liable: "In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused."[195] Such bad-faith acts, if they took place, strip each Director Defendant of the presumption that he acted with proper business judgement. If so, the burden will

---

[194] N.C. Gen. Stat. Ann. § 62-326.
[195] *Desimone*, 924 A.2d at 934.

fall on the Director Defendants to justify their actions; in such a situation, there is reason to doubt the impartiality of the Defendants in evaluating any demand seeking to impose liability for those actions, and demand is excused under *Rales*.[196]

 *B. The Defendants Motion to Dismiss Under Rule 12(b)(6).*

Given my decision above, and in light of the broad allegations of the Complaint, I find it efficient to defer action on this motion, pending conference of counsel regarding what causes of action remain, and whether further consideration under Rules 12(b)(6) and 23.1 is required.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of standing is GRANTED in part and DENIED in part. A decision on the Defendants' motion to dismiss for failure to state a claim is deferred pending further consultation with counsel. An omnibus final order on these outstanding motions will await further proceedings.

---

[196] Alternatively, under *Aronson*, I find the Plaintiffs have pled particularized facts sufficient to create a reasonable doubt that the underlying transaction was the product of a valid exercise of business judgment.

# EXHIBIT D

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    SAUL BRESALIER, suing derivatively on
     behalf of DUKE ENERGY CORPORATION,          : CIVIL ACTION
5                                                :
                  Plaintiff,                     :
6    v                                           :
                                                 :
7    LYNN J. GOOD, MICHAEL G. BROWNING,          :
     DANIEL R. DiMICCO, JOHN H. FORSGREN,        :
8    ANN MAYNARD GRARY, JAMES H. HANCE, JR.,     :
     JOHN T. HERRON, JAMES T. RHODES, JAMES      :
9    B. HYLER, JR., HARRIS DELOACH, JR.,         :
     CARLOS A. SALADRIGAS, WILLIAM E. KENNARD,   :
10   E. MARIE MCKEE, RICHARD A. MESERVE,         :
     JAMES E. ROGERS, G. ALEX BERNHARDT,         :
11   E. JAMES REINSCH, WILLIAM BARNETT III,      :
     and PHILIP R. SHARP,                        :
12                                               :
                  Defendants,                    :
13   and                                         :
                                                 :
14   DUKE ENERGY CORPORATION,                    :
                                                 : NO. 13-1853-LPS
15                Nominal Defendant.
                               - - -
16
                         Wilmington, Delaware
17                      Wednesday, June 15, 2016
                         Oral Argument Hearing
18
                              - - -
19
     BEFORE:        HONORABLE **LEONARD P. STARK**, Chief Judge
20
     APPEARANCES:                  - - -
21

22              MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
                BY:  SIDNEY S. LIEBESMAN, ESQ., and
23                   LISA ZWALLY BROWN, ESQ.

24                   Counsel for Plaintiffs

25                        Brian P. Gaffigan
                          Official Court Reporter

2

1   APPEARANCES:  (Continued)

2
        MORRIS NICHOLS ARSHT & TUNNELL, LLP
3       BY:  KENNETH J. NACHBAR, ESQ., and
             SUSAN WOOD WAESCO, ESQ.
4
        and
5
        SIDLEY AUSTIN, LLP
6       BY:  STEVEN M. BIERMAN, ESQ.
             (New York, New York)
7
             Counsel for Defendants
8

9

10

11

12

13
14              - oOo -
15          P R O C E E D I N G S
16      (REPORTER'S NOTE:  The following oral argument
17  hearing was held in open court, beginning at 3:31 p.m.)
18          THE COURT:  Good afternoon.
19          (The attorneys respond:  "Good afternoon, Your
20  Honor.")
21          THE COURT:  I'll have you put your appearances
22  on the record for us please.
23          MS. BROWN:  Good afternoon Your Honor.  Lisa
24  Brown from Montgomery, McCracken, Walker & Rhoads on behalf
25  of plaintiff.  With me today at counsel table is my

3

1   colleague, Steve Liebesman.  We also have some summer
2   associates with us, Mara Smith, Carla Grass, Bianca
3   Valcarce, and Raul Mendez.  They will be monitoring today's
4   hearing.
5           THE COURT:  Welcome to all of you.
6           MR. NACHBAR:  Good afternoon, Your Honor.
7           THE COURT:  Good afternoon.
8           MR. NACHBAR:  Kenneth Nachbar from Morris
9   Nichols Arsht & Tunnell here on behalf of the defendants.
10  With me is Susan Waesco of my firm, Steve Bierman of Sidley
11  Austin, Michelle Spak who is in-house counsel at Duke, and
12  we also have a summer associate, Gerard Horowitz who is also
13  in the courtroom.
14          THE COURT:  Welcome.  Thank you to all of you.
15          We're here on argument on the plaintiff's motion
16  to convert the motion to dismiss to a motion for summary
17  judgment so we will hear from the plaintiff first.
18          MS. BROWN:  Thank you, Your Honor.  Again, Lisa
19  Brown on behalf of plaintiff from Montgomery McCracken.
20  Your Honor, I understand from your letter that each side is
21  permitted 45 minutes.  I think my opening remarks will take
22  nearly that long.  And with Your Honor's permission, I'd
23  like to save some time for rebuttal if that is appropriate.
24          THE COURT:  It is appropriate.  You can have
25  whatever is left of the 45 minutes which hopefully will be

4

1   significant but we'll see after you are done with your
2   presentation and my questions.
3           MS. BROWN:  Thank you, Your Honor.
4           So as I said, I believe we can keep this keep
5   this relatively brief because we're here on a procedural
6   issue that will be plaintiff's motion to convert.
7           As Your Honor is aware, we filed the complaint
8   in this action in October 30th, 2015.  Prior to that, we
9   had served a demand on the Board which was refused.  After
10  we filed our complaint and response, there was a motion to
11  dismiss filed by defendants.  They also provided their
12  opening brief in support of the motion.
13          What defendants did, though, was include the
14  demand refusal letter which was not a part of the complaint.
15  What that did was introduce extraneous facts into the
16  record.
17          As Your Honor is well aware, when considering
18  a motion to dismiss, it is a purely legal motion.  The
19  allegations in the complaint are taken as true.  So we did
20  not rely in the complaint on the allegations that are in the
21  demand refusal letter, and by doing that, Your Honor, we
22  have been prejudiced.  Plaintiff has been prejudiced in this
23  matter introducing those facts into the record.
24          If the Court were to grant the motion, and that
25  is the full record in this case, plaintiff would have no

5

1   opportunity to look into those facts that have been now in
2   the record.  We've had no opportunity to challenge them.
3   So that is why on that basis, we are not trying to do any
4   end-runaround our pleading standard under 23.1, as
5   defendants state in their response.  Rather, what we are
6   trying to do is make this be a fair proceeding.
7           If they're going to introduce extraneous facts,
8   then plaintiff either deserves the right to take limited
9   discovery as to those facts or we would ask that Your Honor
10  disregard the extraneous facts mostly coming from the demand
11  refusal letter.
12          THE COURT:  Well, let's stop there.
13          So you say you didn't rely on the demand refusal
14  letter.  They say there are certain facts in your complaint
15  that could only have come from the demand refusal letter.
16  Aren't they right about that?
17          MS. BROWN:  Your Honor, there are very few
18  facts that are -- to which there is no dispute that have
19  come from that letter.  For instance, we don't dispute that
20  the names of the persons, the four people involved in the
21  Review Committee.  Those names came from that.  Nor the fact
22  that obviously the demand refusal letter refused the demand.
23          However, if you take a close look at that letter
24  or even a cursory look for that matter, the substance of it
25  is what the Committee relied on.  They talk about the Report

6

1   and Recommendations. Now, that is itself a problem because
2   not only did they not attach it, we've never seen that. So
3   there is no -- they mentioned the Report and Recommendations
4   which is the basis which formed their refusal. We have
5   never seen it. We have no idea what is in that.
6          THE COURT: But, if the measure whether or not
7   it is fair to consider the demand refusal letter on a motion
8   to dismiss is whether the plaintiff relied on it for its
9   complaint, it seems to me from what you have just said, you
10  acknowledge you did rely on it.
11         MS. BROWN: We used certain facts that were in
12  that. I believe the standard is whether it was integral
13  or explicitly relied upon. I would not agree that it is
14  explicitly relied upon.
15         As I mentioned, there are very few facts that
16  were taken from that letter but the sum and substance of
17  the letter, particularly the allegations cited in the
18  defendants' motion to dismiss brief, we did not rely on, nor
19  have they been put before the Court. And if the Court is
20  to consider them again, that is why we ask this be converted
21  to a motion for summary judgment, so we can take discovery
22  as to those things, so we can ask for the Report and
23  Recommendations.
24         Keeping in mind when we first sent the demand
25  prior to filing the complaint, we did request these kinds of

7

1   materials and we were denied those materials. We had asked
2   for some background on things that were relied upon by the
3   Committee, what kind of considerations the Committee was
4   looking at, and we were not given any of that information.
5          THE COURT: So is it fair to say that the demand
6   refusal letter was integral to your complaint at least to
7   the extent that it is the basis by which you know your
8   demand was refused and the basis by which you know which of
9   the directors were on the Committee?
10         MS. BROWN: As to those two points, we use that
11  letter. I don't know -- I mean if "integral" means it is
12  the only means by which we knew it at that point in time,
13  then I would have to say yes.
14         Again, I don't believe that that makes it
15  integral to the complaint that those two facts were garnered
16  from the demand refusal letter. I think there are quite a
17  few other allegations from that letter as well as, again,
18  the Report and Recommendations which we have never seen that
19  have been put into the record.
20         That, basically, they're asking the Court,
21  defendants are asking the Court to take their allegations
22  as true, and that is not the standard on the motion to
23  dismiss. The motion to dismiss standard is again taking the
24  plaintiff's allegations as true. If plaintiff's allegations
25  were as baseless as defendants claim them to be, and if our

8

1   legal standard was not met, and if we did not meet 12(b)(6),
2   there would have been no need for extraneous facts to be
3   introduced by defendants. They simply could have said, Your
4   Honor, under these circumstances they have not met their
5   pleading stand under 23.1. You know, they don't have a
6   basis under 12(b)(6). Therefore, deny the motion.
7          They didn't do that. Instead, they introduced
8   these extraneous facts. And, again, without a chance to delve
9   into them and have them be a part of the record undisputed and
10  without being able to be uncontested facts and taken as true,
11  which we don't believe is the appropriate measure here, we
12  believe that plaintiff would be prejudiced with that.
13         So what we had asked, Your Honor, was to either
14  convert the motion to summary judgment -- the problem with
15  that, though, is with that we would ask for limited discovery.
16         The other option, and also defendants raise
17  this, is to just disregard the extraneous facts and
18  disregard the demand refusal letter. The problem with that,
19  Your Honor, is that those facts have already been put in
20  front of Your Honor, and we believe that there has been,
21  the litigation has been tainted by those facts in the sense
22  that it is hard to unsee them once you have seen them.
23         So, obviously, Your Honor, if that is the
24  decision that were to be made, we would certainly abide by
25  that and then ask that the motion be refiled and we have a

9

1   chance to fully brief that.
2          The other point I would like to raise is that
3   defendants also in their motion in opposition to convert
4   to convert basically re-briefed their motion to dismiss.
5   However, there was a stipulation between the parties that
6   the briefing on the motion to dismiss was being stayed upon
7   the decision on our motion to convert.
8          So I was not planning to get into the merits of
9   the case today unless Your Honor has specific questions
10  about that. But we would ask that, again with our
11  procedural issue whether or not to convert our motion --
12  their motion to dismiss into one for summary judgment and
13  whether or not we're entitled to a limited amount of
14  discovery as to the Committee's report.
15         THE COURT: The argument about discovery and
16  your entitlement to it, that is only in the event that I do
17  want to consider the demand refusal letter and therefore, I
18  take it, convert to summary judgment?
19         MS. BROWN: That is correct, Your Honor.
20         THE COURT: So if I went for the alternative of
21  not considering the demand refusal letter, do you have an
22  argument that you are entitled to discovery before we decide
23  the motion to dismiss?
24         MS. BROWN: No, Your Honor. But I think we
25  would ask that, it is not only that the letter itself be

10

1    taken out but the facts derived from that letter that were
2    included in the opening brief on the defendants's motion to
3    dismiss would also be excluded from the record.
4           THE COURT:  Right.  So some of that is probably
5    going to just be subject to debate at the motion to dismiss.
6    There are certain allegations in your complaint that the
7    defendants say are conclusory or maybe might argue are legal
8    conclusions, and you presumably would have similar arguments
9    about what they say in their motion to dismiss.  Is that
10   something you think I could sort out today on a motion to
11   convert?
12          MS. BROWN:  Could you sort out which ones you
13   could take out?
14          THE COURT:  Right.
15          MS. BROWN:  I think Your Honor could.  I think
16   it is apparent which ones have come from the letter itself,
17   which allegations have come from the letter.  Disputed, I
18   should say disputed allegations, obviously.  As I said, we
19   did take the name of the Committee members as well as the
20   fact that that letter certainly did deny our demand, though
21   it certainly could stay in.  It's just that, things that the
22   Committee relied on that we have no basis of knowledge other
23   than that demand refusal letter, it's things like that.  But
24   I think that could be parsed.  I'm not asking Your Honor to
25   do that on the spot, but I think that is possible.

11

1           THE COURT:  Just briefly on the merits.  Since,
2    whether it is today or some other day, eventually it seems
3    as if we'll have to get there.  But with respect to, as I
4    understand your complaint, even you contend there is only
5    two of the claims in the complaint that you made a demand
6    with respect to.  The other three or four you didn't demand
7    that the Board take action, legal action on.
8           Is that a correct understanding of your claims?
9    And have you pled demand futility with respect to those
10   other three or four?
11          MS. BROWN:  That is correct, Your Honor, as
12   to which ones demand was considered for.  As to demand
13   futility, I believe we have.  Again, we'd like the
14   opportunity, should that come up, to brief that fully and
15   make sure we inform the Court in a fully informed manner and
16   make sure we've done the research.  But, yes, I believe we
17   have or we would not have included them in the complaint.
18          THE COURT:  Right.  Because you either need to
19   plead demand refused or demand futility; correct?
20          MS. BROWN:  In a derivative action, yes, Your
21   Honor.
22          THE COURT:  And we're here in a derivative
23   action.
24          MS. BROWN:  Correct.
25          THE COURT:  Do you have any dispute with the

12

1    Court taking judicial notice of the defendant's SEC filings?
2           MS. BROWN:  No, Your Honor.
3           THE COURT:  Are you disputing the authenticity
4    of the demand refusal letter?
5           MS. BROWN:  No, Your Honor.  We're disputing
6    the factual contents of it.  And that is what we take issue
7    with, is that those are put before the Court to be taken as
8    true fact when in fact we don't know, and there is a dispute
9    as to those.
10          THE COURT:  I think the defendant points out
11   there is a number of letters or correspondence exchanged
12   between plaintiff's attorney and a Gibson Dunn attorney.
13   Some are attached to the complaint, but not the demand
14   refusal letter.  Can you help me understand the reasoning
15   for that?  Would there be an argument that for completeness
16   sake the full correspondence should be before the Court on
17   a motion to dismiss?
18          MS. BROWN:  Sure.  And, Your Honor, I think
19   the decision was made because we feel that the facts stop up
20   until the point that we got back their refusal letter.  We
21   don't know what happened.  Things were happening, we don't
22   know what they are, so the facts of what they did, you know,
23   we believe we know but we don't know the basis for those.
24          Again, they relied on the Report and
25   Recommendations.  We haven't seen it.  So in our mind, it

13

1    was we have the facts that we needed even aside from the
2    fact they were refusing our demand up until that point.
3    Because we felt that it was, as we take issue today, a
4    self-serving document that was their version of the facts,
5    that it had not been tested, that it wouldn't be fair to put
6    in front of the Court as facts taken as true when in fact
7    we haven't had to chance to test those and to get discovery
8    into those.
9           THE COURT:  And there is some discussion in the
10   briefing about a 220 books and records action.  At least
11   at the time of the briefing, you had not brought such an
12   action.  Is that still true today?
13          MS. BROWN:  That is true, Your Honor.
14          THE COURT:  And does that have any relevance to
15   the issues before me?
16          MS. BROWN:  I don't think so, Your Honor.  The
17   decision was made not to do that.  We understand it was
18   possible.  However, one consideration was that there were
19   other actions pending.  We saw what was asked for and what
20   was denied in some of those other actions.
21          Also, Your Honor, we understand, having been
22   through this before, the way that these committees work,
23   and a lot of what we were seeking would likely not have
24   been produced because it might have been protected by
25   attorney-client privilege.  Those things can be -- there is

14

1  really no mechanism to get past the privilege issue on a 220
2  demand. It would be easier in litigation. So we had
3  considered it, Your Honor.
4         I also believe there is case law to suggest that
5  it's still possible, Your Honor. Should this case continue,
6  this case could be stayed and we could pursue a 220 action
7  in the Court of Chancery or at least serve a 220 demand. I
8  don't say we have plans to do that at this time.
9         And, again, it was knowingly done, a 220 demand
10 was not served. Although, as I mentioned before, documents
11 and information were requested in the demand letter made to
12 the Board.
13        THE COURT: Okay. Is there anything else?
14        MS. BROWN: No, unless Your Honor has further
15 questions.
16        THE COURT: No, we'll save the rest of your time
17 for rebuttal. Thank you.
18        And we'll hear from Mr. Nachbar.
19        MR. NACHBAR: Good afternoon, Your Honor.
20        THE COURT: Good afternoon.
21        MR. NACHBAR: This is really a straightforward
22 issue: Is this letter something that can properly be before
23 the Court.
24        As a matter of Delaware law, before making a
25 demand, Bresalier, if I'm pronouncing it correctly, conceded

15

1  that the Board of Duke was in a position to exercise
2  business judgment with such a demand.
3         In other words, a stockholder -- and that is
4  the *Levine v Smith* case and other cases that we cited -- a
5  plaintiff can't simultaneously make a demand and claim that
6  a demand would be futile. So you have your choice. They
7  chose, at least on the claims that we were talking about
8  here this afternoon, to make a demand. They've conceded
9  that the Board is in a position, was in a position to
10 exercise its business judgment with respect to that demand.
11        THE COURT: That is not a concession that the
12 Board did properly exercise its judgment.
13        MR. NACHBAR: Correct.
14        THE COURT: Just that it could have.
15        MR. NACHBAR: Correct. That it was positioned
16 to. It was capable of. Not disable I guess is the way I
17 would put it.
18        So that leaves the plaintiff with a possible
19 wrongful refusal case if the demand is in fact refused. And
20 the wrongful refusal case, as I think Your Honor knows,
21 having decided one fairly recently, is a fairly difficult
22 pleading standard for the plaintiffs. They have got to
23 essentially prove that the Board didn't exercise its
24 business judgment in an appropriate way, that it either
25 didn't consider the demand or was just so slipshod that the

16

1  business judgment rule wouldn't attach.
2         It's not enough to allege I disagree with a
3  decision, and it is not enough for the Court to say if I
4  were on the Committee, I would have reached a different
5  decision. The whole point of the business judgment rule
6  is that the business judgment is entitled to deference. So
7  it is a very, very high pleading standard here.
8         We don't ask that the facts in the demand
9  refusal letter be taken as true on this motion. What we
10 ask is that it be taken as true that those facts were
11 communicated to the plaintiffs.
12        Now, why does that matter? Because the
13 plaintiffs are going to come in in an answering brief and
14 they're going to make a lot of allegations, some of which
15 may well be counter to the facts. So it's really to head
16 off some possible Rule 11 motion down the road. They
17 know what they were told. They can't in good faith and
18 consistent with Rule 11 allege things that are contrary to
19 what they were told.
20        THE COURT: To head off the need in your view to
21 file a Rule 11 motion against the plaintiff.
22        MR. NACHBAR: Correct. Correct. And, look, I
23 mean we also think that they did rely on it. The case law
24 we think is pretty clear that you don't have to specifically
25 cite a document or specifically expressly incorporate it by

17

1  reference. If you rely on it to frame your pleadings, it
2  can come in.
3         And, look, it is sort of like the contract in a
4  contract case. I mean this is a demand refusal case. They
5  claim that is the wrong year that the Board refused their
6  demand. The letter refusing the demand is, as they admit,
7  the operative document. It is the refusal that they're
8  complaining about.
9         So it doesn't seem to me for it to be beyond the
10 pale for the Court to be able to look at that letter to see
11 what was communicated, not necessarily to accept every word
12 in the letter as the gospel truth admitted by the plaintiffs
13 but rather this is what was communicated by the plaintiffs.
14        Now, if in view of that letter, the plaintiffs
15 are able to craft a pleading that the Board did such an
16 awful job or just failed in its duty in an egregious way
17 that they could survive a motion to dismiss, then great,
18 they'll win their motion to dismiss.
19        On the other hand, if they can't meet that
20 pleading standard, the case ought to be dismissed. I think
21 it is really no more complicated than that, Your Honor.
22        THE COURT: Let's talk a little bit more about
23 the analogy to an agreement for a breach of contract claim.
24        It seems to me the reason for the rule that you
25 could consider the contract even if the plaintiff didn't

18

1   attach it to the complaint is because the action clearly
2   arises substantively from that contractual agreement and we
3   don't want to let plaintiff have an opportunity to say you
4   agreed contractually to buy all your goods from them when it
5   is black and white in the contract that you didn't.
6           This seems like a different circumstance. The
7   substantive claims are not at all based on the demand
8   refusal letter, and it seems like the risks that those
9   cases talked about allowing us to look at, for instance, a
10  contract are not present here.
11          MR. NACHBAR:  But I think their claim is based
12  on the refusal letter. I mean the question that Your Honor
13  is going to have to face, you know, not today but after
14  briefing is based upon what plaintiffs were told and what
15  they knew, have they alleged sufficient facts to overcome
16  the presumption of the business judgment rule to state a
17  claim for wrongful refusal?
18          And so what they were told is important:  If
19  they were told that the Committee met many times or that
20  Committee was advised by competent counsel or the Committee
21  diligently considered claims, they have to plead something
22  to overcome that.
23          The business judgment rule, it is a presumption.
24  It is a presumption that the Board acted properly and it is
25  plaintiffs' pleading burden to overcome that presumption.

19

1   It is a very difficult burden.
2           And I think what is in the demand refusal
3   letter, again, it is not dispositive but it certainly isn't
4   irrelevant either. It is part of the mix that needs to be
5   considered. That is why we think it is properly before the
6   Court.
7           And we think the cases, you know, say that. The
8   *Burlington Coat* case and the *Trump Resorts* case we think are
9   squarely on all fours.
10          The *Fagin* case that they cite and the other
11  cases they cite are very different. Those are instances in
12  which the defendants try to put in documents that were not
13  available to the plaintiff. And the Court said, no, you
14  can't do that.
15          Here, of course, the demand refusal letter was
16  sent to one person, plaintiffs' counsel. That is the only
17  person. Maybe it was cc'd to somebody but they were the
18  addressee. They had it all relevant times.
19          That also brings us to the report. As
20  plaintiffs' counsel admitted, they specifically didn't ask
21  for a copy of the report. And there is a reason for that.
22  It is a tactical choice that they made.
23          Under Section 220, the Delaware state law is
24  very clear, the *Morgan Stanley* case says if you make a
25  demand, the demand is refused, you make a 220 request for

20

1   the report. You are entitled to the report.
2           So by asking for it in proper form, they could
3   have received it. And as they have admitted, they haven't
4   asked for it and therefore haven't received it. And that
5   is a tactical choice that they have made because they feel
6   if the whole report were before the Court, the argument for
7   them would get worse probably. And, you know, they're
8   probably right about that. It's not a crazy choice to make.
9           In fact, another shareholder plaintiff requested
10  a copy of the report, was given a copy of the report and
11  hasn't filed the wrongful refusal case or any -- we haven't
12  heard from them, despite having gotten the report, you know,
13  months and months ago. They were evidently satisfied by it.
14          So the plaintiffs don't want the report. And
15  that is a tactical choice that they're allowed to make. But
16  they still have to meet their pleading burden, and they
17  can't meet their pleading burden by alleging things that
18  are contrary to what is in the letter that they receive.
19          That is the point, and that is why the letter is
20  important. It is not that everything in it is necessarily
21  -- you know, if they say we held 12 meetings and interviewed
22  six people, that doesn't mean that the plaintiffs have
23  admitted that they met 12 times and interviewed six people.
24  What it means is they can't allege, consistent with Rule 11,
25  that the Committee only met once or the Committee didn't

21

1   interview anybody. That's the point.
2           THE COURT:  Well, there is Rule 11, but then
3   there is what the record will be before the Court when we
4   get to the motion to dismiss.
5           If they choose, for whatever reason,
6   notwithstanding having not received the letter, to allege
7   the Committee never met -- let's just say, I don't recall
8   but let's say the letter says they met 12 times, to take
9   your example, and the plaintiff comes into court and says
10  our allegation is the Committee never met.
11          Again, putting aside whether they're committing
12  unethical conduct or going to be subject to Rule 11, when
13  I evaluate the motion to dismiss, do I take as true the
14  Committee never met or, if I've got the letter in front of
15  me, are you suggesting now I am going to have to say the
16  Committee did meet and maybe they met 12 times?
17          MR. NACHBAR:  I think what you are going to have
18  to say is that the plaintiffs have no basis for their
19  conclusory allegation that is without basis in fact. I mean
20  it is one thing if they had a confidential informant and one
21  of the Committee members said, yeah, the letter is false, we
22  never met and then have a John Doe allegation. That's fine.
23  Then they pled something that is specific.
24          But a conclusory allegation that is contrary to
25  the written record I submit is problematic. And if what

22

1  Your Honor is saying is, well, Rule 11 is the only remedy
2  that you have as a defendant, then if we come to that path,
3  then I guess we'll make a Rule 11 motion.
4      But it seems to me that the letter is integral
5  enough to all of this that it should be before the Court.
6  And we certainly don't think there was anything improper in
7  our attaching it.
8      Now, we also I think all agree that Your Honor
9  can decide the motion without considering the letter, and
10 that is certainly an alternative.
11     Again, I think the case law is pretty clear that
12 Your Honor can and should have the letter in the record,
13 but I think both sides are in agreement that Your Honor can
14 consider the motion without considering the letter. And
15 I'm glad to hear that plaintiffs are not contending that,
16 you know, having put the letter as an exhibit to our opening
17 brief, that somehow the door is now open to discovery.
18 They say they want discovery only if Your Honor is going to
19 consider the letter.
20     Again, we think Your Honor can consider the
21 letter without converting this to summary judgment and
22 without opening the discovery door. But plaintiffs now seem
23 to be saying that if Your Honor doesn't consider the letter,
24 then their request for discovery would be deemed withdrawn.
25     THE COURT: Well, I would like to view this

23

1  alternative as something agreeable to both sides, but I'm
2  not quite sure if it is.
3      You agree the alternative, I know it is not your
4  preference but the alternative is that I don't consider the
5  letter, don't give discovery but just go to the motion to
6  dismiss, but the plaintiff further wants me not to credit
7  any of the disputed factual allegations that are in the
8  letter but are also I think in your motion to dismiss brief
9  and presumably would be in any renewed briefing. I take it,
10 you don't agree to that.
11     MR. NACHBAR: We don't. And, again, we think
12 that the law is pretty clear. We haven't heard *Burlington*
13 *Coat* and *Trump Casinos* distinguished in any meaningful way.
14 And those cases clearly say that when you have relied on a
15 document to draft your pleading that the Court may consider,
16 may at least look at that document.
17     That is clearly the case here. They've clearly
18 considered the demand letter. They have admitted it here
19 this afternoon. Therefore, we think the Court can properly
20 look at that letter as part of our motion to dismiss without
21 implicating discovery.
22     THE COURT: So you all clearly, I'm sure,
23 looked at the Report and Recommendation that was sent to the
24 Committee. You say you didn't rely on it in drafting your
25 motion to dismiss brief. But why isn't it the same analysis

24

1  that you would have me apply to them apply to you? Mind
2  you, if we have to get to the report, then obviously we need
3  discovery because they don't have it.
4      MR. NACHBAR: Well, so a couple of things.
5      The most straightforward answer to Your Honor's
6  question is the law is not that if somebody looks at
7  something in drafting an opening brief in support of our
8  motion to dismiss, the other side gets it. The law is if
9  you rely on it in drafting your complaint, the other side
10 gets it.
11     And there is a reason for that. Because on the
12 motion to dismiss, it is a plaintiff friendly standard, you
13 know, facts are reasonably pled. Well pled facts are deemed
14 to be true.
15     On a wrongful refusal claim, the plaintiffs
16 have a little bit higher burden. They have got to show
17 particularized facts but still there are presumptions.
18     The second thing that is important is the
19 plaintiffs don't want the report. I mean if they wanted the
20 report, they would have filed a 220 demand, and we would
21 have given it to them just as we gave it to Pinsky's counsel
22 who did make a 220 demand. They don't want it. And they
23 said they made a tactical choice not to make a 220 demand.
24     So I don't think they can now reverse course and
25 say, well, now we want it. I mean if they did do that, we

25

1  cross that bridge, I suppose.
2      But I don't think they're going to do that. I
3  don't think they want it because they know it's not going
4  to help their case. It's just going to make it worse.
5  Everything that is in the letter that they don't like is
6  going to be in the report in a much more, you know, better
7  elaborated in a much longer and detailed form. So they
8  don't want it.
9      And that's fine. We're not trying to put the
10 report in.
11     THE COURT: So they write in the motion to
12 convert, it is on page 16, but I'll read it to you: "There
13 is no evidence whatsoever as to the independence of the DRC
14 numbers and counsel, the scope of the investigation, who was
15 interviewed and by whom, what documents were reviewed, how
16 the investigation was informed by the criminal investigation
17 and plea or the basis upon which the DRC reached its
18 conclusion."
19     Again, they say there is no evidence whatsoever
20 for that. What is the response to that?
21     MR. NACHBAR: Well, I think that is not for
22 today. I mean they will get to write an answering brief on
23 a motion to dismiss at some point, and they'll make whatever
24 arguments they want to make, and then we'll write a reply
25 brief, and we'll argue about whether those are sufficient to

26

1  state a wrongful refusal case or not.
2          It is a high pleading standard, and there doesn't
3  have to be evidence that the special Committee conducted --
4  you know, as to the scope of their investigation as to who
5  they interviewed and all of the things that Your Honor just
6  read. That is not what is required to defeat, to win a motion
7  to dismiss in a wrongful refusal case.
8          All I have to allege or all I have to prove is
9  that they haven't alleged a deficiency. So uncertainty
10  about the scope, that is not good enough. They've got to
11  allege facts, specific facts that, if true, would show that
12  the Committee's work was improper, tainted, inappropriate.
13          I don't think they can do that. And I think
14  that they certainly can't do that consistent with what's
15  been reported to them in the wrongful refusal -- in the
16  refusal letter.
17          So that's why we think the letter is
18  appropriate. That is why it should be before the Court.
19  Because as some point, we think you will be able to hold up
20  what they allege in their answering brief and compare it to
21  what is in the letter and see if it rings true, and I don't
22  think it will.
23          So I think Your Honor will be in the position
24  of concluding that they're saying things that have no basis.
25  They have no basis in the complaint. They have no basis in

27

1  fact. They're just the type of conclusory allegations that
2  aren't credited in a wrongful refusal case.
3          THE COURT: Okay. Is there anything else?
4          MR. NACHBAR: Nothing further, Your Honor.
5          THE COURT: All right. Thank you. We'll turn
6  back to plaintiffs and hear from Ms. Brown.
7          MS. BROWN: Just briefly, Your Honor.
8          First, as Your Honor pointed out, the contract
9  analogy. There is a big difference between a case involving
10  a contract and what we have here. A contract has been
11  negotiated by the two parties. They agreed, and if they
12  didn't there is a real problem, but they agreed to enter
13  into that contract. They agreed to be bound by it. And
14  then, therefore, if there is an issue, they bring the
15  lawsuit underneath that.
16          But in this case, we're dealing with a demand
17  refusal letter which was written by counsel. And what it does
18  is it needs to, for their benefit, it needs to show, oh, here
19  is what we did. It is a self-serving letter. So to take the
20  facts there as truth and to have them in the record without
21  being able to be tested is completely different than if you
22  are dealing with any type of a contract.
23          THE COURT: Well, Mr. Nachbar says they're not
24  asking that if I consider the letter that the facts in there
25  are to be taken as truth, just that those facts, assuming for

28

1  the moment that they're facts, were communicated to the
2  plaintiff. What is wrong with that?
3          MS. BROWN: So the facts were communicated. The
4  problem that we have -- and to back up a little bit.
5  Plaintiff doesn't not want Report and Recommendations. So
6  one of the big problems with the demand refusal letter --
7  and I have it, Your Honor. It was an exhibit obviously to
8  their motion to dismiss in the briefing.
9          It says: "The Committee presented its Report
10  and Recommendations to the Board on August 27th, 2015.
11  After considering the Report and Recommendation, the Board
12  decided to accept the Committee's recommendation to reject
13  your litigation demand."
14          So again, as Your Honor pointed out, to say that
15  they haven't relied on that Report and Recommendation, much
16  like their argument about relying on the refusal letter,
17  seems to be exactly the same.
18          This rejection was based on the Report and
19  Recommendation. We might not have done a 220 specifically
20  asking for this document, but that doesn't indicate that
21  plaintiffs don't want it.
22          In fact, again, going back to correspondence
23  that was exchanged before the filing of the complaint,
24  Exhibit B to the complaint is a letter from Mr. Greenfield
25  to Mr. Warren where he asks a list of questions about such

29

1  things as, No. 1, were you or a representative of your firm
2  or any other counsel present at any portion of the meetings?
3  What criteria were used by the Board to determine which of
4  its members would be appointed? Who participated? And so
5  on and so on.
6          So there is a list of questions that may be in
7  the Report and Recommendations. We asked for that
8  information and never received it. So we might have not
9  called it, at the time, the Report and Recommendations. The
10  Report and Recommendations may not have been in existence at
11  that time, but we were seeking that type of information.
12          Again, that seems to have formed the basis for the
13  demand refusal letter. So I don't think it's just the fact
14  that we were communicating. If we wanted to communicate the
15  basis for it, we were communicating the fact that there was
16  this "things happen" and we said no, but we don't know what
17  the basis for that was. I think that is a problem that
18  plaintiff has with the letter.
19          THE COURT: Well, come back to the question,
20  though. If I were to consider the letter just for what
21  is communicated to you and what is communicated to the
22  plaintiff prior to filing of the suit but not taking any
23  disputed facts in it as true, what would be wrong with that?
24          MS. BROWN: The fact that we were communicated
25  this information, I don't think there is a problem. I think

---

30

1  it's the problem that, again, we believe it to be written by
2  counsel, self-serving, and we have no basis. But the fact
3  that we received it, we can't dispute the fact that we
4  received the letter.
5       THE COURT: As another alternative, if you
6  want the Report and Recommendation today, I know defendants
7  haven't said yet that they would give it to you, but if they
8  would give it to you and the motion were to be considered on
9  the basis of the complaint, the report, and the letter, is
10 that something the plaintiff might be interested in?
11      MS. BROWN: I certainly can say we would be
12 interested in seeing the Report and Recommendations. Can I
13 say that would form the basis? I don't, I can't say that
14 with certainty because I can't say we would still want
15 some -- we would want to know the basis for the Report and
16 Recommendations, but certainly we are not trying to run away
17 from the report because we're nervous or intimidated by what
18 we might find in it.
19      Also, there was an implication that we're trying
20 to head off a Rule 11 motion. I also take issue with that.
21 Obviously, if plaintiffs didn't think they had some basis,
22 they know Rule 11 and would not have chosen to file a
23 complain in this matter.
24      The only other thing that I would point out is
25 just that certain of the cases raised like the *Burlington*

---

31

1  *Coat* and the *Donald Trump* case, those were authentic
2  documents. There is no question as to authenticity. I'm
3  not saying I don't believe the letter was jargon as drawn
4  by counsel, but those were I think it was an annual report
5  and things like that. So I think there is a difference
6  between those types of documents, again, with contracts,
7  there is a difference between those types of documents
8  and a letter written by counsel for the purpose of them
9  trying to avoid litigation, knowing it probably is going to
10 litigation, that they have something to stand on, be it
11 based in fact or not.
12      THE COURT: Okay. Is there anything else?
13      MS. BROWN: Thank you, Your Honor. No.
14      THE COURT: Well, let's take a short recess, and
15 I will come back and give you a decision. We'll be a few
16 minutes.
17      (Brief recess taken.)
18      *   *   *
19      (Proceedings reconvened after recess.)
20      THE COURT: Have a seat.
21      Thank you for the helpful argument and for
22 presenting a motion that is, as you all acknowledge, a
23 narrow one. That puts me in the fortunate situation that
24 I'm able to rule today from the bench.
25      So having considered all of the materials that

---

32

1  were submitted prior to today and having heard argument and
2  had my questions answered, I'm focused just today on the
3  plaintiff's motion to convert, which is a request that we
4  convert the defendants' motion to dismiss to a motion for
5  summary judgment.
6       That motion is denied.
7       Now, there are further subsidiary issues, one of
8  which is that the Court decide whether or not on the motion
9  to dismiss, it will consider the demand refusal letter.
10      I am going to consider the demand refusal letter
11 when it comes time to decide the motion to dismiss, but I'm
12 only going to consider it for purposes of understanding
13 what was communicated to the plaintiff. I'm not going to
14 consider the demand refusal letter for the truth of any
15 disputed fact are contained in that letter.
16      Similarly, any extraneous factual statements on
17 matters that are disputed that are contained in the
18 defendants' motion to dismiss briefs will not be considered
19 in resolving the motion to dismiss.
20      There is also the subsidiary dispute as to
21 whether plaintiff is entitled to take any discovery or will
22 be permitted to take any discovery in advance of the Court's
23 ruling on the motion to dismiss.
24      The plaintiff will not be permitted to take such
25 discovery.

---

33

1       There are several reasons that I think make what
2  I have said the right outcome on this very narrow motion.
3       First, the plaintiff admits that it did rely on
4  the letter, the demand refusal letter for certain undisputed
5  facts that it did not learn anywhere else -- facts such as
6  who was on the Committee that considered the demand. And,
7  of course, the fact that the demand was refused.
8       Those facts are in integral to the complaint, at
9  least for the reason that the plaintiff does have to plead
10 that demand was wrongfully refused, and we will have to find
11 that wrongful refusal was adequately pled in order for this
12 case to proceed beyond the motion to dismiss stage.
13      Also, the letter is indisputably authentic and
14 indisputably received by the plaintiff.
15      So I think it is appropriate that we consider
16 the demand refusal letter in connection with the motion to
17 dismiss in assessing the sufficiency of the complaint.
18      And because of all of those reasons, being
19 reasons why it's appropriate to consider the letter, there
20 is no need to convert the motion to dismiss to a motion
21 for summary judgment in order to consider the letter.
22      Why is it appropriate not to allow the plaintiff
23 to have discovery before deciding the motion to dismiss?
24      Well, first, if I understand the plaintiff's
25 position correctly, they're not asking for discovery in

---

34

1  light of our decision to not convert to a motion for summary
2  judgment, but also I think it is entirely appropriate to,
3  before granting discovery, attempt to assess the sufficiency
4  of the pleadings on the record -- the record consisting of
5  the complaint and the demand refusal letter to be taken for
6  the limited basis that I have already described.
7          It is also informative that the decision not
8  to allow discovery at this time is consistent with Delaware
9  law.
10         So that is the decision.  That is my reasoning
11  for it.  I will not be writing an opinion.  I'll simply
12  enter an oral order indicating that this is the decision.
13         Now, I understand by stipulation which the Court
14  entered as an order that the briefing on the motion to
15  dismiss has been stayed until this decision today.  I do
16  want the parties to meet and confer and figure out what the
17  remainder of that briefing schedule should be.
18         I'll give you all until Monday to submit
19  something to me.  I'm hopeful that whatever you submit will
20  be a joint proposal, that there won't be any disputes as to
21  what should happen next.
22         Are there any questions about any of what I have
23  said, Ms. Brown?
24         MS. BROWN:  No, Your Honor.
25         THE COURT:  And Mr. Nachbar?

35

1          MR. NACHBAR:  Nothing, Your Honor.
2          THE COURT:  Okay.  Well, thank you both very
3  much.  We will be in recess.
4          (Hearing ends at 4:31 p.m.)
5
6     I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.
7
8                  /s/ Brian P. Gaffigan
                   Official Court Reporter
9                  U.S. District Court
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**/**

/s [1] - 35:8

**1**

1 [1] - 29:1
11 [10] - 16:16, 16:18, 16:21, 20:24, 21:2, 21:12, 22:1, 22:3, 30:20, 30:22
12 [4] - 20:21, 20:23, 21:8, 21:16
12(b)(6 [1] - 8:1
12(b)(6) [1] - 8:6
13-1853-LPS [1] - 1:14
15 [1] - 1:17
16 [1] - 25:12

**2**

2015 [2] - 4:8, 28:10
2016 [1] - 1:17
220 [11] - 13:10, 14:1, 14:6, 14:7, 14:9, 19:23, 19:25, 24:20, 24:22, 24:23, 28:19
23.1 [2] - 5:4, 8:5
27th [1] - 28:10

**3**

30th [1] - 4:8
3:31 [1] - 2:17

**4**

45 [2] - 3:21, 3:25
4:31 [1] - 35:4

**A**

abide [1] - 8:24
able [6] - 8:10, 17:10, 17:15, 26:19, 27:21, 31:24
accept [2] - 17:11, 28:12
accurate [1] - 35:6
acknowledge [2] - 6:10, 31:22
acted [1] - 18:24
ACTION [1] - 1:4
action [9] - 4:8, 11:7, 11:20, 11:23, 13:10, 13:12, 14:6, 18:1
actions [2] - 13:19,

13:20
addressee [1] - 19:18
adequately [1] - 19:18
admit [1] - 17:6
admits [1] - 33:3
admitted [5] - 17:12, 19:20, 20:3, 20:23, 23:18
advance [1] - 32:22
advised [1] - 18:20
afternoon [9] - 2:18, 2:19, 2:23, 3:6, 3:7, 14:19, 14:20, 15:8, 23:19
ago [1] - 20:13
agree [4] - 6:13, 22:8, 23:3, 23:10
agreeable [1] - 23:1
agreed [4] - 18:4, 27:11, 27:12, 27:13
agreement [3] - 17:23, 18:2, 22:13
ALEX [1] - 1:10
allegation [4] - 21:10, 21:19, 21:22, 21:24
allegations [13] - 4:19, 4:20, 6:17, 7:17, 7:21, 7:24, 10:6, 10:17, 10:18, 16:14, 23:7, 27:1
allege [7] - 16:2, 16:18, 20:24, 21:6, 26:8, 26:11, 26:20
alleged [2] - 18:15, 26:9
alleging [1] - 20:17
allow [2] - 33:22, 34:8
allowed [1] - 20:15
allowing [1] - 18:9
alternative [6] - 9:20, 22:10, 23:1, 23:3, 23:4, 30:5
amount [1] - 9:13
analogy [2] - 17:23, 27:9
analysis [1] - 23:25
AND [1] - 1:7
ANN [1] - 1:8
annual [1] - 31:4
answer [1] - 24:5
answered [1] - 32:2
answering [4] - 16:13, 25:22, 26:20
apparent [1] - 10:16
APPEARANCES [2] - 1:20, 2:1
appearances [1] - 2:21
apply [2] - 24:1
appointed [1] - 29:4
appropriate [9] - 3:23,

3:24, 8:11, 15:24, 26:18, 33:15, 33:19, 33:22, 34:2
argue [2] - 10:7, 25:25
Argument [1] - 1:17
argument [9] - 2:16, 3:15, 9:15, 9:22, 12:15, 20:6, 28:16, 31:21, 32:1
arguments [2] - 10:8, 25:24
arises [1] - 18:2
Arsht [1] - 3:9
ARSHT [1] - 2:2
aside [2] - 13:1, 21:11
assess [1] - 34:3
assessing [1] - 33:17
associate [1] - 3:12
associates [1] - 3:2
assuming [1] - 27:25
attach [1] - 6:2, 16:1, 18:1
attached [1] - 12:13
attaching [1] - 22:7
attempt [1] - 34:3
attorney [3] - 12:12, 13:25
attorney-client [1] - 13:25
attorneys [1] - 2:19
August [1] - 28:10
AUSTIN [1] - 2:5
Austin [1] - 3:11
authentic [2] - 31:1, 33:13
authenticity [2] - 12:3, 31:2
available [1] - 19:13
avoid [1] - 31:9
aware [2] - 4:7, 4:17
awful [1] - 17:16

**B**

background [1] - 7:2
BARNETT [1] - 1:11
based [5] - 18:7, 18:11, 18:14, 28:18, 31:11
baseless [1] - 7:25
basis [22] - 5:3, 6:4, 7:7, 7:8, 8:6, 10:22, 12:23, 21:18, 21:19, 25:17, 26:24, 26:25, 29:12, 29:15, 29:17, 30:2, 30:9, 30:13, 30:15, 30:21, 34:6
BEFORE [1] - 1:19
beginning [1] - 2:17
behalf [4] - 1:4, 2:24,

3:9, 3:19
bench [1] - 31:24
benefit [1] - 27:18
BERNHARDT [1] - 1:10
better [1] - 25:6
between [5] - 9:5, 12:12, 27:9, 31:6, 31:7
beyond [2] - 17:9, 33:12
Bianca [1] - 3:2
BIERMAN [1] - 2:6
Bierman [1] - 3:10
big [2] - 27:9, 28:6
bit [3] - 17:22, 24:16, 28:4
black [1] - 18:5
Board [13] - 4:9, 11:7, 14:12, 15:1, 15:9, 15:12, 15:23, 17:5, 17:15, 18:24, 28:10, 28:11, 29:3
books [1] - 13:10
bound [1] - 27:13
breach [1] - 17:23
BRESALIER [1] - 1:4
Bresalier [1] - 14:25
Brian [2] - 1:25, 35:8
bridge [1] - 25:1
brief [14] - 4:5, 4:12, 6:18, 9:1, 10:2, 11:14, 16:13, 22:17, 23:8, 23:25, 24:7, 25:22, 25:25, 26:20
Brief [1] - 31:17
briefed [1] - 9:4
briefing [8] - 9:6, 13:10, 13:11, 18:14, 23:9, 28:8, 34:14, 34:17
briefly [2] - 11:1, 27:7
briefs [1] - 32:18
bring [1] - 27:14
brings [1] - 19:19
brought [1] - 13:11
Brown [2] - 2:24, 3:19
brown [2] - 27:6, 34:23
BROWN [26] - 1:23, 2:23, 3:18, 4:3, 5:17, 6:11, 7:10, 9:19, 9:24, 10:12, 10:15, 11:11, 11:20, 11:24, 12:2, 12:5, 12:18, 13:13, 13:16, 14:14, 27:7, 28:3, 29:24, 30:11, 31:13, 34:24
BROWNING [1] - 1:7
burden [5] - 18:25, 19:1, 20:16, 20:17,

24:16
Burlington [3] - 19:8, 23:12, 30:25
business [8] - 15:2, 15:10, 15:24, 16:1, 16:5, 16:6, 18:16, 18:23
buy [1] - 18:4
BY [3] - 1:22, 2:3, 2:6

**C**

capable [1] - 15:16
Carla [1] - 3:2
CARLOS [1] - 1:9
case [27] - 4:25, 9:9, 14:4, 14:5, 14:6, 15:4, 15:19, 15:20, 16:23, 17:4, 17:20, 19:8, 19:10, 19:24, 20:11, 22:11, 23:17, 25:4, 26:1, 26:7, 27:2, 27:9, 27:16, 31:1, 33:12
cases [6] - 15:4, 18:9, 19:7, 19:11, 23:14, 30:25
Casinos [1] - 23:13
cc'd [1] - 19:17
certain [5] - 5:14, 6:11, 10:6, 30:25, 33:4
certainly [9] - 8:24, 10:20, 10:21, 19:3, 22:6, 22:10, 26:14, 30:11, 30:16
certainty [1] - 30:14
certify [1] - 35:6
challenge [1] - 5:2
chance [3] - 8:8, 9:1, 13:7
Chancery [1] - 14:7
Chief [1] - 1:19
choice [6] - 15:6, 19:22, 20:5, 20:8, 20:15, 24:23
choose [1] - 21:5
chose [1] - 15:7
chosen [1] - 30:22
circumstance [1] - 18:6
circumstances [1] - 8:4
cite [3] - 16:25, 19:10, 19:11
cited [2] - 6:17, 15:4
CIVIL [1] - 1:4
claim [7] - 7:25, 15:5, 17:5, 17:23, 18:11, 18:17, 24:15
claims [5] - 11:5, 11:8,

15:7, 18:7, 18:21
**clear** [4] - 16:24, 19:24, 22:11, 23:12
**clearly** [5] - 18:1, 23:14, 23:17, 23:22
**client** [1] - 13:25
**close** [1] - 5:23
**Coat** [3] - 19:8, 23:13, 31:1
**colleague** [1] - 3:1
**coming** [1] - 5:10
**Committee** [22] - 5:21, 5:25, 7:3, 7:9, 10:19, 10:22, 16:4, 18:19, 18:20, 20:25, 21:7, 21:10, 21:14, 21:16, 21:21, 23:24, 26:3, 28:9, 33:6
**Committee's** [3] - 9:14, 26:12, 28:12
**committees** [1] - 13:22
**committing** [1] - 21:11
**communicate** [1] - 29:14
**communicated** [9] - 16:11, 17:11, 17:13, 28:1, 28:3, 29:21, 29:24, 32:13
**communicating** [2] - 29:14, 29:15
**compare** [1] - 26:20
**competent** [1] - 18:20
**complain** [1] - 30:23
**complaining** [1] - 17:8
**complaint** [24] - 4:7, 4:10, 4:14, 4:19, 4:20, 5:14, 6:9, 6:25, 7:6, 7:15, 10:6, 11:4, 11:5, 11:17, 12:13, 18:1, 24:9, 26:25, 28:23, 28:24, 30:9, 33:8, 33:17, 34:5
**completely** [1] - 27:21
**completeness** [1] - 12:15
**complicated** [1] - 17:21
**conceded** [2] - 14:25, 15:8
**concession** [1] - 15:11
**concluding** [1] - 26:24
**conclusion** [1] - 25:18
**conclusions** [1] - 10:8
**conclusory** [4] - 10:7, 21:19, 21:24, 27:1
**conduct** [1] - 21:12
**conducted** [1] - 26:3
**confer** [1] - 34:16
**confidential** [1] -

21:20
**connection** [1] - 33:16
**consider** [20] - 6:7, 6:20, 9:17, 15:25, 17:25, 22:14, 22:19, 22:20, 22:23, 23:4, 23:15, 27:24, 29:20, 32:9, 32:10, 32:12, 32:14, 33:15, 33:19, 33:21
**consideration** [1] - 13:18
**considerations** [1] - 7:3
**considered** [9] - 11:12, 14:3, 18:21, 19:5, 23:18, 30:8, 31:25, 32:18, 33:6
**considering** [5] - 4:17, 9:21, 22:9, 22:14, 28:11
**consistent** [4] - 16:18, 20:24, 26:14, 34:8
**consisting** [1] - 34:4
**contained** [2] - 32:15, 32:17
**contend** [1] - 11:4
**contending** [1] - 22:15
**contents** [1] - 12:6
**continue** [1] - 14:5
**Continued** [2] - 2:1
**contract** [11] - 17:3, 17:4, 17:23, 17:25, 18:5, 18:10, 27:8, 27:10, 27:13, 27:22
**contracts** [1] - 31:6
**contractual** [1] - 18:2
**contractually** [1] - 18:4
**contrary** [3] - 16:18, 20:18, 21:24
**convert** [13] - 3:16, 4:6, 8:14, 9:4, 9:7, 9:11, 9:18, 10:11, 25:12, 32:3, 32:4, 33:20, 34:1
**converted** [1] - 6:20
**converting** [1] - 22:21
**copy** [3] - 19:21, 20:10
**CORPORATION** [2] - 1:4, 1:14
**correct** [9] - 9:19, 11:8, 11:11, 11:19, 11:24, 15:13, 15:15, 16:22
**correctly** [2] - 14:25, 33:25
**correspondence** [3] - 12:11, 12:16, 28:22
**counsel** [13] - 1:24, 2:25, 3:11, 18:20,

19:16, 19:20, 24:21, 25:14, 27:17, 29:2, 30:2, 31:4, 31:8
**Counsel** [1] - 2:7
**counter** [1] - 16:15
**couple** [1] - 24:4
**course** [3] - 19:15, 24:24, 33:7
**Court** [27] - 1:25, 4:24, 6:19, 7:20, 7:21, 11:15, 12:1, 12:7, 12:16, 13:6, 14:7, 14:23, 16:3, 17:10, 19:6, 19:13, 20:6, 21:3, 22:5, 23:15, 23:19, 26:18, 32:8, 34:13, 35:8, 35:9
**COURT** [43] - 1:1, 2:18, 2:21, 3:5, 3:7, 3:14, 3:24, 5:12, 6:6, 7:5, 9:15, 9:20, 10:4, 10:14, 11:1, 11:18, 11:22, 11:25, 12:3, 12:10, 13:9, 13:14, 14:13, 14:16, 14:20, 15:11, 15:14, 16:20, 17:22, 21:2, 22:25, 23:22, 25:11, 27:3, 27:5, 27:23, 29:19, 30:5, 31:12, 31:14, 31:20, 34:25, 35:2
**court** [2] - 2:17, 21:9
**Court's** [1] - 32:22
**courtroom** [1] - 3:13
**craft** [1] - 17:15
**crazy** [1] - 20:8
**credit** [1] - 23:6
**credited** [1] - 27:2
**criminal** [1] - 25:16
**criteria** [1] - 29:3
**cross** [1] - 25:1
**cursory** [1] - 5:24

# D

**DANIEL** [1] - 1:7
**dealing** [2] - 27:16, 27:22
**debate** [1] - 10:5
**decide** [4] - 9:22, 22:9, 32:8, 32:11
**decided** [2] - 15:21, 28:12
**deciding** [1] - 33:23
**decision** [12] - 8:24, 9:7, 12:19, 13:17, 16:3, 16:5, 31:15, 34:1, 34:7, 34:10, 34:12, 34:15
**deemed** [2] - 22:24, 24:13

**defeat** [1] - 26:6
**Defendant** [1] - 1:15
**defendant** [2] - 12:10, 22:2
**defendant's** [1] - 12:1
**defendants** [12] - 3:9, 4:11, 4:13, 5:5, 7:21, 7:25, 8:3, 8:16, 9:3, 10:7, 19:12, 30:6
**Defendants** [2] - 1:12, 2:7
**defendants'** [3] - 6:18, 32:4, 32:18
**defendants's** [1] - 10:2
**deference** [1] - 16:6
**deficiency** [1] - 26:9
**DELAWARE** [1] - 1:2
**Delaware** [4] - 1:16, 14:24, 19:23, 34:8
**DELOACH** [1] - 1:9
**delve** [1] - 8:8
**demand** [66] - 4:9, 4:14, 4:21, 5:10, 5:13, 5:15, 5:22, 6:7, 6:24, 7:5, 7:8, 7:16, 8:18, 9:17, 9:21, 10:20, 10:23, 11:5, 11:6, 11:9, 11:12, 11:19, 12:4, 12:13, 13:2, 14:2, 14:7, 14:9, 14:11, 14:25, 15:2, 15:5, 15:6, 15:8, 15:10, 15:19, 15:25, 16:8, 17:4, 17:6, 18:7, 19:2, 19:15, 19:25, 23:18, 24:20, 24:22, 24:23, 27:16, 28:6, 28:13, 29:13, 32:9, 32:10, 32:14, 33:4, 33:6, 33:7, 33:10, 33:16, 34:5
**denied** [3] - 7:1, 13:20, 32:6
**deny** [2] - 8:6, 10:20
**derivative** [2] - 11:20, 11:22
**derivatively** [1] - 1:4
**derived** [1] - 10:1
**described** [1] - 34:6
**deserves** [1] - 5:8
**despite** [1] - 20:12
**detailed** [1] - 25:7
**determine** [1] - 29:3
**difference** [3] - 27:9, 31:5, 31:7
**different** [4] - 16:4, 18:6, 19:11, 27:21
**difficult** [2] - 15:21, 19:1

**diligently** [1] - 18:21
**DiMICCO** [1] - 1:7
**directors** [1] - 7:9
**disable** [1] - 15:16
**disagree** [1] - 16:2
**discovery** [21] - 5:9, 6:21, 8:15, 9:14, 9:15, 9:22, 13:7, 22:17, 22:18, 22:22, 22:24, 23:5, 23:21, 24:3, 32:21, 32:22, 32:25, 33:23, 33:25, 34:3, 34:8
**discussion** [1] - 13:9
**dismiss** [39] - 3:16, 4:11, 4:18, 6:8, 6:18, 7:23, 9:4, 9:6, 9:12, 9:23, 10:3, 10:5, 10:9, 12:17, 17:17, 17:18, 21:4, 21:13, 23:6, 23:8, 23:20, 23:25, 24:8, 24:12, 25:23, 26:7, 28:8, 32:4, 32:9, 32:11, 32:18, 32:19, 32:23, 33:12, 33:17, 33:20, 33:23, 34:15
**dismissed** [1] - 17:20
**dispositive** [1] - 19:3
**dispute** [6] - 5:18, 5:19, 11:25, 12:8, 30:3, 32:20
**disputed** [6] - 10:17, 10:18, 23:7, 29:23, 32:15, 32:17
**disputes** [1] - 34:20
**disputing** [2] - 12:3, 12:5
**disregard** [3] - 5:10, 8:17, 8:18
**distinguished** [1] - 23:13
**District** [1] - 35:9
**DISTRICT** [2] - 1:1, 1:2
**document** [6] - 13:4, 16:25, 17:7, 23:15, 23:16, 28:20
**documents** [6] - 14:10, 19:12, 25:15, 31:2, 31:6, 31:7
**Doe** [1] - 21:22
**Donald** [1] - 31:1
**done** [4] - 4:1, 11:16, 14:9, 28:19
**door** [2] - 22:17, 22:22
**down** [1] - 16:16
**draft** [1] - 23:15
**drafting** [3] - 23:24, 24:7, 24:9
**drawn** [1] - 31:3
**DRC** [2] - 25:13, 25:17

**Duke** [2] - 3:11, 15:1
**DUKE** [2] - 1:4, 1:14
**Dunn** [1] - 12:12
**duty** [1] - 17:16

**E**

**easier** [1] - 14:2
**egregious** [1] - 17:16
**either** [5] - 5:8, 8:13, 11:18, 15:24, 19:4
**elaborated** [1] - 25:7
**end** [1] - 5:4
**end-runaround** [1] - 5:4
**ends** [1] - 35:4
**ENERGY** [2] - 1:4, 1:14
**enter** [2] - 27:12, 34:12
**entered** [1] - 34:14
**entirely** [1] - 34:2
**entitled** [5] - 9:13, 9:22, 16:6, 20:1, 32:21
**entitlement** [1] - 9:16
**ESQ** [5] - 1:22, 1:23, 2:3, 2:3, 2:6
**essentially** [1] - 15:23
**evaluate** [1] - 21:13
**event** [1] - 9:16
**eventually** [1] - 11:2
**evidence** [2] - 25:13, 25:19, 26:3
**evidently** [1] - 20:13
**exactly** [1] - 28:17
**example** [1] - 21:9
**exchanged** [2] - 12:11, 28:23
**excluded** [1] - 10:3
**exercise** [4] - 15:1, 15:10, 15:12, 15:23
**Exhibit** [1] - 28:24
**exhibit** [2] - 22:16, 28:7
**existence** [1] - 29:10
**explicitly** [2] - 6:13, 6:14
**expressly** [1] - 16:25
**extent** [1] - 7:7
**extraneous** [7] - 4:15, 5:7, 5:10, 8:2, 8:8, 8:17, 32:16

**F**

**face** [1] - 18:13
**fact** [19] - 5:21, 10:20, 12:8, 13:2, 13:6, 15:19, 20:9, 21:19,

27:1, 28:22, 29:13, 29:15, 29:24, 30:2, 30:3, 31:11, 32:15, 33:7
**facts** [41] - 4:15, 4:23, 5:1, 5:7, 5:9, 5:10, 5:14, 5:18, 6:11, 6:15, 7:15, 8:2, 8:8, 8:10, 8:17, 8:19, 8:21, 10:1, 12:19, 12:22, 13:1, 13:4, 13:6, 16:8, 16:10, 16:15, 18:15, 24:13, 24:17, 26:11, 27:20, 27:24, 27:25, 28:1, 28:3, 29:23, 33:5, 33:8
**factual** [3] - 12:6, 23:7, 32:16
**Fagin** [1] - 19:10
**failed** [1] - 17:16
**fair** [4] - 5:6, 6:7, 7:5, 13:5
**fairly** [2] - 15:21
**faith** [1] - 16:17
**false** [1] - 21:21
**felt** [1] - 13:3
**few** [4] - 5:17, 6:15, 7:17, 31:15
**figure** [1] - 34:16
**file** [2] - 16:21, 30:22
**filed** [5] - 4:7, 4:10, 4:11, 20:11, 24:20
**filing** [3] - 6:25, 28:23, 29:22
**filings** [1] - 12:1
**fine** [2] - 21:22, 25:9
**firm** [2] - 3:10, 29:1
**first** [5] - 3:17, 6:24, 27:8, 33:3, 33:24
**focused** [1] - 32:2
**following** [1] - 2:16
**FOR** [1] - 1:2
**foregoing** [1] - 35:6
**form** [3] - 20:2, 25:7, 30:13
**formed** [2] - 6:4, 29:12
**FORSGREN** [1] - 1:7
**fortunate** [1] - 31:23
**four** [3] - 5:20, 11:6, 11:10
**fours** [1] - 19:9
**frame** [1] - 17:1
**friendly** [1] - 24:12
**front** [3] - 8:20, 13:6, 21:14
**full** [2] - 4:25, 12:16
**fully** [3] - 9:1, 11:14, 11:15
**futile** [1] - 15:6
**futility** [3] - 11:9,

11:13, 11:19

**G**

**Gaffigan** [2] - 1:25, 35:8
**garnered** [1] - 7:15
**Gerard** [1] - 3:12
**Gibson** [1] - 3:12
**given** [3] - 7:4, 20:10, 24:21
**glad** [1] - 22:15
**GOOD** [1] - 1:7
**goods** [1] - 18:4
**gospel** [1] - 17:12
**grant** [1] - 4:24
**granting** [1] - 34:3
**GRARY** [1] - 1:8
**Grass** [1] - 3:2
**great** [1] - 17:17
**Greenfield** [1] - 28:24
**guess** [2] - 15:16, 22:3

**H**

**HANCE** [1] - 1:8
**hand** [1] - 17:19
**hard** [1] - 8:22
**HARRIS** [1] - 1:9
**head** [3] - 16:15, 16:20, 30:20
**hear** [4] - 3:17, 14:18, 22:15, 27:6
**heard** [3] - 20:12, 23:12, 32:1
**Hearing** [1] - 1:17
**hearing** [3] - 2:17, 3:4, 35:4
**held** [2] - 2:17, 20:21
**help** [2] - 12:14, 25:4
**helpful** [1] - 31:21
**hereby** [1] - 35:6
**HERRON** [1] - 1:8
**high** [2] - 16:7, 26:2
**higher** [1] - 24:16
**hold** [1] - 26:19
**Honor** [53] - 2:20, 2:23, 3:6, 3:18, 3:20, 4:3, 4:7, 4:17, 4:21, 5:9, 5:17, 8:4, 8:13, 8:19, 8:20, 8:23, 9:9, 9:19, 9:24, 10:15, 10:24, 11:11, 11:21, 12:2, 12:5, 12:18, 13:13, 13:16, 13:21, 14:3, 14:5, 14:14, 14:19, 15:20, 17:21, 18:12, 22:1, 22:8, 22:12, 22:13, 22:18, 22:20, 22:23, 26:5,

26:23, 27:4, 27:7, 27:8, 28:7, 28:14, 31:13, 34:24, 35:1
**Honor's** [2] - 3:22, 24:5
**HONORABLE** [1] - 1:19
**hopeful** [1] - 34:19
**hopefully** [1] - 3:25
**Horowitz** [1] - 3:12
**house** [1] - 3:11
**HYLER** [1] - 1:9

**I**

**idea** [1] - 6:5
**Ill** [1] - 1:11
**implicating** [1] - 23:21
**implication** [1] - 30:19
**important** [3] - 18:18, 20:20, 24:18
**improper** [2] - 22:6, 26:12
**IN** [2] - 1:1, 1:2
**in-house** [1] - 3:11
**inappropriate** [1] - 26:12
**include** [1] - 4:13
**included** [2] - 10:2, 11:17
**incorporate** [1] - 16:25
**independence** [1] - 25:13
**indicate** [1] - 28:20
**indicating** [1] - 34:12
**indisputably** [2] - 33:13, 33:14
**inform** [1] - 11:15
**informant** [1] - 21:20
**information** [5] - 7:4, 14:11, 29:8, 29:11, 29:25
**informative** [1] - 34:7
**informed** [2] - 11:15, 25:16
**instance** [2] - 5:19, 18:9
**instances** [1] - 19:11
**instead** [1] - 8:7
**integral** [6] - 6:12, 7:6, 7:11, 7:15, 22:4, 33:8
**interested** [2] - 30:10, 30:12
**interview** [1] - 21:1
**interviewed** [4] - 20:21, 20:23, 25:15, 26:5
**intimidated** [1] - 30:17

**introduce** [2] - 4:15, 5:7
**introduced** [2] - 8:3, 8:7
**introducing** [1] - 4:23
**investigation** [4] - 25:14, 25:16, 26:4
**involved** [1] - 5:20
**involving** [1] - 27:9
**irrelevant** [1] - 19:4
**issue** [8] - 4:6, 9:11, 12:6, 13:3, 14:1, 14:22, 27:14, 30:20
**issues** [2] - 13:15, 32:7
**itself** [3] - 6:1, 9:25, 10:16

**J**

**JAMES** [5] - 1:8, 1:8, 1:10, 1:11
**jargon** [1] - 31:3
**job** [1] - 17:16
**John** [1] - 21:22
**JOHN** [2] - 1:7, 1:8
**joint** [1] - 34:20
**JR** [3] - 1:8, 1:9
**Judge** [1] - 1:19
**judgment** [18] - 3:17, 6:21, 8:14, 9:12, 9:18, 15:2, 15:10, 15:12, 15:24, 16:1, 16:5, 16:6, 18:16, 18:23, 22:21, 32:5, 33:21, 34:2
**judicial** [1] - 12:1
**June** [1] - 1:17

**K**

**keep** [2] - 4:4
**keeping** [1] - 6:24
**KENNARD** [1] - 1:9
**Kenneth** [1] - 3:8
**KENNETH** [1] - 2:3
**kind** [1] - 7:3
**kinds** [1] - 6:25
**knowing** [1] - 31:9
**knowingly** [1] - 14:9
**knowledge** [1] - 10:22
**knows** [1] - 15:20

**L**

**law** [9] - 14:4, 14:24, 16:23, 19:23, 22:11, 23:12, 24:6, 24:8, 34:9

lawsuit [1] - 27:15
learn [1] - 33:5
least [6] - 7:6, 13:10, 14:7, 15:7, 23:16, 33:9
leaves [1] - 15:18
left [1] - 3:25
legal [4] - 4:18, 8:1, 10:7, 11:7
LEONARD [1] - 1:19
letter [85] - 3:20, 4:14, 4:21, 5:11, 5:14, 5:15, 5:19, 5:22, 5:23, 6:7, 6:16, 6:17, 7:6, 7:11, 7:16, 7:17, 8:18, 9:17, 9:21, 9:25, 10:1, 10:16, 10:17, 10:20, 10:23, 12:4, 12:14, 12:20, 14:11, 14:22, 16:9, 17:6, 17:10, 17:12, 17:14, 18:8, 18:12, 19:3, 19:15, 20:18, 20:19, 21:6, 21:8, 21:14, 21:21, 22:4, 22:9, 22:12, 22:14, 22:16, 22:19, 22:21, 22:23, 23:5, 23:8, 23:18, 23:20, 25:5, 26:16, 26:17, 26:21, 27:17, 27:19, 27:24, 28:6, 28:16, 28:24, 29:13, 29:18, 29:20, 30:4, 30:9, 31:3, 31:8, 32:9, 32:10, 32:14, 32:15, 33:4, 33:13, 33:16, 33:19, 33:21, 34:5
letters [1] - 12:11
Levine [1] - 15:4
Liebesman [1] - 3:1
LIEBESMAN [1] - 1:22
light [1] - 34:1
likely [1] - 13:23
limited [4] - 5:8, 8:15, 9:13, 34:6
LISA [1] - 1:23
Lisa [2] - 2:23, 3:18
list [2] - 28:25, 29:6
litigation [5] - 8:21, 14:2, 28:13, 31:9, 31:10
LLP [3] - 1:22, 2:2, 2:5
look [9] - 5:1, 5:23, 5:24, 16:22, 17:3, 17:10, 18:9, 23:16, 23:20
looked [1] - 23:23
looking [1] - 7:4
looks [1] - 24:6
LYNN [1] - 1:7

**M**

manner [1] - 11:15
Mara [1] - 3:2
MARIE [1] - 1:10
materials [3] - 7:1, 31:25
matter [5] - 4:23, 5:24, 14:24, 16:12, 30:23
matters [1] - 32:17
MAYNARD [1] - 1:8
McCracken [3] - 1:22, 2:24, 3:19
MCKEE [1] - 1:10
mean [9] - 7:11, 16:23, 17:4, 18:12, 20:22, 21:19, 24:19, 24:25, 25:22
meaningful [1] - 23:13
means [3] - 7:11, 7:12, 20:24
measure [2] - 6:6, 8:11
mechanism [1] - 14:1
meet [6] - 8:1, 17:19, 20:16, 20:17, 21:16, 34:16
meetings [2] - 20:21, 29:2
members [3] - 10:19, 21:21, 29:4
Mendez [1] - 3:3
mentioned [3] - 6:3, 6:15, 14:10
merits [2] - 9:8, 11:1
MESERVE [1] - 1:10
met [11] - 8:1, 8:4, 18:19, 20:23, 20:25, 21:7, 21:8, 21:10, 21:14, 21:16, 21:22
MICHAEL [1] - 1:7
Michelle [1] - 3:11
might [6] - 10:7, 13:24, 28:19, 29:8, 30:10, 30:18
mind [3] - 6:24, 12:25, 24:1
minutes [3] - 3:21, 3:25, 31:16
mix [1] - 19:4
moment [1] - 28:1
Monday [1] - 34:18
monitoring [1] - 3:3
MONTGOMERY [1] - 1:22
Montgomery [2] - 2:24, 3:19
months [2] - 20:13
Morgan [1] - 19:24
MORRIS [1] - 2:2

Morris [1] - 3:8
most [1] - 24:5
mostly [1] - 5:10
motion [70] - 3:15, 3:16, 4:6, 4:10, 4:12, 4:18, 4:24, 6:7, 6:18, 6:21, 7:22, 7:23, 8:6, 8:14, 8:25, 9:3, 9:4, 9:6, 9:7, 9:11, 9:12, 9:23, 10:2, 10:5, 10:9, 10:10, 12:17, 16:9, 16:16, 16:21, 17:17, 17:18, 21:4, 21:13, 22:3, 22:9, 22:14, 23:5, 23:8, 23:20, 23:25, 24:8, 24:12, 25:11, 25:23, 26:6, 28:8, 30:8, 30:20, 31:22, 32:3, 32:4, 32:6, 32:8, 32:11, 32:18, 32:19, 32:23, 33:2, 33:12, 33:16, 33:20, 33:23, 34:1, 34:14
MR [14] - 3:6, 3:8, 14:19, 14:21, 15:13, 15:15, 16:22, 18:11, 21:17, 23:11, 24:4, 25:21, 27:4, 35:1
MS [25] - 2:23, 3:18, 4:3, 5:17, 6:11, 7:10, 9:19, 9:24, 10:12, 10:15, 11:11, 11:20, 11:24, 12:2, 12:5, 12:18, 13:13, 13:16, 14:14, 27:7, 28:3, 29:24, 30:11, 31:13, 34:24

**N**

NACHBAR [15] - 2:3, 3:6, 3:8, 14:19, 14:21, 15:13, 15:15, 16:22, 18:11, 21:17, 23:11, 24:4, 25:21, 27:4, 35:1
Nachbar [4] - 3:8, 14:18, 27:23, 34:25
name [1] - 10:19
names [2] - 5:20, 5:21
narrow [2] - 31:23, 33:2
nearly [1] - 3:22
necessarily [2] - 17:11, 20:20
need [5] - 8:2, 11:18, 16:20, 24:2, 33:20
needed [1] - 13:1
needs [3] - 19:4, 27:18
negotiated [1] - 27:11

nervous [1] - 30:17
never [8] - 6:2, 6:5, 7:18, 21:7, 21:10, 21:14, 21:22, 29:8
New [2] - 2:6
next [1] - 34:21
Nichols [1] - 3:9
NICHOLS [1] - 2:2
NO [1] - 1:14
Nominal [1] - 1:15
NOTE [1] - 2:16
notes [1] - 35:6
nothing [2] - 27:4, 35:1
notice [1] - 12:1
notwithstanding [1] - 21:6
number [1] - 12:11
numbers [1] - 25:14

**O**

obviously [6] - 5:22, 8:23, 10:18, 24:2, 28:7, 30:21
October [1] - 4:8
OF [1] - 1:2
Official [1] - 1:25, 35:8
once [2] - 8:22, 20:25
one [9] - 9:12, 13:18, 15:21, 19:16, 21:20, 28:6, 31:23, 32:7
ones [3] - 10:12, 10:16, 11:12
oOo [1] - 2:14
open [2] - 2:17, 22:17
opening [3] - 3:21, 4:12, 10:2, 22:16, 22:22, 24:7
operative [1] - 17:7
opinion [1] - 34:11
opportunity [4] - 5:1, 5:2, 11:14, 18:3
opposition [1] - 9:3
option [1] - 8:16
Oral [1] - 1:17
oral [2] - 2:16, 34:12
order [4] - 33:11, 33:21, 34:12, 34:14
ought [1] - 17:20
outcome [1] - 33:2
overcome [3] - 18:15, 18:22, 18:25

**P**

p.m [2] - 2:17, 35:4
page [1] - 25:12
pale [1] - 17:10
parsed [1] - 10:24

part [4] - 4:14, 8:9, 19:4, 23:20
participated [1] - 29:4
particularized [1] - 24:17
particularly [1] - 6:17
parties [3] - 9:5, 27:11, 34:16
past [1] - 14:1
path [1] - 22:2
pending [1] - 13:19
people [3] - 5:20, 20:22, 20:23
permission [1] - 3:22
permitted [3] - 3:21, 32:22, 32:24
person [2] - 19:16, 19:17
persons [1] - 5:20
PHILIP [1] - 1:11
Pinsky's [1] - 24:21
plaintiff [30] - 2:25, 3:17, 3:19, 4:22, 4:25, 5:8, 6:8, 8:12, 15:5, 15:18, 16:21, 17:25, 18:3, 19:13, 20:9, 21:9, 23:6, 24:12, 28:2, 28:5, 29:18, 29:22, 30:10, 32:13, 32:21, 32:24, 33:3, 33:9, 33:14, 33:22
Plaintiff [1] - 1:5
plaintiff's [7] - 3:15, 4:6, 7:24, 12:12, 32:3, 33:24
Plaintiffs [1] - 1:24
plaintiffs [17] - 15:22, 16:11, 16:13, 17:12, 17:13, 17:14, 18:14, 22:15, 22:22, 24:15, 24:19, 27:6, 28:21, 30:21
plaintiffs' [3] - 18:25, 19:16, 19:20
planning [1] - 9:8
plans [1] - 14:8
plea [1] - 25:17
plead [3] - 11:19, 18:21, 33:9
pleading [11] - 5:4, 8:5, 15:22, 16:7, 17:15, 17:20, 18:25, 20:16, 20:17, 23:15, 26:2
pleadings [2] - 17:1, 34:4
pled [5] - 11:9, 21:23, 24:13, 33:11
point [10] - 7:12, 9:2,

12:20, 13:2, 16:5, 20:19, 21:1, 25:23, 26:19, 30:24
pointed [2] - 27:8, 28:14
points [2] - 7:10, 12:10
portion [1] - 29:2
position [5] - 15:1, 15:9, 26:23, 33:25
positioned [1] - 15:15
possible [5] - 10:25, 13:18, 14:5, 15:18, 16:16
preference [1] - 23:4
prejudiced [3] - 4:22, 8:12
present [2] - 18:10, 29:2
presentation [1] - 4:2
presented [1] - 28:9
presenting [1] - 31:22
presumably [2] - 10:8, 23:9
presumption [4] - 18:16, 18:23, 18:24, 18:25
presumptions [1] - 24:17
pretty [3] - 16:24, 22:11, 23:12
privilege [2] - 13:25, 14:1
problem [8] - 6:1, 8:14, 8:18, 27:12, 28:4, 29:17, 29:25, 30:1
problematic [1] - 21:25
problems [1] - 28:6
procedural [2] - 4:5, 9:11
proceed [1] - 33:12
proceeding [2] - 5:6, 35:6
Proceedings [1] - 31:19
produced [1] - 13:24
pronouncing [1] - 14:25
proper [1] - 20:2
properly [5] - 14:22, 15:12, 18:24, 19:5, 23:19
proposal [1] - 34:20
protected [1] - 13:24
prove [2] - 15:23, 26:8
provided [1] - 4:11
purely [1] - 4:18
purpose [1] - 31:8
purposes [1] - 32:12

pursue [1] - 14:6
put [10] - 2:21, 6:19, 7:19, 8:19, 12:7, 13:5, 15:17, 19:12, 22:16, 25:9
puts [1] - 31:23
putting [1] - 21:11

Q

questions [7] - 4:2, 9:9, 14:15, 28:25, 29:6, 32:2, 34:22
quite [7] - 7:16, 23:2

R

raise [2] - 8:16, 9:2
raised [1] - 30:25
rather [2] - 5:5, 17:13
Raul [1] - 3:3
re [1] - 9:4
re-briefed [1] - 9:4
reached [2] - 16:4, 25:17
read [2] - 25:12, 26:6
real [1] - 27:12
really [4] - 14:1, 14:21, 16:15, 17:21
reason [5] - 17:24, 19:21, 21:5, 24:11, 33:9
reasonably [1] - 24:13
reasoning [2] - 12:14, 34:10
reasons [3] - 33:1, 33:18, 33:19
rebuttal [2] - 3:23, 14:17
receive [1] - 20:18
received [7] - 20:3, 20:4, 21:6, 29:8, 30:3, 30:4, 33:14
recently [1] - 15:21
recess [4] - 31:14, 31:17, 31:19, 35:3
Recommendation [5] - 23:23, 28:11, 28:15, 28:19, 30:6
recommendation [1] - 28:12
Recommendations [12] - 6:1, 6:3, 6:23, 7:18, 12:25, 28:5, 28:10, 29:7, 29:9, 29:10, 30:12, 30:16
reconvened [1] - 31:19
record [14] - 2:22, 4:16, 4:23, 4:25, 5:2,

7:19, 8:9, 10:3, 21:3, 21:25, 22:12, 27:20, 34:4
records [1] - 13:10
reference [1] - 17:1
refiled [1] - 8:25
refusal [45] - 4:14, 4:21, 5:11, 5:13, 5:15, 5:22, 6:4, 6:7, 7:6, 7:16, 8:18, 9:17, 9:21, 10:23, 12:4, 12:14, 12:20, 15:19, 15:20, 16:9, 17:4, 17:7, 18:8, 18:12, 18:17, 19:2, 19:15, 20:11, 24:15, 26:1, 26:7, 26:15, 26:16, 27:2, 27:17, 28:6, 28:16, 29:13, 32:9, 32:10, 32:14, 33:4, 33:11, 33:16, 34:5
refused [9] - 4:9, 5:22, 7:8, 11:19, 15:19, 17:5, 19:25, 33:7, 33:10
refusing [2] - 13:2, 17:6
REINSCH [1] - 1:11
reject [1] - 28:12
rejection [1] - 28:18
relatively [1] - 4:5
relevance [1] - 13:14
relevant [1] - 19:18
relied [9] - 5:25, 6:8, 6:13, 6:14, 7:2, 10:22, 12:24, 23:14, 28:15
rely [9] - 4:20, 5:13, 6:10, 6:18, 16:23, 17:1, 23:24, 24:9, 33:3
relying [1] - 28:16
remainder [1] - 34:17
remarks [1] - 3:21
remedy [1] - 22:1
renewed [1] - 23:9
reply [1] - 25:24
report [18] - 9:14, 19:19, 19:21, 20:1, 20:6, 20:10, 20:12, 20:14, 24:2, 24:19, 24:20, 25:6, 25:10, 30:9, 30:17, 31:4
Report [17] - 5:25, 6:3, 6:22, 7:18, 12:24, 23:23, 28:5, 28:9, 28:11, 28:15, 28:18, 29:7, 29:9, 29:10, 30:6, 30:12, 30:15
reported [1] - 26:15
Reporter [2] - 1:25,

35:8
REPORTER'S [1] - 2:16
representative [1] - 29:1
request [4] - 6:25, 19:25, 22:24, 32:3
requested [2] - 14:11, 20:9
required [1] - 26:6
research [1] - 11:16
resolving [1] - 32:19
Resorts [1] - 19:8
respect [4] - 11:3, 11:6, 11:9, 15:10
respond [1] - 2:19
response [3] - 4:10, 5:5, 25:20
rest [1] - 14:16
reverse [1] - 24:24
Review [1] - 5:21
reviewed [1] - 25:15
RHOADS [1] - 1:22
Rhoads [1] - 2:24
RHODES [1] - 1:8
RICHARD [1] - 1:10
rings [1] - 26:21
risks [1] - 18:8
road [1] - 16:16
ROGERS [1] - 1:10
rule [6] - 16:1, 16:5, 17:24, 18:16, 18:23, 31:24
Rule [10] - 16:16, 16:18, 16:21, 20:24, 21:2, 21:12, 22:1, 22:3, 30:20, 30:22
ruling [1] - 32:23
run [1] - 30:16
runaround [1] - 5:4

S

sake [1] - 12:16
SALADRIGAS [1] - 1:9
satisfied [1] - 20:13
SAUL [1] - 1:4
save [2] - 3:23, 14:16
saw [1] - 13:19
schedule [1] - 34:17
scope [3] - 25:14, 26:4, 26:10
seat [1] - 31:20
SEC [1] - 12:1
second [1] - 24:18
Section [1] - 19:23
see [3] - 4:1, 17:10, 26:21
seeing [1] - 30:12

seeking [2] - 13:23, 29:11
seem [2] - 17:9, 22:22
self [3] - 13:4, 27:19, 30:2
self-serving [3] - 13:4, 27:19, 30:2
sense [1] - 8:21
sent [3] - 6:24, 19:16, 23:23
serve [1] - 14:7
served [2] - 4:9, 14:10
serving [3] - 13:4, 27:19, 30:2
several [1] - 33:1
shareholder [1] - 20:9
SHARP [1] - 1:11
short [1] - 31:14
show [3] - 24:16, 26:11, 27:18
side [3] - 3:20, 24:8, 24:9
sides [2] - 22:13, 23:1
Sidley [1] - 3:10
SIDLEY [1] - 2:5
SIDNEY [1] - 1:22
significant [1] - 4:1
similar [1] - 10:8
similarly [1] - 32:16
simply [2] - 8:3, 34:11
simultaneously [1] - 15:5
situation [1] - 31:23
six [2] - 20:22, 20:23
slipshod [1] - 15:25
Smith [2] - 3:2, 15:4
sort [3] - 10:10, 10:12, 17:3
Spak [1] - 3:11
special [1] - 26:3
specific [3] - 9:9, 21:23, 26:11
specifically [4] - 16:24, 16:25, 19:20, 28:19
spot [1] - 10:25
squarely [1] - 19:9
stage [1] - 33:12
stand [2] - 8:5, 31:10
standard [10] - 5:4, 6:12, 7:22, 7:23, 8:1, 15:22, 16:7, 17:20, 24:12, 26:2
Stanley [1] - 19:24
STARK [1] - 1:19
state [4] - 5:5, 18:16, 19:23, 26:1
statements [1] - 32:16
STATES [1] - 1:1
stay [1] - 10:21
stayed [3] - 9:6, 14:6,

34:15
**stenographic** [1] - 35:6
**Steve** [2] - 3:1, 3:10
**STEVEN** [1] - 2:6
**still** [5] - 13:12, 14:5, 20:16, 24:17, 30:14
**stipulation** [2] - 9:5, 34:13
**stockholder** [1] - 15:3
**stop** [2] - 5:12, 12:19
**straightforward** [2] - 14:21, 24:5
**subject** [2] - 10:5, 21:12
**submit** [3] - 21:25, 34:18, 34:19
**submitted** [1] - 32:1
**subsidiary** [2] - 32:7, 32:20
**substance** [2] - 5:24, 6:16
**substantive** [1] - 18:7
**substantively** [1] - 18:2
**sufficiency** [2] - 33:17, 34:3
**sufficient** [2] - 18:15, 25:25
**suggest** [1] - 14:4
**suggesting** [1] - 21:15
**suing** [1] - 1:4
**suit** [1] - 29:22
**sum** [1] - 6:16
**summary** [9] - 3:16, 6:21, 8:14, 9:12, 9:18, 22:21, 32:5, 33:21, 34:1
**summer** [2] - 3:1, 3:12
**support** [2] - 4:12, 24:7
**suppose** [1] - 25:1
**survive** [1] - 17:17
**SUSAN** [1] - 2:3
**Susan** [1] - 3:10

## T

**table** [1] - 2:25
**tactical** [4] - 19:22, 20:5, 20:15, 24:23
**tainted** [2] - 8:21, 26:12
**test** [1] - 13:7
**tested** [2] - 13:5, 27:21
**THE** [44] - 1:1, 1:2, 2:18, 2:21, 3:5, 3:7, 3:14, 3:24, 5:12, 6:6, 7:5, 9:15, 9:20, 10:4,

10:14, 11:1, 11:18, 11:22, 11:25, 12:3, 12:10, 13:9, 13:14, 14:13, 14:16, 14:20, 15:11, 15:14, 16:20, 17:22, 21:2, 22:25, 23:22, 25:11, 27:3, 27:5, 27:23, 29:19, 30:5, 31:12, 31:14, 31:20, 34:25, 35:2
**therefore** [5] - 8:6, 9:17, 20:4, 23:19, 27:14
**they've** [3] - 15:8, 23:17, 26:10
**three** [2] - 11:6, 11:10
**today** [14] - 2:25, 9:9, 9:10, 10:10, 11:2, 13:3, 13:12, 18:13, 25:22, 30:6, 31:24, 32:1, 32:2, 34:15
**today's** [1] - 3:3
**transcript** [1] - 35:6
**true** [17] - 4:19, 7:22, 7:24, 8:10, 12:8, 13:6, 13:12, 13:13, 16:9, 16:10, 21:13, 24:14, 26:11, 26:21, 27:25, 29:23, 35:6
**Trump** [3] - 19:8, 23:13, 31:1
**truth** [2] - 17:12, 27:20, 32:14
**try** [1] - 19:12
**trying** [6] - 5:3, 5:6, 25:9, 30:16, 30:19, 31:9
**TUNNELL** [1] - 2:2
**Tunnell** [1] - 3:9
**turn** [1] - 27:5
**two** [4] - 7:10, 7:15, 11:5, 27:11
**type** [3] - 27:1, 27:22, 29:11
**types** [2] - 31:6, 31:7

## U

**U.S** [1] - 35:9
**uncertainty** [1] - 26:9
**uncontested** [1] - 8:10
**under** [5] - 5:4, 8:4, 8:5, 8:6, 19:23
**underneath** [1] - 27:15
**undisputed** [2] - 8:9, 33:4
**unethical** [1] - 21:12
**UNITED** [1] - 1:1
**unless** [2] - 9:9, 14:14
**unsee** [1] - 8:22

**up** [5] - 11:14, 12:19, 13:2, 26:19, 28:4

## V

**Valcarce** [1] - 3:3
**version** [1] - 13:4
**view** [3] - 16:20, 17:14, 22:25

## W

**WAESCO** [1] - 2:3
**Waesco** [1] - 3:10
**WALKER** [1] - 1:22
**Walker** [1] - 2:24
**wants** [1] - 23:6
**Warren** [1] - 28:25
**Wednesday** [1] - 1:17
**welcome** [2] - 3:5, 3:14
**whatsoever** [2] - 25:13, 25:19
**white** [1] - 18:5
**whole** [2] - 16:5, 20:6
**WILLIAM** [2] - 1:9, 1:11
**Wilmington** [1] - 1:16
**win** [2] - 17:18, 26:6
**withdrawn** [1] - 22:24
**WOOD** [1] - 2:3
**word** [1] - 17:11
**words** [1] - 15:3
**worse** [2] - 20:7, 25:4
**write** [3] - 25:11, 25:22, 25:24
**writing** [1] - 34:11
**written** [4] - 21:25, 27:17, 30:1, 31:8
**wrongful** [10] - 15:19, 15:20, 18:17, 20:11, 24:15, 26:1, 26:7, 26:15, 27:2, 33:11
**wrongfully** [1] - 33:10

## Y

**year** [1] - 17:5
**York** [2] - 2:6

## Z

**ZWALLY** [1] - 1:23

# EXHIBIT E

DEF 14A 1 a2218591zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.     )

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material under §240.14a-12



DUKE ENERGY CORPORATION
(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.
☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

   (4)   Date Filed:

Table of Contents



## Welcome to the Duke Energy Annual Shareholder Meeting



March 20, 2014

Dear Fellow Shareholders:

I am pleased to invite you to our annual shareholder meeting to be held on Thursday, May 1, 2014, at 10:00 a.m. in the O.J. Miller Auditorium located at 526 South Church Street in Charlotte, North Carolina.

As explained in the enclosed proxy statement, at this year's meeting you will be asked to vote (i) for the election of directors, (ii) for the ratification of the selection of the independent public accountant, (iii) for the approval, on an advisory basis, of Duke Energy Corporation's named executive officer compensation, (iv) for the amendment to Duke Energy Corporation's Amended and Restated Certificate of Incorporation to authorize shareholder action by less than unanimous written consent, (v) against two shareholder proposals, and (vi) to consider any other business that may properly come before the meeting.

This year's proxy statement includes certain items such as a proxy statement summary on page 6 and certain charts and illustrations to help better explain our corporate governance and compensation programs and objectives. With this document, our aim is to communicate with you the matters to be addressed at the meeting in a way that is simple and straightforward.

Your vote is important – exercise your shareholder right and vote your shares right away.

Please turn to page 12 for the instructions on how you can vote your shares over the Internet, by telephone or by mail. It is important that all Duke Energy shareholders, regardless of the number of shares owned, participate in the affairs of the Company. At Duke Energy's 2013 Annual Shareholder Meeting, approximately 84 percent of the Company's outstanding shares were represented in person or by proxy.

We hope you will find it possible to attend this year's annual shareholder meeting and thank you for your continued interest in Duke Energy.

Sincerely,

Lynn J. Good
*Vice Chairman, President and Chief Executive Officer*

Table of Contents

# INFORMATION ON THE BOARD OF DIRECTORS

## Our Board Leadership

Our Board of Directors is currently structured with an independent Chairman of the Board and a separate Vice Chairman who is also our President and Chief Executive Officer. On January 1, 2014, Ann Gray, previously the Company's independent lead director, became Chairman of the Board. Our President and Chief Executive Officer, Lynn Good, assumed the role of Vice Chairman in July 2013.

The Board of Directors believes that the Company and its shareholders are best served by the Board retaining discretion to determine the appropriate leadership structure for the Company based on what it believes is best for the Company at a particular point in time, including whether the same individual should serve as both Chief Executive Officer and Chairman of the Board, or whether the roles should be separate. In the event that the Board of Directors determines that the same individual should hold the positions of Chief Executive Officer and Chairman of the Board, the Company's Principles for Corporate Governance provide for an independent lead director to be appointed from among the independent directors.

## Director Attendance

The Board of Directors of Duke Energy met 10 times during 2013 and has met 3 times so far in 2014. The overall attendance percentage for our directors was approximately 95% in 2013, and no director attended less than 75% of the total of the Board of Directors' meetings and the meetings of the committees upon which he or she served in 2013. Directors are encouraged to attend the annual shareholder meeting. All members of the Board of Directors attended Duke Energy's last annual shareholder meeting on May 2, 2013.

## Risk Oversight

The Board of Directors is actively involved in the oversight of risks that could affect Duke Energy. This oversight is conducted primarily through the Finance and Risk Management Committee of the Board but also through the other committees of the Board, as appropriate. See below for descriptions of each of the committees. The Board and its committees, including the Finance and Risk Management Committee, satisfy its risk oversight responsibility through reports by each committee chair regarding the committee's considerations and actions, as well as through regular reports directly from officers responsible for oversight of particular risks within Duke Energy.

## Independence of Directors

The Board of Directors may determine a director to be independent if the Board of Directors has affirmatively determined that the director has no material relationship with Duke Energy or its subsidiaries (references in this proxy statement to Duke Energy's subsidiaries shall mean its consolidated subsidiaries), either directly or as a shareholder, director, officer or employee of an organization that has a relationship with Duke Energy or its subsidiaries. Independence determinations are generally made on an annual basis at the time the Board of Directors approves director nominees for inclusion in the proxy statement and, if a director joins the Board of Directors in the interim, at such time.

The Board of Directors also considers its Standards for Assessing Director Independence, which set forth certain relationships between Duke Energy and directors and their immediate family members, or affiliated entities, that the Board of Directors, in its judgment, has deemed to be material or immaterial for purposes of assessing a director's independence. Duke Energy's Standards for Assessing Directors Independence are linked on our website at http://www.duke-energy.com/corporate-governance/board-of-directors/independence.asp. In the event a director has a relationship with Duke Energy that is not addressed in the Standards for Assessing Director Independence, the independent members of the Board of Directors determine whether such relationship is material.

The Board of Directors has determined that none of the directors, other than Ms. Good, has a material relationship with Duke Energy or its subsidiaries, and all are, therefore, independent under the listing standards of the NYSE and the rules and regulations of the SEC. In arriving at this determination, the Board of Directors considered all transactions and the materiality of any relationship with Duke Energy and its subsidiaries in light of all facts and circumstances.

*DUKE ENERGY – 2014 Proxy Statement*   21

Back to Contents

INFORMATION ON THE BOARD OF DIRECTORS

Finance and Risk Management Committee

5 meetings held in 2013

**Committee Members**

James H. Hance, Jr., Chairperson
William Barnet, III
Michael G. Browning
John H. Forsgren
Ann M. Gray
James B. Hyler, Jr.
William E. Kennard
E. James Reinsch



James H. Hance, Jr.

- The *Finance and Risk Management Committee* is primarily responsible for the oversight of risk at the Company. This oversight function includes reviews of Duke Energy's financial and fiscal affairs and recommendations to the Board of Directors regarding dividends, financing and fiscal policies, and significant transactions. It reviews the financial exposure of Duke Energy, as well as mitigation strategies, reviews Duke Energy's risk exposure as related to overall company portfolio and impact on earnings, and reviews the financial impacts of major projects as well as capital expenditures.

Nuclear Oversight Committee

7 meetings held in 2013

**Committee Members**

James T. Rhodes, Chairperson
G. Alex Bernhardt, Sr.
Harris E. DeLoach, Jr.
Daniel R. DiMicco
John H. Forsgren
John T. Herron
E. James Reinsch
Philip R. Sharp



James T. Rhodes

- The *Nuclear Oversight Committee* provides oversight of the nuclear safety, operational performance and long-term plans and strategies of Duke Energy's nuclear power program. The oversight role is one of review, observation and comment and in no way alters management's authority, responsibility or accountability.

24   DUKE ENERGY – *2014 Proxy Statement*

Table of Contents

# REPORT OF THE AUDIT COMMITTEE

The following is the report of the Audit Committee with respect to Duke Energy's audited financial statements for the fiscal year ended December 31, 2013.

The information contained in this Audit Committee Report shall not be deemed to be "soliciting material" or "filed" or "incorporated by reference" in future filings with the SEC, or subject to the liabilities of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), except to the extent that Duke Energy specifically incorporates it by reference into a document filed under the Securities Act of 1933, as amended, or the Exchange Act.

The purpose of the Audit Committee is to assist the Board in its general oversight of Duke Energy's financial reporting, internal controls and audit functions. The Audit Committee Charter describes in greater detail the full responsibilities of the committee and is available on our website at http://www.duke-energy.com/corporate-governance/board-committee-charters/audit.asp.

The Audit Committee has reviewed and discussed the consolidated financial statements with management and Deloitte & Touche LLP ("Deloitte"), the Company's independent public accountant. Management is responsible for the preparation, presentation and integrity of Duke Energy's financial statements; accounting and financial reporting principles; establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)); establishing and maintaining internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)); evaluating the effectiveness of disclosure controls and procedures; evaluating the effectiveness of internal control over financial reporting; and, evaluating any change in internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, internal control over financial reporting. Deloitte is responsible for performing an independent audit of the consolidated financial statements and expressing an opinion on the conformity of those financial statements with accounting principles generally accepted in the United States ("GAAP"), as well as expressing an opinion on the effectiveness of internal control over financial reporting.

The Audit Committee reviewed the Company's audited financial statements with management and Deloitte, and met separately with both management and Deloitte to discuss and review those financial statements and reports prior to issuance. These discussions also addressed the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. Management has represented, and Deloitte has confirmed, that the financial statements were prepared in accordance with GAAP.

In addition, management completed the documentation, testing and evaluation of Duke Energy's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002, and related regulations. The Audit Committee was kept apprised of the progress of the evaluation and provided oversight and advice to management during the process. In connection with this oversight, the Audit Committee received periodic updates provided by management and Deloitte at each regularly scheduled Audit Committee meeting. At the conclusion of the process, management presented to the Audit Committee on the effectiveness of the Company's internal control over financial reporting. The Audit Committee also reviewed the report of management contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013 ("Form 10-K") filed with the SEC, as well as Deloitte's Report of Independent Registered Public Accounting Firm included in the Company's Form 10-K related to its audit of (i) the consolidated financial statements and (ii) the effectiveness of internal control over financial reporting. The Audit Committee continues to oversee the Company's efforts related to its internal control over financial reporting and management's preparations for the evaluation in fiscal 2014.

The Audit Committee has discussed with Deloitte the matters required to be discussed by professional and regulatory requirements, including, but not limited to, the standards of the Public Company Accounting Oversight Board regarding The Auditors' Communications with Those Charged with Governance. In addition, Deloitte has provided the Audit Committee with the written disclosures and the letter required by "Public Company Accounting Oversight Board Ethics and Independence Rule 3526, Communications with Audit Committees Concerning Independence" that relates to Deloitte's independence from Duke Energy and its subsidiaries and the Audit Committee has discussed with Deloitte the firm's independence.

Based on its review of the consolidated financial statements and discussions with and representations from management and Deloitte referred to above, the Audit Committee recommended that the audited financial statements be included in Duke Energy's Form 10-K, for filing with the SEC.

Audit Committee
Carlos A. Saladrigas *(Chair)*
G. Alex Bernhardt, Sr.
Michael G. Browning
John H. Forsgren
James B. Hyler, Jr.
James T. Rhodes

Page 81 of 104

Back to Contents

COMPENSATION DISCUSSION AND ANALYSIS

provide completely independent advice to the Compensation Committee and is not permitted to provide any services to Duke Energy other than at the direction of the Compensation Committee. With the consent of the Chair of the Compensation Committee, the consultant may meet with management to discuss strategic issues with respect to executive compensation and assist the consultant in its engagement with the Compensation Committee. The Compensation Committee has assessed the independence of Frederic W. Cook & Company, Inc. pursuant to SEC rules and concluded that no conflict of interest exists that would prevent the consulting firm from independently advising the Compensation Committee.

## Additional Compensation Matters

### Consideration of Results of Shareholder Advisory Votes on Executive Compensation

As required by the Dodd-Frank Act, we included a shareholder vote on executive compensation in last year's proxy statement. Because our shareholders supported the compensation of our named executive officers as disclosed in the 2013 proxy statement (i.e., 78% of the votes represented in person or by proxy), the Compensation Committee views the results of this advisory vote as confirmation that our compensation program, including our emphasis on pay-for-performance, is structured and designed to achieve our stated goals and objectives. As a result, we have continued to emphasize pay-for-performance alignment, and our 2013 compensation program, as previously described, continues to reflect this philosophy.

### Risk Assessment of Compensation Policies and Practices

In consultation with the Compensation Committee, members of management from Duke Energy's Human Resources, Legal and Risk Management groups assessed whether our compensation policies and practices encourage excessive or inappropriate risk-taking by our employees, including employees other than our named executive officers. This assessment included a review of the risk characteristics of Duke Energy's business and the design of our incentive plans and policies.

Management reported its findings to the Compensation Committee, and after review and discussion, the Compensation Committee concluded that our plans and policies do not encourage excessive or inappropriate risk-taking. Although a significant portion of our executive compensation program is performance-based, the Compensation Committee has focused on aligning Duke Energy's compensation policies with the long-term interests of Duke Energy and avoiding rewards that could create unnecessary risks to the Company, as evidenced by the following:

- We do not use highly leveraged STI goals, but instead the STI opportunities are based on balanced performance metrics that promote long-term goals, and all payouts are capped at a pre-established percentage of the target payment opportunity.

- Our LTI opportunities generally vest over a period of three years in order to focus our executives on long-term performance and enhance retention. Our performance shares are granted annually and have overlapping three-year performance periods, so any inappropriate risks taken to increase the payout under one award could jeopardize the potential payouts under other awards.

- We use a variety of performance metrics (i.e., adjusted diluted EPS, O&M expense, reliability, safety, and TSR) that correlate to long-term value, and our performance goals are set at levels that we believe are reasonable in light of past performance and market conditions.

- Our stock ownership policy requires the members of our Executive Leadership Team, including our named executive officers, to hold a minimum level of Duke Energy shares so that each executive has personal wealth tied to the long-term success of Duke Energy and is therefore aligned with shareholders.

- We maintain a "clawback policy," which allows Duke Energy to require the reimbursement of any incentive compensation, the payment of which was predicated upon the achievement of financial results that were subsequently the subject of a restatement caused or partially caused by the recipient's fraud or misconduct. It also entitles us to recover inadvertent payments based on an incorrect calculation.

### Tax and Accounting Implications

Deductibility of Executive Compensation. The Compensation Committee reviews and considers the deductibility of executive compensation under Section 162(m) of the Code, which provides that Duke Energy generally may not deduct, for federal income tax purposes, annual compensation in excess of $1 million paid to certain employees. Performance-based compensation paid pursuant to shareholder approved plans is not subject to the deduction limit as long as such compensation is approved by "outside directors" within the meaning of Section 162(m) of the Code and certain other requirements are satisfied.

Although the Compensation Committee generally intends to structure and administer executive compensation plans and arrangements so that they will not be subject to the deduction limit of Section 162(m) of the Code, the Compensation Committee may, from time to time, approve payments that cannot be deducted in order to maintain flexibility in structuring appropriate compensation programs in the interests of

# EXHIBIT F

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.     )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
☐   Preliminary Proxy Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☐   Definitive Proxy Statement
☒   Definitive Additional Materials
☐   Soliciting Material under §240.14a-12

**DUKE ENERGY**

DUKE ENERGY CORPORATION
(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.
☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
    (1)   Amount Previously Paid:

    (2)   Form, Schedule or Registration Statement No.:

    (3)   Filing Party:

    (4)   Date Filed:

On April 21, 2014, Lynn J. Good, Vice Chairman, President and Chief Executive Officer of the registrant, Philip R. Sharp, Chair of the Regulatory Policy and Operations Committee of the registrant's Board of Directors, and Julie S. Janson, Executive Vice President, Chief Legal Officer and Corporate Secretary of the registrant, participated in a conference call moderated by Glass, Lewis & Co.  A transcript of that call is included below:

Bob McCormick: ...of a Duke Energy Corporation directors, a couple of whom, CalPERS and New York City Comptroller's Office, they show us a vote against. Just before we get started I'd like to remind everyone that our conference call series, and this call in particular, should not be considered a solicitation of proxies by Glass Lewis and Company. Glass Lewis has not sought permission to do so from the Securities and Exchange Commission, nor will it. This call is for informational purposes only and should not be construed as providing investment advice. In addition, Glass Lewis makes no representation regarding the accuracy, completeness or liability of any statement, information, opinion or views presented by its guest speakers.

All lines have been placed on a listen-only mode for this call. However, if you have questions, please enter them in the question box in the webinar window. We are going to be recording this call, so it will be available on our website subsequent to the call.

So, we're very pleased to be joined by a few representatives from Duke Energy. First we have Lynn Good, the Vice-Chairman, President and CEO. We also have Philip Sharp, who chairs the Regulatory Policy and Operations Committee on the Board of Directors and we also have Julie Janson, who is the Executive Vice President, Chief Legal Officer and Corporate Secretary.

Just some brief background before I turn it over to Lynn. CalPERS and New York City Comptroller's Office believe shareholders should vote against the election of four Duke Energy Corporation directors: Alex Bernhardt, James Hyler, James Rhodes and Carlos Saladrigas for what they believe is a failure to fulfill their obligations of risk oversight as members of a committee overseeing health, safety and environment for plants at the Company as a result of a large coal ash spill on the Dan River in North Carolina.

The Duke Energy annual meeting is coming up on May 1st. Just a reminder: if you have questions, feel free to load them in the question box. At this point it's my pleasure to turn it over to Lynn and you can follow along with presentation. Lynn, thanks for joining us and please take it away.

Lynn J. Good: Thank you, Bob and welcome everyone. My name is Lynn Good, I am Vice Chairman, President and Chief Executive Officer of Duke Energy. And as Bob announced, with me today are Phil Sharp the Chairman of our Board's Regulatory Policy and Operations Committee and Julie Janson, Executive Vice President, Chief Legal Officer and Corporate Secretary.

Before getting into our prepared remarks, let me briefly review our Safe Harbor statement on slide 2 in our accompanying presentation, as some of our remarks today will be forward looking

2

in nature. Please refer to our SEC filings for factors that could cause our future performance to differ from this forward looking information.

Our presentation today will provide an overview of the Dan River incident, Duke's response and our plans for coal ash management going forward. We will also discuss the role of the Board's Regulatory Policy and Operations Committee in providing oversight on this important matter. Throughout our presentation, we will also address a number of inaccuracies in CalPERS' presentation to Glass Lewis last Thursday.

Let me begin with slide 3 which provides an overview of the Dan River incident. On Sunday, February 2nd, 2014, a break in a storm water pipe beneath our retired Dan River primary ash pond was discovered leaking coal ash and water from the ash basin into the Dan River. The facility is located in Eden, North Carolina in Rockingham County near the Virginia border. We estimate that between 30,000 and 39,000 tons of ash was released into the river.

I would like to put the Dan River release into perspective. You may remember the 2008 incident in Kingston, Tennessee when a dam break released ash into the surrounding community. This incident, at a TVA facility, involved over 5 million tons of ash being released. The Dan River release was less than 1% of this amount.

It is also important to clarify that the Dan River incident was not a basin dam failure — rather it was a storm water pipe failure. The bottom line is that what happened at Dan River was an accident and it is one for which Duke has taken responsibility. Safe operations are non-negotiable in our  business. And we're very focused on moving forward and doing the right thing.

Before I move to a discussion of Duke's response, I want to take a moment to explain what coal ash is. Coal naturally contains inorganic matter from the rocks and minerals in the coal seam where it was mined.  When that coal is burned, the inorganic matter in the coal becomes coal ash. The US Environmental Protection Agency has considered coal ash a non-hazardous waste for decades and accordingly, ash has been used in a number of industrial applications, including production of cement and use as industrial fill. The EPA is scheduled to release additional regulations on ash in December of 2014, and will address whether the non-hazardous designation should change.

Turning to slide 4, I'd like to discuss Duke's response. Once the leak was discovered we immediately mobilized resources to address the situation. Over a period of several days, hundreds of our people worked with experts around the clock to engineer, design and manage plans to stop the pipe's flow to the Dan River. I was on-site shortly after it happened, and I can tell you the scale of the operation was massive. Our efforts were successful and we permanently plugged the storm water pipe and stopped the release of ash into the river. I think it's important to note that drinking water remained safe the entire time. Furthermore, ongoing water sampling demonstrates the Dan River has returned to normal water quality conditions. Our scientists continue to work closely with experts from the EPA, U.S. Fish and Wildlife Service, Virginia Department of Environmental Quality and N.C. Department of Environment and Natural Resources to study and monitor the Dan River.

As previously stated, we will not ask customers to pay the costs associated with cleaning up this incident.  Our recent 8-K filing reports that we incurred approximately $15 million in costs associated with the clean-up and remediation efforts at Dan River for the quarter ended

3

March 31, 2014. The total costs to be incurred by the Company to remediate the Dan River ash release are not expected to be material.

While we have done a lot of work at and near the site, we know there is more to do. We are accountable for this, we've taken responsibility and we are prepared to move forward and make the lessons learned from Dan River a part of our ongoing operations, because our commitment to safety has not changed.

I will now hand it over to Phil to provide comments on the role of Duke's Regulatory Policy and Operations Committee as well as to discuss the role and oversight of Duke's Board of Directors. Julie will then provide a few comments on the legal landscape and I will close with remarks about Duke's overall plan for coal ash management going forward. Let me turn the call over to Phil. Phil, if you could take slide 5 at this point.

Bob McCormick: Phil, we're not hearing out of... you're on mute, but we're not able to hear you right now. I apologize, ladies and gentlemen. We're figuring some technical difficulties. Phil looks like he may have got disconnected at this point. He may need to dial back in [inaudible].

Lynn J. Good: You know, Bob, while we're waiting for Phil to dial back in, what I might do is ask Julie to cover Phil's material, as well as her own and then we'll have Phil jump in.

Julie S. Janson: I'd be happy to do that. So, I'll cover now for Phil to discuss slide 5, which provides details on Duke's Regulatory Policy and Operations Committee. As the Board evolved following the merger with Progress Energy in 2012, the various committees were reconstituted accordingly. As part of this process, the Regulatory Policy and Operations Committee was formed in July of 2012. Its purpose is to provide oversight for regulatory strategy and environmental, health and safety issues as well as the public policies and practices of the Company. The Committee currently has seven members. CalPERS targeted four individuals due to their longstanding tenure on this Committee. However, it is worth noting that three of these four individuals joined the Committee in January. We firmly believe that this Committee has the requisite skills and experience to provide effective oversight and appropriately perform its duties.

Philip R. Sharp: I just re-went in and they tell me I'm on the listening mode, I can't speak.

Lynn J. Good: Phil, we can hear you.

Julie S. Janson: We can hear you, Phil.

Philip R. Sharp: Oh, good.

Lynn J. Good: If you would like to pick up on the discussion Julie just briefly covered, maybe CalPERS identification of four members and then she was moving into the requisite skills and experience of the Committee, if you would like to continue at this point.

Philip R. Sharp: Alright, I will try to pick up there. I think, I don't know if Julie indicated to you that there was the broad scale of experience that people have, but I think one of the important things is to recognize too that several members of Duke's Board of Directors have actually had experience, management experience at coal fired utilities.

4

And if you turn to slide 6, I think you'll see the outline with respect to specific individuals. As you can see, they're very diverse backgrounds that have valuable skills that are transferrable across many fields.

For example, Bernhardt, Herron and Rhodes all have extensive nuclear experience that includes risk analysis, safety priority, and environmental issues, including hazardous disposal — all of which is transferrable to the Dan River issues and other coal basin issues. Furthermore, Jim Rhodes, a former CEO of Virginia Electric & Power Company as well as the Institute of Nuclear Power Operations which, as you probably know, is a nonprofit corporation which promotes safety, reliability and excellence in nuclear plant operation — also serves as the chairman of Duke's Nuclear Oversight Committee. Alex Bernhardt also has knowledge of environmental and water quality issues in North Carolina and in the region because of this membership and his leadership in various environmental organizations. Jim Hyler has knowledge and expertise in financial services, corporate finance and risk management, as well as an understanding of Duke's North Carolina service territory, including experience that's extremely important dealing with the North Carolina Utilities Commission. Carlos Saladrigas has extensive experience in human resources, financial services, and accounting and international operations. As an executive in the health care field, Mr. Saladrigas also has experience in the regulatory arena. Carlos currently serves as chairman of Duke's Audit Committee.

So, not only are the Regulatory Policy and Operations Committee members capable of doing the business appropriate to the Committee, you can see that they have a very important role elsewhere on the Board of Directors and if you were to remove them from the Board, you would certainly undermine the Board's ability to effectively oversee the safe operations of all of Duke's Energy facilities.

In addition, the Board has engaged its own independent counsel to advise on this issue, including appropriate oversight of the review and investigation of the matter. If, at any time, we believe the Company's shareholders would be better served by the Board or Committee initiating an independent investigation, separate from the thorough reviews already underway within the Company, as well as the various state and federal regulators who are examining the issue, we certainly would not hesitate to do so.

If you turn to slide 7, it provides an overview of the Board's oversight and its engagement on this issue. Clearly, the Dan River incident has the full attention of the entire Board. Coal ash management has been a focus area of the Board and the Committee for quite some time. Let me say that again, this issue has been a focus of the Board for quite some time. In fact, the Board and the Committee were already overseeing management's operational and risk assessment work regarding coal ash management prior to the Dan River incident. This prior oversight of coal ash matters included Board and Committee meetings, as well as management updates. Since the incident in February, the Board has been updated regularly and has met frequently to discuss the matter. To date, the Board and the Committee have held 5 meetings and have received 13 updates from management, not to mention a host of informal calls. The Board and the Committee have been, and will continue to be, actively engaged in reviewing this very serious matter with management and in overseeing the Company's response.

At the direction and under the guidance of the Board and the Committee, the Company has already taken a number of major actions in the short-term. These include first the establishment of an internal strategic task force, reporting directly to Lynn to undertake a comprehensive engineering review of every Duke ash basin. This review will be the basis for implementing

5

near-term actions and developing longer-term solutions across our entire system. John Elnitsky, the head of the task force, has met with the Committee already. The engagement of independent... the second action is the engagement of independent third-party engineering experts to complete an assessment of all of our ash basins. We expect this work to be completed by May 31 and we'll take, we will take immediate action based on its recommendations. Third, the development of a near-term plan in North Carolina for three of our retired plants and three of our active operating units. The task force has also developed an approach to risk reduction at ash ponds at our retired North Carolina plants by accelerating the removal of water from those ash basins.

We on the Board are very pleased with the solid work that has been completed to date to address the incident and are confident in the Company's ability to address the near-term issues and prepare for the longer term actions that will be required for a comprehensive and successful coal ash management plan. I can assure you that the entire Board is focused on getting this right. We take very seriously our responsibility to our shareholders, our customers, our employees and the communities in which we operate. We recognize that safely and cost effectively managing 90 years' worth of coal ash is a complex challenge, and one that requires a great deal of thought and evaluation. We must find constructive near- and long-term solutions that are prudent, safe, cost-effective and environmentally sound.

It is important to note that Duke is working towards addressing every ash basin across our entire system, and creating an industry-leading plan for coal ash management. All of our director nominees, including the members of this Committee, have the requisite experience, knowledge, judgment and the dedication to effectively oversee the development and the execution of our comprehensive coal ash management plans.

I'll end by stating that Duke's Board of Directors strongly endorses all of the Company's director nominees, and unanimously recommends that shareholders vote for all Duke director nominees.

And I'll now turn it over to Julie who will address and clarify some of the legal matters around this situation.

Julie Janson: Phil, thank you. I just wanted to take an opportunity to provide some context on the ongoing grand jury investigation and the NCDENR enforcement litigation. As I am sure you can appreciate, it is company policy not to comment on pending litigation or governmental investigations. However, I can say that these cases did not deal with structural integrity of dikes or storm water pipes. So to suggest the lawsuits were a forewarning of the particular risk and accident that occurred at Dan River is simply inaccurate and misleading. Although the litigation has the potential to delay elements of the ash basin closure process, the Company will continue its ongoing evaluation of closure alternatives. A process that began well before the litigation started. To that end, Duke is working towards addressing every ash basin across our entire system, and creating an industry-leading plan for coal ash management about which Lynn will now provide a few details.

Lynn Good: Thank you, Julie. Let me close with slide 8, which provides an overview of our coal ash basins in North Carolina. North Carolina has a great history of proactive energy policy. We modernized our fleet long before other states and built cleaner power generation and retired older plants. Our ash management practices have evolved over time as we transition to cleaner, more efficient energy sources. As part of this plan, we place a high priority on closing ash basins across the fleet once they are no longer needed. In light of the Dan River incident we are

6

taking another look at our coal ash management and basin closure plans and are committed to a fact-based and disciplined approach to addressing the long-term policy of ash basin management and closure across our system.

As mentioned, we have initiated a near-term engineering review of the ash basins to identify and address potential risks and are already moving forward on our near-term actions. We've committed to relocating ash at our River Bend and Dan River sites. We continue to relocate Ash at our Asheville site, and we've agreed to accelerate closure of ash basins at an additional plant. We've also begun engineering, to convert all of our remaining coal facilities to dry fly ash handling, which essentially means that ash will go directly into lined landfills. And we've also committed to lower water levels in our retired facilities, which reduces the water pressure in those basins.

Duke operates 71 ash basins, 33 of which are in North Carolina. There are approximately 676 ash basins around the US. This is an industry and national issue. When you talk about something of that magnitude, it's going to take science, it's going to take engineering and it's going to take time. Every site is situated differently and needs to be addressed with an appropriate engineered solution.

There are also regulations that the EPA is continuing to address around ash. As we develop solutions, we need to assure that these solutions line up with regulatory requirements on this industry issue.

I think it's also important to note that we need to continue to think about balance. Of course we must protect the environment. We also must promote safe, reliable and cost-effective electricity. We can't do one; we have to do both. Duke is taking earnest and responsible action.

The Board's strong oversight, support and engagement have been critically important in our efforts to date and will continue to be as we shape our plans for the future. We will work constructively with lawmakers and regulators in all of our states in which we operate to determine the best coal ash management policies.

I will end by restating that Duke will continue to do the right thing. We will implement plans that make sense for communities across our footprint, and our commitment to safety and safe operations is unwavering. As we close the presentation Bob, you can turn the slide to slide 9, and we would be happy to answer any questions you have.

Bob McCormick: Great, thank you very much. I think that really frames the discussion quite a bit. It initially occurred to me, given the number of ash basins that you said Duke has compared to the number in the country, I think that helps sort of provide some scope in terms of the potential risk exposure for Duke as a company, versus its peers, and I was curious if you wanted to expand upon that, and maybe also related to that is, in terms of power generation for Duke, how much is in coal production, in coal generation, and how much is in other forms of generation?

Lynn Good: Bob, let me take the second part of the question first, and it would be helpful if you could repeat the first part of the question because I'm not sure I understood it fully. Let me talk about the portfolio at Duke. By 2015, a third of our generation will be from coal, a third from gas, and a third from nuclear. We operate a very balanced portfolio and over the last five years have invested over nine billion dollars modernizing our fleet, installing additional environmental

7

equipment as needed and retiring older coal and replacing it with gas. So if you could perhaps repeat the first part of your question, I would appreciate that.

Bob McCormick: Yeah I was just sort of trying to get a sense of the scope of sort of ash basins that Duke has compared to its peers. This is an overall sort of risk evaluation, if Duke has more of these than the average or fewer than the standard amount, whether the risk is commensurate with the types of peers you have.

Lynn Good: Thanks for the clarification Bob. I can't speak to the character of other utilities and ash basins, but I think the statistics, that we have 71 and the industry has 676, really speaks to the fact that this is an industry-wide issue. You know, it's interesting, as we come to this point in our history, because of the actions we've taken to modernize our fleet, we do have more ash basin closure at this point, as we've retired those older units. So our plans have been underway for some time, we believe the actions that we've identified for short-term, and our comprehensive engineering plans will position the Company well as we move forward.

Bob McCormick: Ok. So one question regarding, and obviously this is a topic that's on the top of a lot of shareholders' minds, is what is potentially the ultimate cost to the Company in terms of environmental impact and other claims and potential litigation. Is there an idea of what that estimate could be at this point, or is it too premature to determine that?

Lynn Good: You know Bob, we've disclosed, through an 8-K filing last week, the costs we've incurred to date on repair and cleanup at the Dan River site, and that's 15 million dollars. In terms of, you know, litigation, or other claims that could arise from the incident, it's premature for us to put an estimate in place, but you will find comprehensive disclosure on all the matters regarding the basins in all of our public disclosures, and we will continue to update cost estimates as those estimates become available, and as engineering studies are completed on ash basin closure techniques.

Bob McCormick: Ok. Another question we received, is something Phil touched on, in terms of potential need for a separate investigation, and of course, has that been done, and if not, is there a plan to do so, or why not? Is that something that, you know, as the situation develops, might that be something you'd consider doing?

Lynn Good: Phil, would you like take that question.

Philip R. Sharp: Certainly, absolutely. Well first of all, given the fact that management has moved aggressively on putting the resources together to deal with the incident and to plan ahead on the other ash basins, and that they were aggressively informing us discussing with us on the Board and our Committee the issue, and given the fact that there are number of outside state and federal agencies with eyes on these issues and on our facilities, we frankly didn't think at this point it makes sense for us to have an outside further investigation. But as indicated in my presentation, if at some point the Committee or the Board itself feels that this really would serve some major interest in the Company or to the public, we would certainly be willing to do that. But at this point there's so much activity, and so much engagement and examination, internally and externally, that it just seems inappropriate at this point.

Bob McCormick: I see you mentioned engagement. I was just curious, obviously this is an issue that caused CalPERS and New York City Comptroller to look at it very closely. In terms of engagement with other shareholders on this issue, I'm just wondering what level that is, and

8

what are some of the questions or concerns you may be hearing from shareholders on this issue.

Lynn Good: Bob let me take that question and then ask Julie to respond if she has further input. You know we're in ongoing discussions and contact with our institutional investors, as well as our investors broadly, and really have been, dating back to early February, when this incident occurred, and the questions from investors range from, what actions has the Company taken, what do we see as the future in terms of ash basin closure, an update on litigation, and update on regulatory process. So these types of disclosures will continue to be front and center in our communications with investors and in our SEC disclosures and you can expect further disclosure as facts become available and we have additional items that we need to update.

Julie Janson: And Bob, it's Julie. A couple fine points I would put on that. It is certainly our practice each year during the proxy season to reach out to our large investors. We've done that to approximately 30 investors to engage in conversations about all of the items we carry in within our proxy, so that engagement is ongoing. In addition, you may have seen, and it's posted to our company website if you have not, Dr. Sharp and the Committee received an inquiry from the Nathan Cummings Foundation representing other shareholders, to which he responded, and his response, it was on the matter of internal investigations, is posted externally on our website.

Bob McCormick: Ok. Lynn, I don't necessarily like to characterize it as an evolution in the sort of breakdown of the generation types, between coal, gas and nuclear. I'm just wondering, as this company's generation evolved, as the Board and its experience evolves with that to make sure the Company shifts the type of generation forms, that the experience of the board has shifted as well?

Lynn Good: I'll start with that Bob and then ask Phil to comment as well. You know, we continue to exercise a great deal of oversight as part of the governance of the Committee and of the Board, to ensure that we have appropriate skills and recognition of the business that we're in, including generation mix, scope of business, you know, the evolution of the industry in general. And I believe that is an ongoing responsibility of the Board, and one that it takes very seriously. Phil would you add anything to that?

Philip R. Sharp: The only thing I would add is the Board is continuing to refresh itself, some of us have to leave the Board by result of the age requirement, so that has left new openings this year obviously. But also I would say that, as the mix has changed, just to give you one example, from a risk point of view the nuclear facilities always get considerable attention throughout the industry, and there has been very careful focus to watch for the maturing of the Board in terms of oversight of that as well as the other facilities. And of course the coal facilities remain important but they are a diminishing part of the Board's responsibilities.

Bob McCormick: Now, I notice on the Company's website there's a significant amount of information about the response to the Dan River spill, and I believe Phil it was you who mentioned that these types of coal ash ponds have been around for 90 years. I'm just curious as to prior challenges for the company in terms of spills or other problems with coal ash ponds or related to that, given that they've been around for so long.

Lynn Good: You know, we've had a history of safe operation of all of our facilities, Bob, and do not have anything specific that we would point to on another incident regarding the ash basins.

9

Bob McCormick: Ok, well I didn't actually have any additional questions. If you wanted to take a moment or two to wrap up anything you think we should have covered or a question that you think I should have asked, I'm happy to give you that opportunity.

Lynn Good: Bob I just want to thank you for the opportunity to respond this morning and share with you our perspective. The commitment to safe operations has been a longstanding tenet of Duke. We have responded in what we believe is a very comprehensive and forthright way. We've taken responsibility for the Dan River incident. The Board has been very engaged in risk assessment, risk analysis by the Board, as well as their engagement across our business has always been a very important part of our corporate governance, and that won't change. So thank you again for the opportunity and we look forward to another opportunity so we can visit on this or other matters.

Bob McCormick: Thank you very much, thanks a lot. Particularly I want to thank Lynn, Phil and Julie of course for joining us, apologize about the technical difficulties, and also wanted to thank everyone who joined us on the call. Meeting is obviously coming up soon, on May 1 st, so we'll be releasing our report in the near future. Just as an aside, if you have any questions or comments for us in general about these calls, or suggestions, feel free to email us at proxytalk@glasslewis.com. Again, want to thank everyone who joined us today, particularly Lynn, Phil and Julie, and appreciate everyone who took the time to join us. Thanks very much, this concludes today's proxy talk.

Lynn Good: Thank you.

10

# EXHIBIT G

March 27, 2014


<u>VIA FASCIMILE 704-382-7705</u>
Philip R. Sharp
Chair, Regulatory Policy &
Operations Committee
c/o Corporate Secretary
Duke Energy Corporation
P.O. Box 1321
Charlotte, NC 28201-1321


Dear Mr. Sharp:

As long-term institutional investors with substantial holdings in Duke Energy, we are deeply troubled by recent events surrounding the Dan River coal ash spill, one of the largest in our nation's history. Our concerns include the severity of the spill, Duke's purported violations of numerous regulations, the lack of clarity on clean up and costs, the failure to adequately address the future disposition of Duke's other coal ash ponds and federal criminal subpoenas issued to Duke, the North Carolina Department of Environment and Natural Resources and the North Carolina Utilities Commission.[1] These events, and Duke's response to them, have shaken investors' confidence in Duke and its Board.

In spite of the continuing flurry of news accounts, we are unaware of any action taken by the Board to address these serious issues. We call upon you as Chair of the Regulatory Policy and Operations Committee to immediately initiate an independent investigation consistent with the Committee's charter and to provide a written report to shareholders on its findings and recommendations upon completion. As an immediate first step, we call on you to step forward at the upcoming annual meeting of shareholders to provide a status report on the investigation, including the terms of reference, scope of the inquiry and a timetable for the final report.

Such action is explicitly authorized in the charter, which notes that, "The Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate and shall have the authority to retain outside counsel or other experts for this purpose, including the authority to approve the fees payable to such counsel or experts and any other terms of retention.[2]" We firmly believe that such an investigation is called for and must be separate and independent from any investigation being conducted by the Company itself. Specifically, we request the Committee investigate the following in accordance with its charter:

(1) The facts and circumstances behind the coal ash spill and an assessment of the current situation with respect to the spill, condition of surrounding waterways, clean up, costs and allocation of costs to the Company and ratepayers.

(2) Whether adequate procedures, policies and practices are in place within the Company and at the board level to prevent such occurrences at other coal ash sites--including the current condition, risk of failure and adequacy of mitigation and relocation plans as compared to best practices in the industry.

(3) The allegations and underlying circumstances that are now the subject of a federal criminal investigation involving Duke, and whether senior management was aware of, or engaged in, improper conduct and/or violations of Company policy.

(4) The full details as to the legislative lobbying and political activities undertaken by the Company, particularly with respect to the McCrory Administration, the Department of Environment and Natural Resources and the North Carolina Utility Commission, regarding governmental, regulatory and enforcement efforts at the Company's coal ash facilities.

All findings and recommendations should be included in a report to shareholders upon completion. The report should include a full account of conversations with regulators as well as recommended actions to bring the Company back into compliance with current regulations and industry best practices. It should also spell out what changes the Board and this Committee will make to policy and practice to ensure regulatory compliance and adequate oversight of these matters going forward. Finally, it should include measures to hold accountable any Duke executive found to have breached regulatory requirements, engaged in improper conduct and/or to have violated any Duke policy.

In light of the escalating crisis, it is incumbent upon Duke's directors to assert independent leadership by acting promptly. We urge you to exercise your ability to retain independent counsel and the expertise of individuals with no prior financial, professional or other ties to Duke Energy, its executives or the Board to conduct this investigation. The investigation should be specifically convened on behalf of shareholders and must operate in a manner that is fully independent of management.

The spill, subsequent revelations regarding regulatory violations and the ensuing criminal investigation have created serious reputational risks. These developments also raise broader questions about Duke's approach to the management of long-term environmental risks like climate change and water pollution and underscore the need for greater transparency of political and lobbying activity, consistent with the proposal submitted for this year's proxy by the Nathan Cummings Foundation. If they remain unaddressed, these matters may have material consequences for Duke Energy and its long-term shareholders.

The gravity of these matters requires immediate Board action. The Nathan Cummings Foundation will be facilitating investor engagement with respect to this matter. Please contact Laura Campos at 212-787-7300 or laura.campos@nathancummings.org to follow up. We look forward to a prompt response.

Sincerely,


William Dempsey                                    Denise L. Nappier
Senior Vice President                              Connecticut State Treasurer
The Nathan Cummings Foundation

                                                   Robert M. McCord
Ted Wheeler                                        Pennsylvania Treasurer
Oregon State Treasurer

William R. Atwood
Executive Director
Illinois State Board of Investment

Anne Sheehan
Director of Corporate Governance
California State Teachers' Retirement System

Dawn Wolfe
Vice President, Governance & Sustainable Investment
F&C Management Ltd.

Stephen Abrecht
Co-chair
SEIU Master Trust

Greg Kinczewski
Vice President/General Counsel
Marco Consulting Group

Amelia Timbers
Energy Program Manager
As You Sow

Stu Dalheim
Vice President, Shareholder Advocacy
Calvert Investments

Steve Viederman
Chair, Finance Committee
Christopher Reynolds Foundation

Joellen Sbrissa, CSJ
Congregation of St. Joseph

Mark Regier
Director of Stewardship Investing
Everence Financial and the Praxis Mutual Funds

Leslie Samuelrich
President
Green Century Capital Management

Marcela I. Pinilla
Director, Shareholder Advocacy
Mercy Investment Services

Jonas Kron
Senior Vice President
Trillium Asset Management

Nora M. Nash, OSF
Sisters of St. Francis of Philadelphia

Kathryn McCloskey
Director, Social Responsibility
United Church Funds

Cc: William Barnet III, Member, Regulatory Policy & Operations Committee
G. Alex Bernhardt Sr., Member, Regulatory Policy & Operations Committee
John T. Herron, Member, Regulatory Policy & Operations Committee
James B. Hyler, Jr., Member, Regulatory Policy & Operations Committee
James T. Rhodes, Member, Regulatory Policy & Operations Committee
Carlos A. Saladrigas, Member, Regulatory Policy & Operations Committee

---

[1] http://www.latimes.com/nation/nationnow/la-na-nn-coal-ash-spill-regulators-20140228,0,4932463.story#axzz2wF3jSlt2,
http://www.wral.com/duke-energy-vague-on-future-of-nc-coal-ash-ponds/13477108/ and
http://www.theguardian.com/world/2014/feb/13/north-carolina-coal-ash-spill-duke-energy
[2] https://www.duke-energy.com/corporate-governance/board-committee-charters/regulatory-policy-and-operations.asp

# EXHIBIT H

PX14A6G 1 j414140px14a6g.htm





Scott M. Stringer
Comptroller
The City of New York

April 14, 2014

Dear Duke Energy Shareowner:

We are writing to you as fellow investors in Duke Energy to urge you to vote against the re-election of four directors at the company's annual meeting on May 1, 2014. The four directors — G. Alex Bernhardt, Sr., James B. Hyler, Jr., James T. Rhodes, and Carlos A. Saladrigas — have failed to fulfill their obligations of risk oversight as members of a committee overseeing health, safety, and environmental compliance at the company.

CalPERS and the New York City Pension Funds (the "NYC Funds") are significant, long-term shareowners in the company and have decided to vote against these four directors for the following reasons:

1. Duke Energy is responsible for a devastating environmental disaster in North Carolina — the third largest coal ash spill on record in the United States — which occurred in early February 2014 when a drain under its storage basin collapsed, coating 70 miles of the Dan River with 39,000 tons of toxic waste.

2. The company had forewarning of the potential risk through the work of environmental groups, which reportedly took the company to court on three occasions to clean up similar ash ponds at separate North Carolina plants due to the risks of catastrophe. The state's environmental regulator pre-empted the lawsuits, which could have forced Duke to relocate the ash to lined pits away from drinking water, similar to agreements reached with the two largest utilities in South Carolina. The pre-emption in the third case went beyond the specific plants named in the groups' 60-day notice of intent to sue to effectively block environmentalists from pursuing actions against all of Duke's remaining coal ash sites in North Carolina (*Associated Press*, 2/9/14).

3. The directors named are longstanding members of Duke's Regulatory Policy and Operations Committee, which has explicit oversight responsibility for the company's environmental, health and safety goals, objectives and compliance status, as well as its lobbying and political activities, per its Charter. Furthermore, we note that none of these directors have relevant experience in hazardous waste disposal, environmental management and regulatory matters — despite their membership on the committee responsible for these matters. In fact, no director nominee has coal industry expertise, which is a major concern.

**This is not a solicitation of authority to vote your proxy.**
**Please DO NOT send us your proxy card as it will not be accepted.**

CalPERS, NYC Funds to Duke Energy Shareowners
April 14, 2014
Page 2

4. The financial, legal, regulatory and reputational risks for Duke Energy are serious and mounting: costs for clean-up have not yet been estimated, but clean-up of the Tennessee Valley Authority's 2008 coal ash spill in Kingston, Tennessee is reported to have cost $1.2 billion. The U.S. EPA and the state are jointly reviewing potential violations of the Clean Water Act in connection with Duke's Dan River spill (*New York Times*, 3/21/14), and federal prosecutors have launched a criminal investigation into the spill and the relationship between Duke and the state's environmental regulation (*New York Times*, 3/14/14). According to the *New York Times*, critics charge that environmental regulation has been hobbled by political interference since North Carolina's new governor, who was a Duke Energy employee for 29 years, took office last year.

5. We note that since the disaster on February 2nd, Duke Energy's total shareowner returns are the lowest in its 16-company peer group, as defined by Bloomberg. We understand that Duke has more than 30 coal ash storage pits across its 14 coal plants in North Carolina, indicating that this issue has far reaching ramifications for the company's risk management and performance.

CalPERS and the New York City Comptroller's Office asked Duke Energy for an opportunity to discuss our concerns, including the board's role before and after the Dan River spill, with a member of the board. We subsequently had a call to discuss our concerns that included only management, who acknowledged on the call that they did not convey our request to the board. Management reported that the board was receiving reports from management in connection with the spill, but had not initiated any independent reviews.

In light of the serious failures of oversight, scale of impact on the company's risk profile, and the poor response to shareowner enquiry thus far, we urge our fellow investors to hold the relevant Board members accountable and vote against re-election of those responsible.

Should you have any questions about CalPERS' and the NYC Funds' votes or this proxy solicitation, please contact Todd Mattley (916-795-0565) at CalPERS or Michael Garland (212-669-2517) in the New York City Comptroller's Office.

Sincerely,

Anne Simpson, Senior Portfolio Manager
and Director of Global Governanc
CalPERS

Scott M. Stringer
Comptroller
The City of New York

This is not a solicitation of authority to vote your proxy.
Please DO NOT send us your proxy card as it will not be accepted.

# EXHIBIT I



## NORTH CAROLINA

OFFICE OF THE TREASURER                                             JANET COWELL, TREASURER

April 30, 2014

*By Facsimile and U.S. Mail*

Philip Sharp
Chair, Regulatory Policy and Operations Committee of the Board of Directors
Duke Energy Corporation
P.O. Box 1321
Charlotte, N.C. 28201
Facsimile: (704) 382-7705

Dear Mr. Sharp:

State Treasurer Janet Cowell serves as the investment fiduciary for the North Carolina Retirement Systems, our State's pension plans for state and local government employees. Our pension plans have held stock in Duke Energy and its predecessors for many years, and we continue to be a long-term investor holding more than thirty million dollars of Duke Energy stock.

The February 2014 coal ash spill from Duke Energy's Eden plant into the Dan River affected not only the lives of our State citizens who are downstream, but also the performance of the Retirement Systems' investment in Duke Energy. In the Treasurer's view, to maximize shareholder value, the Duke Energy board must change to respond to the coal ash spill. Therefore, at this week's Duke Energy annual meeting, we will cast our vote against the re-election of your fellow Regulatory Policy and Operations Committee member, Carlos Saladrigas. We also urge that your board conduct an independent investigation of the corporate decisions that led to the Dan River spill.

We cast our vote against the re-election of Mr. Saladrigas for two reasons.

First, like any major event, the coal ash spill reflects not only on the performance of the company's management, but also its board. Mr. Saladrigas is the only member of the board's Regulatory Policy and Operations Committee who is up for re-election and who had more than a few weeks of service on that committee before the coal ash spill.

Second, because of the spill, Duke Energy needs board members who can provide specific expertise in the coal industry and, even more important, in environmental remediation. After you and William Barnet retire in the next few days, the Regulatory Policy and Operations Committee will have at least two vacancies – perhaps three vacancies if a sufficient number of shareholders vote against the re-election of Mr. Saladrigas. We urge that Duke Energy appoint a replacement board member who has specific experience with environmental cleanup management. Although the cleanup cost of the Dan River spill has been only approximately $15 million to date, that number is likely to increase many times over. Given Duke's substantial past and ongoing coal operations, it also seems wise to have a board member who can provide internal expertise about the details of the coal industry. Board members with environmental remediation and coal industry experience could help other board members understand environmental consultants' complex terminology and make informed decisions about the closure of Duke Energy's other legacy coal ash ponds.

More broadly, we urge the Duke Energy board of directors to commission an independent firm to investigate the circumstances and decisions that played a role in the Dan River spill. Although Duke Energy is being evaluated today by various federal and state governmental bodies, none of those organizations will be focused on ways to improve corporate governance or management practices. Independent internal investigations have unique aspects that can help teach companies how to better run their business.

In sum, we join the call of many other institutional investors and corporate governance organizations for thoughtful change on the Duke Energy board.

Sincerely,

Blake Thomas
Assistant General Counsel
N.C. Department of State Treasurer
325 North Salisbury Street
Raleigh, North Carolina 27603-1385
Telephone: (919) 508-1037
E-mail: blake.thomas@nctreasurer.com