1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

4    SAUL BRESALIER, suing derivatively on
     behalf of DUKE ENERGY CORPORATION,        : CIVIL ACTION
5                                              :
                    Plaintiff,                 :
6    v                                         :
                                               :
7    LYNN J. GOOD, MICHAEL G. BROWNING,        :
     DANIEL R. DiMICCO, JOHN H. FORSGREN,      :
8    ANN MAYNARD GRARY, JAMES H. HANCE, JR.,   :
     JOHN T. HERRON, JAMES T. RHODES, JAMES    :
9    B. HYLER, JR., HARRIS DELOACH, JR.,       :
     CARLOS A. SALADRIGAS, WILLIAM E. KENNARD, :
10   E. MARIE MCKEE, RICHARD A. MESERVE,       :
     JAMES E. ROGERS, G. ALEX BERNHARDT,       :
11   E. JAMES REINSCH, WILLIAM BARNETT III,    :
     and PHILIP R. SHARP,                      :
12                                             :
                    Defendants,                :
13   and                                       :
                                               :
14   DUKE ENERGY CORPORATION,                  :
                                               : NO. 15-998-LPS
15                  Nominal Defendant.
                                         - - -
16
                           Wilmington, Delaware
17                    Tuesday, December 20, 2016
                         *Oral Argument Hearing*
18
                                  - - -
19
     BEFORE:          HONORABLE **LEONARD P. STARK**, Chief Judge
20
     APPEARANCES:                        - - -
21

22              MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
                BY:  SIDNEY S. LIEBESMAN, ESQ., and
23                   WILLIAM J. BURTON, ESQ.

24                   and

25                                       Brian P. Gaffigan
                                         Official Court Reporter

1    APPEARANCES:   (Continued)

2

3                 GREENFIELD & GOODMAN, LLC
                  BY:   RICHARD D. GREENFIELD, ESQ.
                        (New York, New York)

4

5                            Counsel for Plaintiffs

6                 MORRIS NICHOLS ARSHT & TUNNELL, LLP
                  BY:   KENNETH J. NACHBAR, ESQ., and

7                        SUSAN WOOD WAESCO, ESQ.

8                      and

9                 SIDLEY AUSTIN, LLP
                  BY:   STEVEN M. BIERMAN, ESQ.

10                      (New York, New York)

11                           Counsel for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        - oOo -

 2              P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following hearing was

 4   held in open court, beginning at 1:10 p.m.)

 5              THE COURT:  Good afternoon.

 6              (The attorneys respond, "Good afternoon, Your

 7   Honor.")

 8              THE COURT:  I'll have you put your appearances

 9   on the record for us, please.

10              MR. LIEBESMAN:  Good afternoon, Your Honor.  Sid

11   Liebesman from Montgomery, McCracken, Walker & Rhoads.  With

12   me to my far left is William Burton, an associate with my

13   firm.  To my immediate left is Richard Greenfield of the

14   Greenfield Goodman firm.  Mr. Greenfield has been admitted

15   pro hac vice.  With Your Honor's permission, he will be

16   arguing today on behalf of the plaintiff.

17              THE COURT:  That's fine.  Thank you.

18              MR. LIEBESMAN:  Thank you.

19              THE COURT:  Good afternoon.

20              MR. NACHBAR:  Good afternoon.  Kennett Nachbar

21   of Morris Nichols Arsht & Tunnell on behalf of defendants.

22   With me at counsel table first is Susan Waesco of my firm,

23   second is Steven Bierman of Sidley Austin, and last but not

24   least, Michelle Spak, in-house counsel at Duke.

25              THE COURT:  Okay.  Welcome to all of you as well.
```

1                    MR. BIERMAN:  Good afternoon.

2                    THE COURT:  Good afternoon.

3                    So we are here on defendants' motion to dismiss.

4                    MR. NACHBAR:  Yes, we are.

5                    THE COURT:  We'll hear the defendants' motion to

6       dismiss.

7                    MR. NACHBAR:  Yes.  The allegations really fall

8       into four categories:  First, allegations relating to the

9       progress merger.  Second, allegations related to Dan River

10      and environmental issues.  Third, allegations relating to

11      political contributions.  And, finally, some other claims as

12      to which it has conceded that no pre-suit demand was made.

13                   The first three categories, plaintiff claims

14      that he did make a pre-suit demand and that demand was

15      wrongfully refused.  I'll deal with those first and then

16      deal with the non-demand claims.  And to preview it a bit,

17      the third claim, it's disputed whether a demand was made,

18      so I'll address that one in turn as well.

19                   So we begin with the merger related claims, and

20      those are easy.  Those claims have been settled.  Bresalier,

21      through his counsel, has signed a settlement agreement by

22      which he agreed that those claims would not be pursued in

23      this action so the merger related claims are not before the

24      Court today.

25                   THE COURT:  Does that include the statute of

1    limitations issue?

2              MR. NACHBAR:  No, the claims are actually being

3    settled; and we had a brief conference I think last week

4    about that.

5              THE COURT:  I recall that.  But there were some

6    claims for which part of the argument had to do with statute

7    of limitations.  Did that issue go to the claims that are

8    related to the merger and are now not really before me?

9              MR. NACHBAR:  I think some of those did.  But in

10   any event, there is a settlement, cash is being exchanged,

11   there is a full release, and they're just not before this

12   Court.

13             THE COURT:  So I guess my question is, do I

14   have any statute of limitations questions before me at the

15   moment?

16             MR. NACHBAR:  No, Your Honor.

17             THE COURT:  Okay.  Thank you.

18             MR. NACHBAR:  Plaintiff's second category of

19   claims and the main claims remaining before the Court are

20   related to the Dan River spill and the resulting misdemeanor

21   plea by Duke Energy.

22             It's notable that the lengthy findings of fact in

23   connection with that plea did not even mention any director

24   or officer of Duke or alleged any wrongdoing by such person.

25   Indeed, the claims alleged only negligent conduct, as is clear

1    from paragraph 27 of plaintiff's complaint which has a lengthy

2    quote about the alleged negligent conduct.  So there was no

3    deliberate intentional knowing or similar violations.

4              Nonetheless, the essence of plaintiff's claim is

5    at page 14 of his answering brief, and what he says is the

6    following.  And I'm going to quote.

7              "It defies logic that a penalty of more than

8    $100 million, the requirement of an outside monitor for a

9    five year period coupled with the detail findings of

10   admitted wrongdoing and a course of egregious conduct as

11   particularized in the joint statement of facts could have

12   taken place without there being evidence of willful

13   wrongdoing by the senior executives of Duke and failures of

14   stewardship by its senior officers and directors.  Thus,

15   according to plaintiff, the investigation of his pre-suit

16   demand must have been deficient and the refusal must have

17   been wrongful because there was an admission of negligent

18   conduct and a fine."

19             That argument is contrary to fact, as I'll

20   discuss in a bit, but it's flatly contrary to Delaware law.

21   And, indeed, a similar allegation was rejected in the *Zucker*

22   case which is supplemental authority that we submitted and

23   I'll get to in a few minutes.

24             But by making a demand -- let's start at the

25   beginning.  By making a demand, plaintiff concedes that the

1    directors are independent and thus in a position to consider

2    that demand within the parameters of their business judgment.

3            Plaintiff disputes this, however, at page 7 of

4    his answering brief, citing *Thorpe v CERBCO*, he says he

5    hasn't conceded independent.  But *Thorpe v CERBCO*,

6    consistent with the cases we cited in our briefs, including

7    this Court's decision earlier this year in *Schwartz v*

8    *Perseon Corp.*, the Delaware Supreme Court in *Levine v Smith*

9    and *Grimes v Donald*, and *Scattered Corp. v Chicago Stock*

10   *Exchange* hold differently.

11           And I'll just quote from *Thorpe* because it's so

12   at odds with what plaintiff cites it for.  And this is from

13   page 10, 611 A.2d at 10.

14           But under the Delaware case law, "once a

15   shareholder makes such a demand upon the board to prevent or

16   remedy an alleged breach of duty, the shareholder is deemed

17   to have made an important concession that the board is able

18   to function on the question ..."  Sorry.

19           The Supreme Court said most recently, "A

20   shareholder plaintiff, by making a demand upon the board

21   before filing suit, tacitly concedes the independence of a

22   majority of the board to respond," citing Delaware Supreme

23   Court *Levine v Smith* decision, and the *Thorpe v CERBCO*

24   quote.

25           Now, *Thorpe v CERBCO* then went on to hold that

1    the tacit concession of director independence that results

2    from a pre-suit demand, and again I'm going to quote,

3    "appears to be not simply a factual presumption that might

4    be rebutted by an allegation of fact but a conclusive

5    presumption," end of quote.

6            Thus, plaintiff's assertion that after having

7    made a demand he still is free to challenge the independence

8    of the Duke board is flatly wrong.

9            Now, what plaintiff is entitled to challenge is

10   the board's action, and he can allege that the board failed

11   to properly discharge its duties in responding to the demand.

12           And there is some language in the Supreme Court

13   *Scattered* opinion that says that's ex post independence.

14   And if you want to call it that, you can call it that.

15           But the point is that the capacity, the ability

16   of the board to exercise its business judgment cannot be

17   disputed or rebutted.  The only thing that the Court is free

18   to look at is what the board actually did in response to the

19   demand.  And so that is what I would like to turn to next.

20   And again --

21           THE COURT:  And that you would at least say is

22   all consistent with the discussion we had last time, I think,

23   which is the arrow in the quiver that they can't use any more,

24   to mix the metaphors, is the one that says no way were you

25   ever in a position to make an independent judgment.  But they

1    still can say, sure, you were in a position to do it but you

2    failed to do it for the following reasons.

3                 MR. NACHBAR:  Exactly.  And so I mean to take

4    the extreme example, if they threw a dart at a dartboard and

5    said we'll pursue this claim if it lands on an even number,

6    we won't pursuit it if it lands on an odd number.  There

7    probably would be a good argument that they hadn't exercised

8    their business judgment, and they hadn't acted properly.

9                 THE COURT:  Of course, that wouldn't necessarily

10   go to their independence, but the point would be they still

11   could pursue a claim potentially.

12                MR. NACHBAR:  Correct, and one could say, well,

13   they didn't exercise independent judgment.  They just threw

14   a dart.  And that is where the language gets perhaps a bit

15   confusing.

16                But I don't think there is any confusion or any

17   ambiguity in any of the cases between the status on the one

18   hand, the ability to function as contrasted with what the

19   board actually did after the fact.  And as I said, the

20   *Scattered* opinion describes that as ex ante and ex post.

21   That is another verbiage and another way of looking at it,

22   but I think the concept is the same and undisputed.

23                So under Delaware law, the decision on how to

24   investigate and pursue a stockholder demand is a business

25   judgment to be made by the board.  Accordingly, there is a

1    presumption that the board acted on an informed basis in

2    good faith and in the honest belief that the action taken

3    was in the best interest of the company.

4              For that, we cite the Delaware Supreme Court

5    decision in *Spiegel v Buntrock* and similar cases.

6              Delaware law is also clear that a stockholder

7    challenging a board's refusal of a demand must rebut the

8    business judgment presumption by pleading particularized

9    facts creating a reasonable doubt about the good faith or

10   reasonableness of the board's investigation.

11             Myriad cases so hold, including Your Honor's

12   decision in *Schwartz v Perseon*, Delaware Supreme Court in

13   *Levine v Smith*, the Chancery Court in *Iron Workers v*

14   *Andreotti*, the Chancery Court opinion in *Friedman v Maffei*,

15   the *Zucker* case that we cited as supplemental authority, and

16   many, many others.

17             Now, plaintiff does cite a few non-Delaware

18   cases to argue for a different burden.  Those non-Delaware

19   cases are, first of all, outliers and in any event not

20   controlling here.

21             Now, plaintiff alleges that he can't meet that

22   pleading burden here because he doesn't have sufficient

23   information, but plaintiff has no one but himself to blame

24   for that situation.

25             The Delaware Supreme Court has been crystal

1    clear both in the wrongful refusal context and in the

2    context of alleged demand futility that plaintiffs do not

3    have license to short-circuit their pleading obligations.

4    Rather, it is incumbent on plaintiff to use the tools at

5    hand -- that's the buzz word that the Supreme Court has

6    used repeatedly, "tools at hand" -- including making a books

7    and records demand pursuant to 8 Del Code, Section 220, to

8    obtain documents necessary for the plaintiff to meet his

9    pleading burden, or if the facts don't support the claim,

10   simply to not bring the lawsuit.  *Scattered Corp.*, 701 A.2d,

11   77 through 79 is one of many cases to so hold.

12             Now, plaintiffs elected to bring this action

13   without making a Section 220 demand, to obtain the report of

14   the board, and that is what he principally challenges.

15             Under the *Morgan Stanley* case and other Delaware

16   cases, he could have gotten that report simply by asking.

17   Indeed, Pinsley (phonetic), another plaintiff shareholder,

18   made a demand.  That demand was refused.  He asked for a

19   copy of the report.  It was provided to him.  And he has not

20   filed suit.  That Bresalier choose not to obtain the report

21   is telling.

22             Now, plaintiff, as you will recall, after not

23   seeking the report, sought to convert the motion to dismiss

24   into one for summary judgment because we referred to the

25   letter that was sent in response to the demand, which is

1    obviously integral to the complaint; and Your Honor ruled

2    that we can put that letter in for what was communicated,

3    not for the truth, and that is fine.  The Court otherwise

4    denied the motion to convert this to summary judgment.

5              Tellingly, though, during the argument, we

6    offered to provide the special committee report to the

7    plaintiff but he didn't take us up on that offer.  After

8    argument, plaintiff made a books-and-record demand for the

9    first time in the case.  Now, that books-and-record demand

10   came too late because once a derivative suit is filed, there

11   is pretty clear law that we're not required to respond to a

12   books-and-record demand at that point.

13             But we didn't rest on that law.  We instead

14   offered to provide plaintiff with the report and the

15   recommendation as well as the board resolutions relating to

16   the demand, the minutes of the demand review committee, and

17   any board minutes referring to the demand.

18             Plaintiff refused that request ostensibly on the

19   ground that Duke was unwilling to provide other documents such

20   as transcripts or memoranda which summarized the interviews

21   that the special committee did and similar documents.

22             If the plaintiff thought he was entitled to all

23   of the documents he sought, the report, the minutes,

24   interview notes and other documents, he had a clear remedy.

25   He could have filed a Section 220 lawsuit in Delaware, and

1    if he was right, he would have won that lawsuit.  But he

2    chose not to do so because he recognized that he is not

3    entitled to those documents.  But at the same time, he

4    continued to refuse the offer to obtain the materials that

5    he was entitled to.

6              So it's perfectly obvious that plaintiff doesn't

7    want the report.  He could have asked for it and gotten it

8    before he brought the lawsuit.  It was expressly offered to

9    him during the last or two arguments ago before Your Honor

10   on the motion to convert.  It was offered to him in writing

11   when he made a Section 220 demand and each time he refused.

12             Why did he refuse?  Because he wants to argue

13   that he was denied the report and therefore is not required

14   to meet the Delaware standard of pleading particularized

15   facts to demonstrate a wrongful refusal of his demand.

16             But Delaware law doesn't permit this tactic,

17   and indeed the tactic was rejected when it was tried by this

18   very same counsel earlier this year.  The case is *Levine v*

19   *Liveris*, and it was one of the supplemental authorities that

20   we submitted to the Court last week or early this week.

21             There, as here, the plaintiff made demands to a

22   variety of alleged wrongdoing.  In that case, Dow Chemical

23   was the corporate defendant.

24             After the demand was refused, plaintiff brought

25   suit alleging that the investigation was biased because

1    counsel in the case had previously represented Dow and had a

2    "well established reputation" for recommending the rejection

3    of shareholder demand.  Opinion at star 9, very similar to

4    the allegations here.

5            As in the present case, Mr. Greenfield's client

6    alleged that the investigation committee and its counsel

7    prejudged the merits of the suit and thus predetermined the

8    outcome of the investigation.

9            As in the present case, plaintiff alleged that

10   counsel failed to interview appropriate witnesses.

11           As in the present case, plaintiff argued that

12   a large judgment, in that case a $1.2 billion antitrust

13   settlement, contradicted the board's conclusion that there

14   were no viable claims to be brought against former officers,

15   directors, or employees.

16           As in the present case, Mr. Greenfield's client

17   alleged that any inadequacies in the complaint stem from

18   the board's refusal to provide information regarding its

19   investigation.  That is at star 11.

20           The Court in *Levine v Liveris* properly rejected

21   each of those allegations.

22           As to information, it relied on the decision

23   in *Scattered* holding that plaintiff has an obligation to

24   utilize Section 220 to get the information it believes it

25   needs to adequately plead demand refusal.  It may not eschew

 1    obtaining a copy of the investigatory report and then assert

 2    "that the generalized reasoning in the demand rejection

 3    letter" creates a reasonable doubt that the investigation was

 4    not conducted -- a reasonable doubt that it was conducted in

 5    good faith.

 6            That is exactly the tactic that was done here.

 7    It was rejected in *Levine*.

 8            The Court similarly rejected a claim that

 9    counsel was somehow biased.  Instead, to state a claim,

10    the Court held that plaintiff must present specific facts

11    demonstrating that the counsel had given biased or

12    inaccurate advice to the board.  That is at star 9.

13            No such facts were pled in *Levine*.  No such

14    facts are pled here.

15            The Court similarly rejected the arguments that

16    the committee did not conduct an adequate investigation

17    because it didn't interview the witnesses who plaintiff

18    thought it would be appropriate to interview.

19            As the Court held, to prevail on a "you

20    didn't interview the right people" claim, the plaintiff

21    must specifically allege what information such witnesses

22    had which would not have been uncovered elsewhere during

23    the investigation.  Opinion at star 12.

24            No such facts were pled in *Levine*.  No such

25    facts are pled here.

1          To survive a motion to dismiss, plaintiff must

2    plead particularized facts which indicate that any decision

3    the board made regarding how to conduct the investigation was

4    grossly negligent.  Conclusory claims of the type here have

5    been repeatedly rejected.  They were rejected in *Andreotti*,

6    they were rejected in *Freeman*, they were rejected in *Belendiuk*

7    -- I'm not sure how to pronounce that -- B-e-l-e-n-d-i-u-k --

8    *v Carrión,* and then several other decisions.

9          Finally, the Court flatly reflected plaintiff's

10   syllogism that the mere fact that Dow sustained a verdict

11   against it was sufficient to establish that the board acted

12   in bad faith in not pursuing a stockholder demand.  And that

13   is at star 10.

14         As the Court noted, there may be many valid

15   reasons for a board not to pursue a stockholder demand even

16   if there is a substantial basis that the lawsuit based on

17   such claims would eventually be successful on the merits.

18   That is also at star 10.

19         The present claims are directly out of plaintiff

20   counsel's Dow playbook.  Identical claims are alleged, in some

21   cases in nearly identical words.  Those claims were properly

22   rejected in Dow, and they should be similarly rejected here.

23              THE COURT:  So as far as you know, the plaintiff

24   still does not have in its possession the report of the

25   committee here; correct?

1              MR. NACHBAR:  Correct.  And he could have had

2      it, as I said, at any time along the way.  It was his for

3      the asking.  He chose not to receive it.

4              THE COURT:  And following the hearing, there is

5      some correspondence that I have seen that you all included

6      in the record, but is it your view there were no conditions

7      attached to providing them with the report?

8              MR. NACHBAR:  There was traditional

9      confidentiality, but that is true in every case.  There are

10     no conditions that you drop certain claims or not pursue

11     things.  There were no obnoxious conditions, I'll put it

12     that way.

13             THE COURT:  There was a dispute it seems about

14     other documents they wanted.

15             MR. NACHBAR:  There was.

16             THE COURT:  But in terms of the report, as you

17     represented here in Court, you would say you followed

18     through in response to their request.  You were willing,

19     other than confidentiality essentially, you would have

20     handed it to them.

21             MR. NACHBAR:  Absolutely, and they studiously

22     avoided obtaining it.  They did not want it.  I think that

23     is crystal clear.

24             So that is the law.  There is also a factual

25     side to this, and the facts simply do not support plaintiff's

1    claims.

2              As the joint statement of facts in connection

3    with the resolution of the *Coal Ash Environmental Litigation*

4    demonstrates, what happened in that case was an accident.

5    An underground wastewater pipe, so it's a pipe that transports

6    wastewater and it's permitted to do so, you know, from the

7    premises into the Dan River.  That pipe ran under a coal ash

8    pond.

9              The pipe ruptured.  Nobody foresaw that was

10   going to happen.  Nobody imagined that was going to happen,

11   and the coal ash contents went into the storm pipe which was

12   never intended to happen.  It was a completely separate pipe

13   but it discharged into the Dan River.

14             That event was not foreseeable or foreseen.  It

15   was an accident.  And Vice Chancellor Glasscock's recent

16   opinion dismissing the coal ash case at page 7 makes that

17   very clear.

18             As to the balance of the claims in the lawsuit,

19   which relate to management of coal ash ponds more generally,

20   the facts show that Duke was actively working with regulators

21   to resolve outstanding issues and minimize liability; and that

22   is most clearly stated in Vice Chancellor Glasscock's recent

23   Rule 23 decision at page 11 and I'll quote from it:

24             "The board was aware that Duke was working with

25   its regulators, primarily the North Carolina Department of

1  Environmental Quality, which I will refer to as 'DEQ,' which

2  before September 18, 2015 was known as the Department of

3  Environmental and Natural Resources, to achieve regulatory

4  compliance in a cost effective way with limited liability."

5     This, of course, is exactly what corporate

6  officers and directors, acting responsibly, should be doing:

7  working with a regulator to fix problems, to resolve them,

8  to move on with limited liability.  That is exactly what

9  you want directors to do.  There is simply no bad faith

10  or wrongful conduct of the type that could give rise to

11  personal liability.

12     And as I stated previously, the extensive

13  factual report that formed the basis for the resolution of

14  the regulatory claims and the fines that plaintiff talk

15  about, they don't allege intentional or knowing wrongdoing.

16  They allege negligence, and they don't even mention any

17  senior officer or director of Duke because the negligence

18  happened at lower levels within the company.

19     THE COURT:  Now, because those findings are

20  ostensibly quoted in the complaint, it would be appropriate

21  in your view that I can refer to the entirety of those

22  findings of fact.

23     MR. NACHBAR:  Yes, Your Honor.  And I think you

24  can also refer to the findings of Vice Chancellor Glasscock

25  in the recent opinion as well.

1          THE COURT:  And that would be --

2          MR. NACHBAR:  But they are coming from the same

3    source.

4          THE COURT:  That would be taking judicial notice

5    of Vice Chancellor Glasscock?

6          MR. NACHBAR:  Yes, exactly.  So it is not our

7    job to prove a negative.  We're not required to prove that

8    in declining to pursue the claims in plaintiff's demand, the

9    review committee and board members committed no wrongdoing.

10          Indeed, the plaintiffs in the *Zucker* case

11    attempted the same pleading trick that is done here.  In

12    *Zucker*, plaintiffs alleged that since the committee report

13    failed to find wrongdoing and the company later admitted in

14    a settlement with the Department of Justice and New York

15    Attorney General that there was wrongdoing, the special

16    committee must have been grossly negligent.  The Court

17    dubbed this a res ipsa loquitur theory, that is at star 2

18    of the *Zucker* opinion, and it rejected it.  As the Court

19    said, the applicable question is not whether the committee

20    was, with the benefit of hindsight, right or wrong.  It is

21    whether the investigation was negligent.

22          As the Court expressly held -- and this is at

23    star 8 of the opinion -- the existence and size of the

24    settlement, standing alone, in light of the process

25    discussed above, does not raise an inference here that the

 1   board failed to inform itself such that it breached its

 2   duty of care.

 3              In fact, the Court in *Zucker* found that the

 4   plaintiff had not plead sufficient facts to demonstrate a

 5   breach of that duty similar to the plaintiff here.

 6              Indeed, the present case is really a fortiori,

 7   as in *Zucker*, there was an admission of wrongdoing.  Here,

 8   there was none.  While Duke admitted discharges in excess

 9   of those allowed by the applicable environmental permit,

10   there was no wrongdoing and no claim the discharges were

11   deliberate or that any senior officer or director of Duke

12   was even aware of them, much less complicit in some way.

13              Thus, it is perfectly congruent to have

14   environmental liability but not an actionable claim against

15   an officer or a director.  There is nothing on the face of

16   things that says, well, gee, there was an environmental

17   liability, so there must be personal liability on the part

18   of some officer or director.  It just doesn't follow.  But

19   that is the heart and the gist of plaintiff's complaint.

20              Instead, what plaintiff has to do, rather than

21   have this res ipsa loquitur theory which as I just explained

22   doesn't really make sense and was rejected in *Zucker,* it's

23   plaintiff's burden to show particularized facts indicating

24   that the review committee and the board did commit wrongdoing.

25   Plaintiff has wholly failed to meet that burden.  This portion

1   of the complaint must be dismissed.

2          Unless Your Honor has questions, I'll move on to

3   the next two.

4          THE COURT:  You can move on.

5          MR. NACHBAR:  As to political contributions,

6   it's not clear that plaintiff even made a demand.  Indeed,

7   we don't think that he did.  Plaintiff's March 24th letter

8   is Exhibit A to the complaint, and it alleges that Duke

9   engages in political activity through a political action

10  committee called Duke PAC.  The demand letter does not

11  allege any illegal or wrongful conduct at all with respect

12  to Duke PAC.

13         Instead -- and I'm going to get it and quote

14  from it.  Instead, what it does is it says that there should

15  be a culture of transparency around the company's use of

16  funds.  It states that Duke PAC has a board of trustees.  It

17  has specified criteria for making contributions.  The demand

18  letter refers to those as innocuous but ambiguous.  But

19  there is no allegation of any wrongdoing.

20         What the demand actually says -- and this is at

21  page 9 of the demand letter, in the middle:

22         "As I am sure you would agree, any direct or

23  indirect political contributions using Duke's fund and those

24  in Duke PAC to make political contributions that can have no

25  conceivable benefit for the company would be demonstrably

1    improper."

2              It doesn't say that that occurred.  It just says

3    if it occurred, it would be improper.

4              It goes on:  "Such contributions would only

5    serve to provide personal contact with politicians and

6    further the personal political preferences of board members

7    and those of senior management.  Such contributions would

8    clearly be a waste of the company's corporate assets and not

9    a proper use of Duke PAC."

10             That is alleged entirely in the conditional.

11   There is no allegation that those things occurred.  There is

12   no allegation that we think those things could be occurring.

13   It simply says if those things occurred, that would be

14   improper in plaintiff's view.

15             At most, the complaint alleges that there could

16   be wrongdoing.  It certainly doesn't allege the existence of

17   any wrongdoing.

18             Now, the complaint goes on to allege that there

19   is an investigation into the nature of Duke's contact with

20   the Department of Environmental and Natural Resources with

21   respect to Duke's North Carolina facilities.

22             There is no allegation, however, that Duke PAC

23   has anything to do with that.  Plaintiff doesn't allege that

24   any official of North Carolina's Department of Environmental

25   and Natural Resources is elected, or that they receive

1    contributions from Duke PAC, or that any money flowed from

2    Duke PAC to anyone affiliated with the Department of

3    Environmental and Natural Resources.

4           Therefore, this allegation can't be a basis for

5    wrongful refusal of the demand even if plaintiff's March

6    24, 2015 letter itself can be deemed to be a shareholder

7    demand.

8           But we don't think it is a shareholder demand.  It

9    doesn't allege wrongdoing.  It simply says that if certain

10   conduct happened, we would all agree that it wouldn't be proper.

11          THE COURT:  Does it identify at least who they

12   think was the wrongdoer with respect to the political

13   contribution?

14          MR. NACHBAR:  Not really.  They imply I suppose

15   that the board of trustees of Duke PAC is the wrongdoer.

16   They don't allege who the board of trustees is.  They don't

17   say it is anybody who is in senior management of Duke.  But,

18   again, it is not a demand.  It doesn't allege wrongdoing so

19   it can't really allege who the wrongdoer is.

20          THE COURT:  And does it even indicate what it is

21   they want, what they're demanding the board do?

22          MR. NACHBAR:  Yes, it does have five generic or

23   four generic requests, and I'll give you sort of the nature

24   of them.  This is at page 10.

25          In light of the foregoing, we hereby demand that

1    you formulate a comprehensive and effective plan to disclose

2    to your shareholders the details of the company's political

3    contribution, you conduct an independent review, et cetera.

4    It goes on for the rest of the paragraph.  But it is in that

5    nature.

6         But what it alleges is that you have Duke PAC

7    employees contribute to Duke PAC.  There is no allegation

8    that Duke even makes contributions to Duke PAC, and I'm told

9    that it doesn't.  That Duke PAC has a board of directors,

10   and that the board of directors decides what to do with the

11   money in Duke PAC.

12        Those are the factual applications, and those

13   are taken from the company's website which describes Duke

14   PAC.  And I think we attached a copy of the website page to

15   our answering brief.

16        The plaintiff then goes on to say, as to Duke

17   PAC, that if Duke PAC is giving to politicians in a way that

18   is not consistent with Duke's interest, that would be bad.

19   And then it has the request for relief that I just reviewed

20   for Your Honor.

21        So that is the nature of the claim.  And we do

22   not believe that that is a demand.  It just isn't.  It fails

23   the test of what a demand is under Delaware law.

24        But, of course, that is a legal question.

25   Whether a particular communication constitutes a demand is a

1   classic legal question.

2            To state a claim for wrongful refusal of demand,

3   plaintiff must, as previously noted, allege particularized

4   facts that the board was grossly negligent or acted in bad

5   faith.

6            So, here, the board was confronted with some

7   generalized purported concerns about political contributions

8   and an assertion that increased transparency would be desirable.

9            The board consulted its lawyers, Gibson Dunn &

10  Crutcher, about that and they sent the communication back to

11  the plaintiff.  The September 4 letter.

12            (The Court sneezes.)

13            MR. NACHBAR:  Gesundheit, Your Honor.

14            THE COURT:  Thank you.

15            MR. NACHBAR:  And that letter says, in footnote

16  1, we don't construe that part of your communication to be a

17  demand.

18            The board, there is no allegation that the board

19  was grossly negligent in that determination.  Indeed, that

20  is a legal determination about which they obviously received

21  legal advice from Gibson Dunn & Crutcher.  Under 8 Del Code,

22  Section 141(e), they're allowed to rely on that legal advice

23  if Gibson Dunn was selected with reasonable care, which they

24  were.

25            And they can't be grossly negligent.  Moreover,

1    the communication is at best ambiguous.

2          There is another element to this, though.  When

3    Mr. Greenfield received the communication on September 4

4    that the committee did not construe this to be a demand, he

5    really had two choices:

6          He could have either written back and said,

7    well, of course it is a demand, and here is why, and to

8    clarify here is specifically what I want and why I want it.

9    He could have done that.

10          Or he could have said you are right, it is not

11    a demand, and then they he could have pursued the claim but

12    then he would have to plead demand futility.

13          He did neither.  He sued.

14          Okay.  But his burden is to show that the

15    committee was grossly negligent in not understanding that

16    his letter was intended to be a demand.  And he can't make

17    that showing.  He wrote an ambiguous letter.  The board

18    referred it to counsel.  They got legal advice to which they

19    are entitled to rely.  They relied on it.

20          If Mr. Greenfield wanted to clarify and

21    communicate that it was a demand, he could have done so, but

22    he didn't.

23          And for all of those reasons, that claim has to

24    be dismissed.

25          Finally, plaintiff's remaining claims I think

1    are easily dismissed.  Those claims assert breaches of

2    fiduciary duty and waste of corporate assets relating to

3    Duke's political contributions, the company's 2015 proxy

4    statement, and the committee's investigation.  And it also

5    alleges an unjust enrichment claim relating to defendants'

6    compensation.

7            Rule 23.1 requires that before making or

8    bringing derivative claims, the plaintiff either has to make

9    a demand or allege particularized reasons why a demand would

10   be futile.

11           Here, the complaint does neither.  The claims

12   at issue were not part of the pre-suit demand, and there is

13   not even an attempt to argue that a pre-suit demand would be

14   futile.  So they simply haven't complied with Rule 23.1, and

15   I think the Court can stop right there.  That is grounds for

16   dismissal.

17           Now, plaintiff attempts to remedy that in their

18   answering brief by stating that, quote, "it is apparently

19   abundant ... that any demand would be futile."

20           That is answering brief at 25.  And that is

21   literally the extent of what they say.  If you take out

22   the ellipses and substitute the words, it says in light of

23   the facts above or something like that.

24           But one could not have a more conclusory statement

25   of demand futility.  That is not sufficient.  They've got to

1    show a particularized pleading as to why each defendant would

2    face personal liability or otherwise not be in a position to

3    exercise business judgment with respect to the demand or with

4    respect to the claim.  They can't do that.

5          Now, plaintiffs also claims that Duke's charter

6    which provides for exculpation of directors other than for

7    self-dealing transactions and transactions undertaken in bad

8    faith can't be considered on this motion.  But *Chemed* and

9    other cases hold otherwise.  The Court can clearly take

10   judicial notice of this publicly available document, the

11   contents of which are not and cannot be disputed.

12         Now, plaintiff's complaint simply does not allege

13   the type of self-dealing or bad faith actions that could

14   possibly give rise to a non-exculpated claim.  Accordingly,

15   there are two independent reasons to dismiss the claims that

16   were not subject to the demand:

17         First, plaintiff has not even attempted to

18   comply with the pre-suit demand requirements of Rule 23.1.

19   Nor has he alleged any possible reasons why a demand would

20   be excused.  This alone is sufficient to dismiss those claims.

21         Second, the claims do not state a theory under

22   which damages could be available.  At most, the complaint

23   alleges claims that do not alleged self-dealing or actions

24   undertaken in bad faith.  The claims alleged, even if

25   accepted as true, are exculpated under Duke's charter.  They

1    therefore can't give rise to a cause of action for damages.

2            So this is a second independent reason to

3    dismiss the claims that were not subject to the demand.

4            So for the foregoing reasons, Your Honor, all of

5    the claims in plaintiff's complaint should be dismissed.

6            THE COURT:  With respect to demand futility, it

7    seems at least they seek leave to amend.  If I agree with

8    you that what they have said is conclusory at this point,

9    should I give them leave to amend to do that?

10           MR. NACHBAR:  No, you shouldn't.  Mr. Greenfield

11   is an experienced litigant.  He knows how to bring a

12   derivative claim.  He chose not to allege demand futility.  He

13   chose not even to try to do so.

14            It would be one thing if he alleged some facts

15   concerning demand futility and there was some ambiguity in

16   the pleading or something that was in the direction of demand

17   futility but didn't quite get there.  Courts sometimes grant

18   leave in those circumstances.

19           Here, there is not even -- the word "demand

20   futility" or "futile" or "excuse," none of those appear in

21   the complaint.  There is just no attempt to do that.

22           That is the complaint that the plaintiff chose

23   to ride with.  That is the complaint that Duke has paid a

24   lot of money for me to defend.  That is the battlefield on

25   which they chose to do battle, and they shouldn't be given a

 1   do-over.

 2                THE COURT:  All right.  We'll save your

 3   remaining time for rebuttal.

 4                MR. NACHBAR:  Thank you.

 5                THE COURT:  We'll hear from Mr. Greenfield.

 6                Good afternoon.

 7                MR. GREENFIELD:  Your Honor, first, I want to

 8   comment on Mr. Nachbar's comments about res ipsa loquitur.

 9   We've never made that argument, not even close, and I don't

10   make it today.  That was something that came up in the

11   context of another case.  And we surely don't say that what

12   happened, we find the guilty plea in any way is res ipsa

13   loquitur as to the defendants' wrongdoing.

14                What we're saying, in essence, is they knew enough

15   facts; and if you read the entire complaint contextually, not

16   taking out specific sentences, we make ample points as to why

17   the board should be held accountable.  And it is not because

18   the company got fined $100 million, it is not just because

19   they pled guilty.

20                Mr. Nachbar is right.  Underlying it all,

21   undoubtedly it was the fault of individual engineers long

22   removed from the board.  But what this case is about is not

23   what those engineers did or did not do but whether this was

24   so pervasive when it took place over so many years, when

25   there was a specific committee of the board with four members

1   who were specifically assigned enterprise risk that focused

2   on these issues that these issues came to the board level.

3   They had to have, number one.

4          Number two, as Mr. Nachbar did not mention to

5   you, at the time of I guess the proxy, the annual meeting a

6   year and-a-half ago, two major shareholders of the company,

7   CalPERS and the New York City pension fund, among the two

8   largest pension funds in the country, fought to get these

9   four directors thrown off the board for their failure of

10  oversight on precisely these environmental issues.  But

11  collectively in the complaint, we laid out what I think are

12  enough reasons why the board should be held culpable or, at

13  a very minimum, the CEO and the four committee members for

14  the Dan River disaster.

15         And with all due respect to Mr. Nachbar, they

16  have continuously used the term "accident."  And, indeed,

17  maybe 30 years ago it started out as an accident, and maybe

18  these accidents still kept happening.  But at some point

19  in time, it became a cover up and it became intentional

20  concealment, and ultimately that is why the feds went

21  after the company.  This wasn't a mere accident, as they

22  characterized it.

23         And, yes, in the opinion dismissing the Chancery

24  Court, the Vice Chancellor used the term "accident."  But I

25  suggest to Your Honor this was not accident by the time that

1    the company pled guilty.

2              If I can --

3              THE COURT:  Well, hold on.  You put a lot on the

4    table, so let me ask you a few questions.

5              First, with respect to the findings of fact

6    related to the plea, do you agree that we can look at that

7    for purposes of resolving the motion?

8              MR. GREENFIELD:  Well, you can look at it as one

9    element.  Most certainly, Your Honor.

10             THE COURT:  And is it true that when we do that,

11   we'll see no reference to any individual defendant here?

12             MR. GREENFIELD:  Precisely, and that is the

13   point.  Number one, remember, Your Honor, this was a plea.

14   It was undoubtedly negotiated over a long period of time.

15   And the company, I can't say for certain because I have

16   not seen the documents, but to the extent any individual

17   or individuals were assigned culpability, the company would

18   not admit to it.

19             But the point is the government's focus in

20   bringing these claims and ultimately settling them was, number

21   one, punishing the crime, so to speak, and, number two,

22   setting in motion a process to keep this from happening again.

23             One of the parts of the deal that Mr. Nachbar

24   did not talk about, which suggests very strongly that there

25   was board culpability or at least culpability to the point

1    of serious responsibility, was that they have agreed to a

2    monitor for five years, to oversee everything this company

3    is doing environmentally.  You don't do that if a board has

4    been performing its function, its stewardship function, and

5    Mr. Nachbar won't deal with that.

6             But the fact is I think what happened over so

7    many years is reflected by the factual statement submitted

8    and agreed to by the company with the blessing of the board.

9    This wasn't some outside lawyer that just agreed to this

10   willy nilly.

11            THE COURT:  But the government agreed to it as

12   well.

13            MR. GREENFIELD:  The government agreed to it,

14   and what the prosecutor said is illustrative.  This was not

15   something in isolation.  This was not a mere accident, as

16   Mr. Nachbar keeps calling it.  This was a 30 year debacle

17   building up and building up and building up with an utter

18   failure of oversight.

19            THE COURT:  But one for which the government

20   agreed there was no personal individual board level

21   responsibility.

22            MR. GREENFIELD:  The government didn't agree,

23   one way or the other.

24            THE COURT:  Well, it was silent.

25            MR. GREENFIELD:  It was not, no.

1          THE COURT:  Is it not silent on that?

2          MR. GREENFIELD:  It is totally silent.  One

3     can't presume one thing or another.

4          THE COURT:  So assuming it is silent, how does

5     it help you meet your burden?

6          MR. GREENFIELD:  What it shows is -- and I

7     haven't read it recently, the factual submission and the

8     entire record.  But what it does show is that this has been

9     so overwhelmingly pervasive for so many years that it would

10    be an utter failure of the board's oversight.  The red flags

11    had to have been flying so prominently for so many years, at

12    least to this committee that was charged with oversight and

13    in my view to the entire board, they could not have kept

14    this under wraps.

15         THE COURT:  Why isn't that res ipsa loquitur?

16         MR. GREENFIELD:  It is not because it is not

17    that by itself, Your Honor.  If it were merely that, one

18    could argue that the fact that there was this disaster by

19    itself means there must have been wrongdoing on the part of

20    the board.

21         We are not saying that.  We're saying that there

22    are enough tell-tale signs, there were mechanisms in place

23    that at least lead to a reasonable presumption that the

24    board or at minimum this committee of four and the CEO were

25    reckless.

1        That is all we have to show, not that we are

2    right.  Ultimately, the facts will show whether we're right

3    or not, if we get to demonstrate what they are.

4        I think this is a board that proclaimed itself.

5    And we have this in our complaint at paragraphs 21 and 22,

6    I believe -- 20 and 21 where Duke and the members of the

7    board consistently represented to shareholders and to the

8    public at large that the members of the board engaged in

9    close oversight of Duke's operating risks generally as

10   well as the risks that Duke's operations could pose to the

11   environment.

12       Your Honor, Mr. Warren, counsel to the

13   committee, acknowledged in a letter to me, "the committee

14   concluded that the company's directors and officers were

15   actively overseeing the company's coal ash management and

16   that directors and officers established and monitored

17   information reporting systems and controls through which

18   they received information regarding the company's coal ash

19   basin."

20       If that is true, and I have no reason to doubt

21   it, that they were knowledgeable at all relevant times as to

22   how bad things had become, and yet they concealed it, yet

23   they did nothing about it.  And that rises to the level of

24   the kind of reckless conduct that borders on intent and

25   certainly is sufficient to satisfy plaintiff's obligation

1    ultimately to show liability.

2            If I could talk about the investigation.

3            Your Honor, if an independent lawyer; and when

4    I say "an independent lawyer," someone who had no previous

5    connection with Duke; was charged with the responsibility of

6    conducting an investigation of what happened of the demands

7    that were presented by my client, the charge to that person

8    would be you're standing in the shoes of Duke.  You have

9    to decide and ultimately make a recommendation to the board

10   whether Duke should sue affirmatively those charged with

11   wrongdoing or reject the demands and do nothing perhaps.

12           If that is your mandate, and it certainly in

13   our view should be what Mr. Warren's mandate was, or should

14   have been, then among other things, you make a record.  If

15   you interview people, you take transcripts.  You perhaps take

16   some of the interviews under oath, but you make a record

17   because if there is any possibility that you, Duke, are going

18   to pursue these claims in the future, you want to nail down

19   that testimony.

20           If you are seriously considering the possibility

21   that Duke might pursue these claims, might, then you are

22   going to interview at a minimum the most important people

23   on the board who would have had firsthand knowledge before

24   board members who were on the committee that had specific

25   oversight.

1            Now, isn't it curious, Your Honor, that none of

2     those people were even interviewed?

3            Shouldn't independent counsel, shouldn't an

4     independent committee have wanted to get the best evidence

5     of who knew what, and when, and what they did about it?

6     Presumably these people on the board knew for many years what

7     was going on.  There was an exceptionally good information

8     gathering process at Duke whereby there was an entity that

9     controlled throughout the company and served as a collection

10    point for all data with respect to these environmental issues,

11    and that there was a chief risk officer as well.

12            It doesn't take much of a stretch, Your Honor, to

13    believe that these people, at a minimum, would have gotten

14    timely and firsthand knowledge of what was transpiring.  Yet

15    the committee, or rather the committee's counsel in this

16    case, never interviewed them.  All they did was rely on the

17    governmental record which wasn't in the slightest bit about

18    any breach of fiduciary duty on the part of the board.  The

19    government had no interest in that.  The government was only

20    interested in what did Duke do or not do that they should

21    have done.

22            So the record, yes, is instructive in terms of the

23    background.  The criminal record is enlightening in terms of

24    the history and how pervasive this was and how long it was

25    ongoing, but it sure as heck is not of any value in terms of

1   showing what any member of the board knew or when they knew it.

2            THE COURT:  Why haven't you looked at the report?

3            MR. GREENFIELD:  Excuse me?

4            THE COURT:  Why haven't you looked at the report?

5            MR. GREENFIELD:  Your Honor, we have asked for the

6   report but as part of the 220 demand for one simple reason.

7   The report is a document prepared by counsel.  It is a

8   self-serving document.  I would expect it to be under these

9   circumstances.  But it is, as Mr. Nachbar said in either

10  his opening brief or his reply brief, well, you know, if you

11  see it, all it is going to do is corroborate everything

12  else that was said.

13            I have little doubt about that.  Therefore, we

14  have asked for the report not as an isolated document but

15  as part of the 220 request which would put it in context to

16  show, among other things, why the board members that were

17  on the committee were not independent, why counsel was not

18  independent.  Because to give any context, to put that

19  report and recommendation in any kind of context, you have

20  to ask yourself, first and foremost, who prepared it?  Under

21  what circumstances?  Was he objective?  Was he unbiased?

22  Or did he do what he was there to do?

23            And not to knock Mr. Warren unduly but he did a

24  very good job I'm sure in putting together a very extensive

25  Report and Recommendation that will shed little light on why

1    he did or did not do certain things, why I'm sure he did

2    not disclose in that report the reasons he did not take the

3    depositions or even interview any of these four directors.

4              THE COURT:  Well, how can you be sure of that?

5    And, in any event, why don't you want to know?

6              MR. GREENFIELD:  I didn't say I don't want to

7    know.  I want to know it and see it in context, Your Honor.

8              THE COURT:  Well, why didn't you file a 220 action?

9              MR. GREENFIELD:  Ah.  Because I believe the com-

10   plaint, standing as it is right now, with some issues that I

11   will concede later I think satisfies our pleading requirement.

12             THE COURT:  Doesn't Delaware law now require you

13   to use all the tools at your disposal?

14             MR. GREENFIELD:  Oh, no.  Oh, no.  No, no.  It is

15   advisory, strongly suggested, but it is certainly not a require-

16   ment.  If it were a requirement, it would be incorporated into

17   Rule 23.1.  The Supreme Court certainly has said use the tools

18   at hand.  And I felt that we had enough facts and could

19   particularize enough reasons why the process was so tainted

20   that we didn't have to do that.

21             Obviously, Mr. Nachbar has come up with great

22   arguments why I should have done it.  And Your Honor may

23   agree with him.  And there is undoubtedly much more I can

24   learn from a 220 request than I know today, but I truly made

25   what I thought was an informed and possibly wrong judgment

1    not to pursue 220 at the outset.

2              THE COURT:  I'm still having trouble understanding

3    why, in connection with the last hearing or your request

4    thereafter reserving all rights and making the arguments that

5    this is out of context, you wouldn't take up the opportunity

6    to look at the report.

7              MR. GREENFIELD:  Because, Your Honor, the way a

8    220 request works is anything they produce to you, they can

9    then put into the record.  And to have that report standing

10   by itself, which is a self-serving document, again, Your

11   Honor says how do you know?  Believe me, I know.  I have seen

12   too many of them, and so I have made a strategic judgment

13   not to accept the tender of the report in a vacuum.

14             And I suggest to Your Honor, I may be wrong.

15   Maybe I should have taken it, but I don't believe so.  Because

16   that document is merely an extension of the arguments that

17   Mr. Nachbar has made in his brief.  It is certainly not very

18   much of an extension over what Mr. Warren said in the demand

19   refusal letter, which has almost no particularity.  And that,

20   in and of itself, is a tactic that I ask Your Honor to consider.

21             We are asked, and I accept the burden, that

22   plaintiffs, after the board has rejected a demand, have the

23   burden of showing that the demand was improperly rejected.

24   That it was the fault of the process, fault with the counsel,

25   fault with whatever, but material enough fault so that the

1    report should be, or the recommendation of the board should

2    be rejected.

3            The letter from Mr. Warren, which is all of I

4    guess three pages, in recognition of the fact that I'm going

5    to have to show at some point with particularity why the

6    rejection of the demand was refused wrongfully, says almost

7    nothing.  When I look at it, it has a few self-serving

8    statements but almost no facts.  And I think it is a double

9    standard.  And I think Your Honor, in looking at this demand

10   refusal letter, has to then look at the burden we face and

11   say, you know, he has done a pretty good job showing why

12   this process was corrupted and why it was wrongfully carried

13   out, despite the fact that the demand refusal letter gives

14   them virtually no ammunition.

15           And this obviously is also a tactic.  I'm not

16   suggesting there is anything illegal about it or improper

17   about it, but what it does is create an uneven playing field

18   for a plaintiff who then has the burden of showing why the

19   rejection was wrongful.

20           THE COURT:  Couldn't you say that is exactly

21   what Delaware law intends?  That it's ultimately for the

22   board to decide whether or not to bring this lawsuit or

23   not, and they have the burden, they have the benefit of the

24   business judgment rule once you make demand.

25           MR. GREENFIELD:  Well, they do.

1            THE COURT:  So you can call it even or uneven,

2       but that is the regime that is set up, isn't it?

3            MR. GREENFIELD:  They absolutely have the right

4       in the first instance to make that determination, but when

5       they embark upon a process that independently particularized

6       facts that are alleged in the complaint show to be a tainted,

7       seriously tainted process, with at least three of the four

8       members of the committee being implicated in the underlying

9       wrongdoing, in counsel who has history that suggests that he

10      is not objective and cannot be objective, where you have a

11      failure to pursue the most material witnesses, to me, it all

12      adds up.  You can't look at any one item.

13           I can't tell a committee how to conduct its

14      investigation.  Mr. Nachbar is correct.  But I can say that

15      in totality, everything about this process as it has been

16      pled in this complaint makes out a case for this committee

17      and this result being wrongful.  And, again, it is not

18      isolated facts.  It's the totality of what we have alleged.

19           I also want to, if I may, go back to something

20      that Mr. Nachbar has said over and over.  And he was fine

21      until he went too far.

22           We acknowledge that by making a demand on the

23      board in the first instance, we can no longer charge the

24      board with lack of independence because we're saying to the

25      board, for the purpose of this demand, you are independent.

1                    But then what did the board do?  The board

2       appointed four members of the committee, three of whom are

3       personally tainted, and perhaps the fourth as well, who

4       appointed counsel, and we have alleged in the complaint

5       that the committee didn't even select its own counsel.

6                    Indeed, I haven't thought about it very much, but

7       Mr. Nachbar revealed the reality of counsel for the committee.

8       They were also counsel for the board.  Mr. Nachbar just said

9       to Your Honor, the board consulted its lawyers, Gibbons Dunn

10      & Crutcher.  They were representing the entire board while

11      purportedly acting independently for the committee.

12                   I want to go back to the board's responsibility.

13      This is not a case where you have a board that is aloof and

14      far removed from what are essentially the Crown Jewels of

15      its business, its utility operations.

16                   And the board has repeatedly, as it says at

17      paragraph 20 of the complaint and again later on, the board

18      is thoroughly involved.  These are not -- this is not a

19      passive board in the sense of a bunch of old fuddy duddies

20      who sit around, collect their checks and go home.  They knew

21      what was happening at the Dan River, or if they didn't know

22      with certainty, the facts they did know should have put them

23      on notice.

24                   Your Honor, if I can shift gears entirely,

25      unless Your Honor wants further discussion, on the merits of

1   the underlying claim relating to the coal ash spill.

2               THE COURT:  You can move on.  If I have more

3   questions, I will ask them.

4               MR. GREENFIELD:  Okay.

5               THE COURT:  But go ahead.

6               MR. GREENFIELD:  The defendants' papers relating

7   to the political contribution issue say, in essence, well,

8   we didn't regard that as a demand despite the fact that the

9   very clear language of the letter says we demand, and we

10  told them what we were demanding.

11              THE COURT:  Including litigation.

12              MR. GREENFIELD:  Yes, but no one says you have

13  to make a demand necessarily in the context of a debacle

14  like the Dan River spill.  We sought, by the demand letter,

15  the board to take specific action.

16              Now, a shareholder has two ways of seeking

17  corporate action.  Well, several ways, but the principal way

18  is through getting something in a proxy statement.  Well,

19  for the average shareholder, they don't have enough shares

20  and they can't do it.  In any event, mounting a proxy fight

21  is not a practical consideration.

22              The other way is to make a demand on the board

23  that they take action.  And when they de facto ignore the

24  demand as they did here, doesn't that give us the right to

25  at least pursue the legitimacy of what we're asking of them?

1    Which is to change their policies because they're putting

2    the company at risk both reputationally and otherwise by

3    not having in place adequate policies to protect against

4    wrongful contribution.

5            For example, Your Honor, we don't know and have

6    not alleged that there were any specific wrongful political

7    contributions.  But the complaint does allege not just Duke

8    PAC, but the board, senior officers, and Duke PAC, among

9    others, have control over a substantial amount of funds to

10   give away.

11           If the CEO of Duke wants to get his picture

12   or now her picture taken with the President of the United

13   States at a fund raiser and has Duke send off a check for

14   $10,000 to go to a cocktail party, I suggest to Your Honor

15   that is not a legitimate corporate expense that should be

16   paid for by the company.  And I use that merely as an example.

17           Companies regrettably, ever since the *Citizens*

18   *United* case, give massive amounts of money not necessarily

19   in the interest of their companies but because of the

20   political leanings of their boards and senior executives.

21   And the demand that was made in this letter was to address

22   precisely that.

23           Two things:  No. 1, to make sure that any

24   company monies that are paid out are only done for valid

25   corporate purposes.  I'm not suggesting that paying for

1    lobbyists or going to someone who has a real connection with

2    the company to his fund raiser might not be legitimate, but

3    there are no controls.

4              The other thing is to avoid the kind of things,

5    to avoid the kind of problems that are clearly on the

6    horizon.  There is no magic to what we have demanded.  We

7    have asked for specified relief, and the board has basically

8    given them a cold shoulder.

9              And I may have been somewhat inartful perhaps

10   in drafting those paragraphs, but I suggest to Your Honor,

11   it makes out a legitimate corporate demand and was clearly

12   understandable in terms of what we were seeking.  We were

13   seeking a change of corporate policy.

14             THE COURT:  But is it --

15             MR. GREENFIELD:  It was not seeking damages.

16             THE COURT:  Hold on.  Is it not a legitimate

17   exercise of business judgment to read what may have been an

18   inartfully written letter as not a demand?

19             MR. GREENFIELD:  No, because it may be inartfully

20   drafted in some respects, Your Honor, but it was clear that it

21   was a demand, it was clear what action was sought.  And they

22   didn't even take the time, besides going to their own counsel,

23   Gibbons Dunn & Crutcher, which I find very illuminating.  They

24   didn't bother to really investigate the issues that I raised.

25             So to that extent, they did not make an informed

1    exercise of business judgment.  They did not investigate

2    whether there were improper political contributions that

3    were being made.  They didn't evaluate what their present

4    policies, if any, exist, and they have some policies.

5          So I suggest, Your Honor, that is a rejection of

6    the demand without a legitimate basis.

7          Speaking of inartful drafting, Your Honor, I will

8    confess that some of those allegations that Mr. Nachbar

9    pointed out to you, where we didn't say demand would have been

10   futile or we made a demand but you didn't act on it I think

11   was a problem that I take responsibility for.  They were

12   intended more contextually and to put things in context, and

13   we probably should not have alleged them as separate failings.

14         There was, as Mr. Nachbar pointed out, a

15   separate proxy fraud suit related to the statements made or

16   not made in Duke's proxy statement.  I believe that has been

17   settled.  But as to these other issues that Mr. Nachbar

18   made, we are prepared to withdraw them.

19         THE COURT:  So you are not seeking to proceed on

20   those as separate claims.

21         MR. GREENFIELD:  That's correct.

22         THE COURT:  So the claims that Mr. Nachbar

23   characterized as no demand having been made, no allegation

24   of demand futility, you agree those are out?

25         MR. GREENFIELD:  I agree that we withdraw

1   them.  Yes, Your Honor.  And that is one of the advantages

2   sometimes of preparing for arguments.  You think about

3   things a little bit more thoroughly.

4              Again, we said it in our papers but I will

5   reiterate it.  If Your Honor sustains the complaint, that

6   would be something we think is appropriate.  To the extent

7   that you find some aspects of it needing further particular-

8   ization, we ask leave to amend.  And further, we ask leave to

9   proceed with the 220 demand that we have made.  That would

10  provide us with the opportunity to further particularize the

11  allegations in the complaint.

12             THE COURT:  The 220 action isn't something

13  before me, though.

14             MR. GREENFIELD:  No.  Well, there is no 220

15  action.

16             THE COURT:  So what are you asking, for a stay?

17             MR. GREENFIELD:  No.  No, no.  I'm saying if

18  Your Honor is disposed towards dismissing the case with

19  leave to amend, then I'm asking Your Honor to give us leave

20  to pursue the 220 proceeding, in court if necessary, but

21  certainly at least to try and extract as many documents as

22  we can from defendants.

23             And I will point out, Your Honor asked before

24  whether there were any conditions that Mr. Nachbar placed

25  upon offering the Report and Recommendation and other documents.

1          Yes, a very serious condition that he placed was

2     that you can't have anything else.  And as I said before,

3     having that document in isolation would have helped.

4          THE COURT:  Did he condition your ability to see

5     the report on you waiving your right to see anything else?

6          MR. GREENFIELD:  Effectively, yes, because it

7     would have cut off the 220 request and not allowed us to

8     pursue it any further at that point in time.

9          THE COURT:  So when you say leave to pursue the

10    220 and see what documents you can extract, I know this is

11    all contingent.  Let's play it out.  Assume I were to grant

12    their motion but grant you leave to amend again or amend the

13    complaint.

14         Are you asking for a chance to fight out with

15    them either informally or in Chancery Court, see what

16    documents you can get before the deadline would be set for

17    you to file that amended complaint?

18         MR. GREENFIELD:  Yes, Your Honor.  And, again,

19    I follow the advice when Justice Jacobs was on the Supreme

20    Court in the *King v Verifone* case, 12 A.3d 1140.

21         He said even if a plaintiff has improvidently --

22    and I'm paraphrasing -- improvidently not availed himself

23    of 220 at the outset, he should nevertheless be allowed to

24    pursue it in furtherance of an amended complaint.

25         I think Your Honor is aware that Justice Jacobs

1   is one of defense counsel, and I think in this case at least

2   I can represent that I agree with his conclusions entirely,

3   should Your Honor be disposed towards dismissing the complaint.

4           The other thing I should say, Your Honor, many

5   companies, when an entire board is under a cloud because of

6   the nature of the allegations in the demand will go out of

7   their way to bring in either new directors who were not on

8   the board to constitute a committee, and in this case they

9   had two new directors appointed in 2015 and 2016, Mr.

10  Angelakis and Mr. Warren, either of whom could have been the

11  committee.  And Delaware law is very clear that you can have

12  a committee of even one, especially since the work of the

13  committee in a case like this was done by counsel.

14          So anyway, I have no further comments, Your

15  Honor, unless you have some more questions for me.

16          THE COURT:  Well, do you want to say anything

17  about this *Levine* case and the analogies that are being

18  drawn to it?

19          MR. GREENFIELD:  Yes.  First of all, some of

20  the analogies are apt and some are not.  The case was very

21  different in the sense that the underlying antitrust

22  violations were fairly far removed from the board.

23          And I don't want to say a billion dollars is

24  petty cash for Dow, but this was something that I don't

25  think Judge Ludington was convinced that this was something

1    that did rise or should have risen to the level of the board.

2            And I should say also the opinion is, the

3    dismissal is on appeal as to the claims he dismissed with

4    prejudice and is a 220 request as to those he dismissed

5    without prejudice.

6            I'm not going to deny to Your Honor that there are

7    not many parallels in that case to this one.  I participated

8    in the drafting of that complaint.  I think the allegations

9    in it should have withstood the motion to dismiss.  I think

10   Judge Ludington is wrong.  But I understand that from his

11   perspective, given the distance between the board and the

12   underlying antitrust violations, I can understand why he came

13   out the way he did.  And I think it was a problem that he had,

14   if I read the opinion as a whole.  We have no way of knowing.

15   He did not hold oral argument.

16           But I cannot deny that there are many parallels

17   in that case to this one.  I just think the outcome was wrong,

18   and we'll see what the Sixth Circuit says.

19           THE COURT:  Is there anything else you want to

20   add?

21           MR. GREENFIELD:  Not that I can think of at this

22   point, Your Honor.

23           THE COURT:  Okay.  Well, thank you very much.

24           Mr. Nachbar, you can have rebuttal.

25           MR. NACHBAR:  Yes.  So a couple of points.

1          First, as to the plea in the *Coal Ash* case,

2     Mr. Greenfield says, well, it's negotiated and individuals

3     never admit wrongdoing or plead to anything.

4          That is not true.  I mean there are case after

5     case in which individuals are specified by name, and in many

6     cases they admit wrongdoing, and sometimes they agree to

7     remedial actions.

8          And a great example is the *Zucker* case.  We just

9     submitted that as supplemental authority.  And in that case,

10    if you look at -- I can't find the little star -- star 3.

11    "Defendant David Nichols also admitted that he knew that the

12    company's best execution and standing instruction services

13    and their true pricing and operations were not fully

14    understood by the market, and that many thought that the

15    best price would be one of the most important factors."

16         That is exactly what Bank of New York was accused,

17    the company was accused of not telling their customers and

18    an individual specifically admitted wrongdoing.  When the

19    regulators have the goods, that is what happens.

20         In *Coal Ash*, the regulators didn't have the

21    goods because there were no goods to be had and therefore no

22    individual who pled anything.

23         Mr. Greenfield said that the company was

24    exceptionally good at information gathering and that there

25    were red flags, but that they knew and concealed the relevant

1    facts.

2              Well, Vice Chancellor Glasscock found just the

3    opposite.  He found that there were no red flags, which is

4    consistent with the findings, joint findings that this was

5    an accident.  These were negligence-based claims.

6              The company did know that there were

7    environmental issues.  They were working actively with the

8    regulators, and they were fixing those problems.  That is

9    exactly what a responsible board should be doing and exactly

10   what, if I'm a stockholder, I want my board members to be

11   doing.

12             So where does that leave us?

13             Well, we come back to the gross negligence

14   standard of pleading.  And Mr. Greenfield made what I

15   thought was a startling admission, that he made a strategic

16   judgment not to seek books and records because he thought he

17   would have a better case if he didn't.

18             He is allowed to make that strategic judgment,

19   but it has consequences.  And I will read from the *Levine*

20   case.  And this is at star 11 of the opinion.

21             "Levine argues that the description of the

22   investigation in the demand rejection letter was conclusory

23   and thus that he was placed in a 'catch-22' whereby Levine

24   was required to plead particularized factual allegations

25   regarding the insufficiency of the investigation, but the

1   board had refused to provide any information about the

2   procedures used."  Citation.  "However, this argument

3   conflicts with Levine's alternative representation that

4   there was no need to make a books and records demand under

5   8 Del Code, Section 220 because 'there were ample facts

6   already available to him to allege with particularity how

7   the board's refusal was wrongful."  Citation.  "If Levine

8   had ample facts, then there is no excuse for the lack of

9   particularity in his allegations."

10          That could be written in this case because the

11  exact same thing is true.

12          So what did I hear about the alleged gross

13  negligence?  I heard only three things:

14          I heard that four directors who were on the

15  board, on the special committee, three of them, possibly

16  four of them were, quote, "tainted" presumably because they

17  were on the board at the time of the alleged wrongdoing.

18          But as we have been through, by making a demand,

19  that arrow in the quiver was removed from the quiver.

20          Mr. Bresalier conceded the independence.  His

21  counsel can't now argue that they were tainted, so that one

22  is gone.

23          Second, counsel was conflicted.  And somehow

24  Gibson Dunn was improper because they represented defendants.

25          Well, that was rejected in *Levine*.  That is the

1   exact same argument that was made about the lawyer in that

2   case.

3           Now, Mr. Greenfield did point out that I

4   misspoke in my opening.  I said the board consulted its

5   lawyers and obviously what I should have said is the special

6   committee consulted its lawyers about the demand.

7           If we go back and look at the transcript, when

8   it is available, you will see that that statement was in the

9   context of talking about the special committee's letter back

10  to Mr. Greenfield at specifically footnote 1 which said we

11  don't think, with respect to the political contributions,

12  that there was a demand.  That was obviously a communication

13  from the special committee through its lawyers back to Mr.

14  Greenfield.  And it was the special committee action being

15  discussed.  And so if I use the term "board," I should have

16  said board members or special committee which would have

17  been more accurate.

18          The final thing, and the only other thing I

19  heard, is that, well, they should have interviewed the four

20  directors who were on the special committee.

21          I have hard time wrapping my mind around that to

22  begin with because it's the special committee who is doing

23  the investigation, so the special committee should have

24  interviewed themselves.  I mean they know what they know.

25  They're the last people who need to be interviewed when

1    they're sitting and deliberating about whether some action

2    should be pursued.  They already know the things that are in

3    their head.  They don't need Gibson Dunn to tell them that

4    or put it in a report.

5              But passing over that, myriad cases say that who

6    to interview and how to go back the investigation process is

7    part of the business judgment.  *Andreotti* says that, *Zucker*

8    says that, numerous other cases say that.

9              THE COURT:  Do I have to take at true at this

10   point that there were people that were not interviewed that

11   plaintiff at least says should have been interviewed?

12   Whether it's legally relevant or not, do I have to take it

13   as true the fact that those folks were not interviewed?

14             MR. NACHBAR:  You know, that is a good question

15   because if plaintiff had gotten the report, they would know

16   who was and who wasn't interviewed.  They chose not to get

17   the report.

18             I do want to hand up, though, the November 3rd

19   letter which Mr. Greenfield read from.  It's not otherwise

20   in the record.  But he did read from it, and I think Your

21   Honor should have a copy.  And it does touch on the question

22   of the scope of the investigation.

23             And I don't know that it changes things

24   dramatically, but I think since Mr. Greenfield read from it,

25   Your Honor should have a copy.

1          THE COURT:  You can pass that up, and I'm going

2     to need to wrap up shortly.

3          And Mr. Greenfield, I will give you a few more

4     minutes to respond, if you want.

5          MR. NACHBAR:  Yes, I understand.

6          THE COURT:  The monitor, he suggests you are not

7     giving adequate weight to the fact that the company agreed

8     to a monitor for five years.  Did you want to say anything

9     about that?

10          MR. NACHBAR:  No, it was part of a plea

11     agreement, and it doesn't indicate there was any wrongdoing

12     or any culpability.  Those are frequently done, and it's

13     something that frankly that somebody can put in a press

14     release, and it doesn't cost the company really anything

15     because after something like this happens, obviously the

16     company is going to be paying attention going forward.

17          If appointing a monitor is something that can

18     help get the parties to agreement, it is something that

19     companies are sometimes willing to do.  Obviously, in this

20     case, Duke was willing to do it.  That is why it is in

21     the agreement.  But I don't think there is anything in

22     particular that can be read into it.

23          THE COURT:  All right.  Is there anything else,

24     briefly?

25          MR. NACHBAR:  I'll only touch very briefly on

1   Duke PAC.

2            Your Honor asked a specific question, was there

3   a demand for litigation in the demand letter?

4            Mr. Greenfield said yes.

5            In fact, there was not.  There was requests to

6   formulate a comprehensive and effective plan, to conduct an

7   independent review, to formulate clear policies, and to

8   cause the company to disclose information.

9            Lawsuit, litigation, suit, demand, recover,

10  recoup, damages.  None of that appear anywhere in the demand.

11           Finally, I would leave with this.  Mr. Greenfield

12  said that he had the facts.  Therefore, there should not be

13  leave to amend.  He made a strategic choice not to seek

14  additional facts because he felt he had enough.  He made that

15  judgment.  Duke incurred a lot of legal fees based on that

16  judgment.  That judgment ought to be conclusive and binding.

17           Thank you, Your Honor.

18           THE COURT:  All right.  Mr. Greenfield, if you

19  would like, you may respond.

20           MR. GREENFIELD:  Yes.  Mr. Nachbar unfortunately

21  got the wrong four directors.  The four directors that the

22  committee counsel should have interviewed at a minimum were

23  Mr. Bernhardt, B-e-r-n-h-a-r-d-t; Hyler, H-y-l-e-r; Rhodes,

24  R-h-o-d-e-s, and Saladrigas, S-a-l-a-d-r-i-g-a-s.

25           They were members of the regulatory policy and

1    operations committee, the committee was charged specifically

2    with the oversight of the Coal Ash facilities, among others,

3    and their impact on the health and safety and risks of the

4    company.

5           And, Your Honor, I still think the complaint more

6    than particularized why the demand refusal was improper.  But

7    I understand that Your Honor could disagree with me, and for

8    that reason, should Your Honor dismiss the complaint with

9    leave to replead, we ask for leave to pursue discovery under

10   220.

11          Thank you.

12          THE COURT:  All right.  Thank you.

13          Mr. Nachbar, did you want to respond on the four

14   directors, now he has made that clear who they are?

15          MR. NACHBAR:  Sure.  No, I didn't understand

16   what he said previously, obviously, but the point is the

17   same.  Who to interview is a classic business judgment.

18   The cases are very clear that unless you can bring forth

19   particularized facts about what those individuals would have

20   added that wasn't available from any other source, the

21   "you didn't interview the right people" isn't a ground to

22   allege wrongful refusal, and we don't have that pleading

23   burden met here.  Therefore, it's not a ground to sustain a

24   claim of wrongful refusal.

25          THE COURT:  All right.

1            MR. NACHBAR:  Thank you.

2            THE COURT:  Thank you.  I thank you both for

3   helpful argument.  We are going to take the motions under

4   advice.  We will be in recess.

5            (Oral argument hearing ends at 2:47 p.m.)

6

7        I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

8

9                            /s/ Brian P. Gaffigan
                            Official Court Reporter
10                            U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25