## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAUL BRESALIER, derivatively on behalf of DUKE ENERGY CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 15-998-LPS |
| | : | |
| LYNN J. GOOD, MICHAEL G. BROWNING, DANIEL R. DIMICCO, JOHN H. FORSGREN, ANN MAYNARD GRAY, JAMES H. HANCE, JR., JOHN T. HERRON, JAMES T. RHODES, JAMES B. HYLER, JR., HARRIS DELOACH, JR., CARLOS A. SALADRIGAS, WILLIAM E. KENNARD, E. MARIE MCKEE, RICHARD A. MESERVE, JAMES E. ROGERS, G. ALEX BERNHARDT, E. JAMES REINSCH, WILLIAM BARNET III, and PHILIP R. SHARP, | : : : : : : : : : : : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| DUKE ENERGY CORPORATION, | : | |
| | : | |
| Nominal Defendant. | : | |

Sidney S. Liebesman and Lisa Zwally Brown, MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP, Wilmington, DE
Richard D. Greenfield and Ann M. Caldwell, GREENFIELD & GOODMAN, LLC, New York, NY
     Attorneys for Plaintiff.

Kenneth J. Nachbar, Susan W. Waesco, and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE
Jack B. Jacobs, SIDLEY AUSTIN LLP, Wilmington, DE
Steven M. Bierman, Andrew W. Stern, and Elizabeth A. Espinosa, SIDLEY AUSTIN LLP, New York, NY
     Attorneys for Defendants.

## MEMORANDUM OPINION

March 30, 2017
Wilmington, Delaware



**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff Saul Bresalier, a Duke Energy Corporation ("Duke" or the "Company") shareholder, filed this derivative action against defendants Lynn J. Good, Michael G. Browning, Daniel R. Dimicco, John H. Forsgren, Ann Maynard Gray, James H. Hance, Jr., John T. Herron, James T. Rhodes, James B. Hyler, Jr., Harris DeLoach, Jr., Carlos A. Saladrigas, William E. Kennard, E. Marie McKee, Richard A. Meserve, James E. Rogers, G. Alex Bernhardt, E. James Reinsch, William Barnet III, and Philip R. Sharp (collectively, the "Director Defendants"[1]), as well as Nominal Defendant Duke (together with the Director Defendants, "Defendants"). (D.I. 1 ("Compl.")) Bresalier alleges breach of fiduciary duty, waste of corporate assets, breach of the duty of loyalty, and unjust enrichment claims, arising from "wrongdoing which took place during the time [the Director Defendants] held office and/or served as . . . director[s] of Nominal Defendant Duke." (*Id.* ¶¶ 1, 88-109)

On January 15, 2016, Defendants moved to dismiss under Federal Rules of Civil Procedure 23.1 and 12(b)(6). (D.I. 25) In response to Defendants' motion to dismiss, Bresalier filed a motion pursuant to Federal Rule of Civil Procedure 12(d), urging the Court to convert Defendants' motion to one for summary judgment. (D.I. 28) The parties agreed to suspend briefing on Defendants' motion to dismiss until the Court ruled on Bresalier's motion to convert. (D.I. 32) The parties then briefed the motion to convert, which the Court denied from the bench during a hearing held on June 15, 2016. (*See* D.I. 44 at 31-34; D.I. 46) The Court now turns

---

[1] All of the Director Defendants are past or present members of Duke's Board of Directors (the "Board").

back to Defendants' motion to dismiss, which the parties have fully briefed (*see* D.I. 47, D.I. 50,

D.I. 51) and argued at a hearing held on December 20, 2016 (*see* D.I. 59 ("Tr.")).[2]

## II.    BACKGROUND

This lawsuit arises from the Duke Board's refusal of Bresalier's March 24, 2015 pre-suit

demand letter. (*See* D.I. 24, Ex. A (the "Demand")) The Demand outlined Bresalier's concerns

regarding three main issues.

First, the Demand alleged that certain Duke officers and directors breached their fiduciary

duties by mismanaging Duke's coal ash basin at its Dan River energy plant in North Carolina,

resulting in the third-worst coal ash spill in the nation's history, in February of 2014. (*See*

Compl. ¶ 25; Demand at 2-5)  The Dan River spill and Duke's mismanagement of coal ash at

other locations in North Carolina led to criminal charges against three Duke subsidiaries, all of

which pled guilty in May 2015 to a total of nine negligence-based misdemeanor violations of the

Clean Water Act, and which further agreed to pay $102 million in fines and implement

environmental compliance plans that would be subject to oversight by a court-appointed monitor

paid for by Duke. (*See* Compl. ¶¶ 25-30; Demand at 2-3)  A Joint Statement of Facts filed with

the U.S. District Court for the Eastern District of North Carolina after the sentencing hearing

"contains numerous and highly material facts to which Duke's General Counsel admitted on

behalf of the Company and its Board, whose members authorized and directed such admissions."

(Compl. ¶ 30)  The Dan River spill also led to enforcement actions by North Carolina's

Department of Environmental and Natural Resources ("DENR"), seeking to hold Duke

---

[2]The parties have also repeatedly provided the Court with their views as to certain
supplemental authorities. (*See* D.I. 57, 58, 61, 62, 63)

responsible for cleanup costs at Duke's 14 coal ash sites in North Carolina; $25 million in fines stemming from these enforcement actions have already been assessed, and the total cleanup costs are estimated to be $10 billion. (*Id.* ¶¶ 31-38) The Demand also referenced a governmental investigation into "the nature of [Duke's] contacts with the DENR with respect to Duke's North Carolina facilities." (Demand at 3 (internal quotation marks omitted))

Second, the Demand alleged that the Director Defendants breached their fiduciary duties with regard to Duke's 2012 merger with Progress Energy, Inc. The Director Defendants were accused of "orchestrat[ing] a scheme to defraud Progress shareholders into believing that [Progress CEO] Bill Johnson . . . would be the CEO of the combined, post-Merger company" through the "charade of giving Johnson a multi-year, multi-million dollar contract," only to then fire Johnson "within hours after the Merger closed, replacing him with [Defendant] Rogers." (Demand at 6) This "not only subjected Duke to a reported potential liability of more than $40 million in breach of contract damages to Mr. Johnson," but also led to a costly shareholder lawsuit, *Nieman v. Duke Energy Corporation et al.*, C.A. No. 3:12-cv-00456-MOC-DSC (W.D.N.C. filed Jan. 29, 2013), which Duke eventually settled for $146 million, $26 million of which was not covered by insurance.[3] (Demand at 5-6)

With respect to these first two issues, Bresalier demanded that the Board "commence litigation against any and all persons and entities who are responsible for the transgressions, violations of law, and damages sustained by the Company as a result of the misconduct summarized in [the Demand] letter." (Compl. ¶ 68; Demand at 8)

---

[3]The events surrounding Johnson's termination also led to a shareholder derivative lawsuit in North Carolina state court. (Compl. ¶ 79) *See Krieger v. Johnson*, 2014 WL 1759054, 2014 NCBC 13 (N.C. Super. Ct. Apr. 30, 2014).

Third, the Demand expressed concerns about Duke's political action committee, DUKEPAC, and asserted that "any direct or indirect political contributions using Duke's funds . . . that can have no conceivable benefit for the Company would be demonstrably improper . . . [and] would only serve to provide personal contact with politicians and further the personal political preferences of Board members." (Demand at 9) Bresalier demanded greater transparency from the Board and DUKEPAC as well as an overhaul of the Company's policies in that regard. (*See* Compl. ¶ 54)

The Board referred the Demand to a review committee (the "Committee"), which had already been formed to address an earlier shareholder demand letter containing some similar allegations. (*See* Compl. ¶ 70; D.I. 47 at 5) The Committee consisted of four of the Director Defendants – DeLoach, Forsgren, Gray, and Kennard – and Gibson Dunn & Crutcher LLP ("Gibson Dunn") served as its legal counsel.[4] (*Id.* ¶¶ 70-71) On May 15, 2015, Bresalier's counsel wrote to the Committee's counsel requesting information on "the bona fides of the selection and work of the [Committee]," a copy of any Board resolutions related to the Committee's creation and Gibson Dunn's retention, and a copy of the other demand being considered by the Committee. (Compl. ¶¶ 72-73; D.I. 24-1, Ex. B) After getting no response, on May 25, 2015, Bresalier's counsel sent another letter to the Committee, seeking a response to his May 15 letter. (Compl. ¶ 74; D.I. 24-1, Ex. C) The Committee's counsel responded to Bresalier's counsel's letters on May 31, 2015, stating that the Demand had not been rejected, the

---

[4]Bresalier alleges that the choice to retain Gibson Dunn as counsel to the Committee was made by the Board rather than the Committee itself. (*See* D.I. 50 at 5 (Gibson Dunn "lacked independence and was selected by the Board's (*i.e.*, the Individual Defendants') counsel, in collaboration with Duke's in-house counsel, *even before the [Committee] was constituted or had its first meeting*") (citing Compl. ¶ 71))

4

investigation was ongoing, and the Committee hoped to complete it within three months.

(Compl. ¶ 74; D.I. 34, Ex. A)  Bresalier's counsel then sent an e-mail on July 3, 2015, reiterating

his unanswered questions about the Committee and its investigation and offering to meet with

the Committee, but he received no response.  (Compl. ¶¶ 74-75; D.I. 24-1, Ex. D)

On September 4, 2015, the Committee informed Bresalier that his Demand had been

refused by the Board based on the Committee's report and recommendation.  (D.I. 47, Ex. C (the

"Rejection Letter") at 2)  The Rejection Letter, which provided the names of the Committee

members (*see id.* at 1), addressed as demands only the allegations regarding Duke's coal ash

management and the Duke-Progress merger.  With regard to the former, the letter informed

Bresalier:

> [T]he Committee concluded that the Company's directors and officers
> did not breach their fiduciary duties with respect to coal ash
> management. The Committee also considered a number of other
> factors that weighed against bringing litigation, including the low
> chances of success; the substantial costs of litigation; the
> unavailability of directors' and officers' liability insurance to satisfy
> any successful claim; the substantial remedial efforts taken by the
> Company to overhaul its approach to coal ash management; and the
> likelihood that litigation would distract key personnel, many of whom
> spend a substantial amount of time overseeing and implementing the
> remedial efforts enacted by the Company.

(*Id.* at 2 (footnote omitted))  The Rejection Letter also cited the guilty pleas to misdemeanor

violations of the Clean Water Act and stated that the Committee's investigation was "[i]nformed

by the resolution of the government's investigation."  (*Id.* at 2)

With respect to the other issues raised in the Demand, the Committee advised Bresalier

that it had determined that the "statute of limitations had run on any claims for breaches of

fiduciary duty the Company could bring" with regard to the 2012 Duke-Progress merger.  (*Id.* at

2 n.3) Finally, the Committee did not make any recommendation to the Board regarding

Bresalier's "general concerns regarding Duke's political contributions and related practices"

because the Demand's generalized statements on this topic did not "constitute a formal demand

under Delaware law." (*Id.* at 1 n.1)

Bresalier filed his Complaint on October 30, 2015, asserting claims for (1) breaches of

fiduciary duty by the Director Defendants with respect to their mismanagement of coal ash, their

replacement of Johnson with Rogers as CEO, and Duke's and DUKEPAC's political

contributions; (2) breaches of the duty of candor with regard to a "materially deceptive proxy

statement [issued] in connection with Duke Energy's 2015 annual meeting of shareholders,"

which led to the initiation of securities litigation in North Carolina;[5] (3) breaches of fiduciary

duty and waste with regard to the Committee's purportedly "sham" investigation and wrongful

refusal of the Demand; and (4) unjust enrichment resulting from the alleged wrongdoing. (*See*

Compl. ¶¶ 37, 45-46, 50, 60-62, 69-71, 88-109)

Defendants move to dismiss, arguing that (1) the Complaint failed to plead with

particularity sufficient facts to raise a reasonable doubt as to the good faith and reasonableness of

the Committee's investigation and the Board's refusal of the Demand, and (2) with respect to

claims not raised in the Demand, the Complaint failed to plead demand futility or, in the

alternative, failed to state a claim. (D.I. 47 at 3) Defendants rely in part on the Rejection Letter,

which they attached as an exhibit to their opening brief. (*See* D.I. 47, Ex. C)[6]

---

[5]*See Greenberg v. Browning et al.*, C.A. No. 4:15-cv-00082-BO (E.D.N.C., voluntarily dismissed with prejudice Oct. 30, 2015).

[6](*See* D.I. 44 at 33 (denying Bresalier's motion to convert because "it is appropriate that [the Court] consider the demand refusal letter in connection with [Defendants'] motion to

For the reasons that follow, the Court will grant Defendants' motion in part and deny the motion in part.

## III.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 23.1

Federal Rule of Civil Procedure 23.1 applies "when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a)  The derivative action may only be maintained if the plaintiff "fairly and adequately represent[s] the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." *Id.*  In order to maintain such a derivative suit, the plaintiff must have owned shares in the company at the time of the disputed transaction. *See* Fed. R. Civ. P. 23.1(b)(1).

In addition, the complaint must "state with particularity":

    (A)    any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

    (B)    the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b)(3).  Put another way, Rule 23.1 requires that a shareholder plaintiff make a pre-suit demand on the board of directors prior to filing a derivative suit on behalf of the company, or to provide a satisfactory explanation for why the plaintiff has not done so.  This

------------------------

dismiss"))

demand requirement allows the corporate machinery to self-correct problems and helps safeguard against frivolous lawsuits. *See Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

"Although Rule 23.1 provides the pleading standard for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard are a matter of state law." *King v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010) (internal quotation marks omitted). Duke is a Delaware corporation (*see, e.g.*, Compl. ¶ 12) and, therefore, Delaware law governs the demand futility or refusal analysis. *See generally Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 101-05 (1991).

When it is clear that making a demand upon the company's board of directors would be futile, the demand requirement may be excused. *See generally Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984) (laying out standard for demand futility), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In order to excuse the demand requirement, a derivative complaint must allege particularized facts sufficient to cast "reasonable doubt" over: (1) the directors' disinterestedness and independence; or (2) the directors' "valid exercise of [their] business judgment." *Id.*; *see also Brehm*,746 A.2d at 256. If either prong is satisfied, the demand requirement is excused. *See Brehm*, 746 A.2d at 256; *see also In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009).

In cases where a shareholder serves a demand and the demand is rejected by the board of directors, the derivative plaintiff's demand is considered a "tacit[] conce[ssion of] the independence of a majority of the board to respond." *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990). In other words, by serving a demand the plaintiff waives any argument that the board of directors was ***incapable*** of acting independently on the demand. *See Rich ex rel. Fuqi*

8

*Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 976 (Del. Ch. 2013) ("By making a litigation demand on a board of directors, a stockholder concedes that the board is able to evaluate the demand, free from concerns of conflicts of interest or lack of independence."); *see also Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997) ("It is not correct that a demand concedes independence conclusively and *in futuro* for all purposes relevant to the demand. . . . [A] board that appears independent *ex ante* may not necessarily act independently *ex post* in rejecting a demand.") (internal quotation marks omitted), *overruled on other grounds by Brehm*, 746 A.2d 244. As a result, "the decision to refuse demand is treated as any other disinterested and independent decision of the board – it is subject to the business judgment rule," and the "only issues" left for the Court to examine are "the good faith and reasonableness of [the board's] investigation." *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *24 (Del. Ch. May 8, 2015) (internal quotation marks omitted), *aff'd sub nom. Ironworkers Dist. Council of Philadelphia v. Andreotti*, 132 A.3d 748 (Del. 2016).

The combination of Rule 23.1 and Delaware law places on plaintiffs whose demand has been refused the "heavy" burden of alleging "particularized facts that raise a reasonable doubt" as to whether (1) the board's decision was "consistent with its duty of care to act on an informed basis"; or as to whether (2) the board "acted in good faith, consistent with its duty of loyalty." *Id.*; *see also Scattered*, 701 A.2d at 75 ("Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation. Such failure could constitute wrongful refusal.").

9

**B. Federal Rule of Civil Procedure 12(b)(6)**

Evaluating a motion to dismiss under Rule 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, [the] plaintiff is not entitled to relief." *Id.*

**IV.   DISCUSSION**

**A.     Coal Ash Management & Dan River Spill**

Bresalier characterizes the Committee's investigation as a "corrupt process with a foregone conclusion; *i.e.* the rejection of plaintiff's demands" (Compl. at ¶ 83), with the objective of "'whitewashing' the wrongdoing of the [Director Defendants] and the Company's senior officers" (*id.* ¶ 70). Bresalier identifies several purported deficiencies in the Board's investigation and refusal of his Demand that he believes satisfy his pleading burden:

- The Board members' exposure to "substantial personal liability due to the wrongdoing alleged." (*Id.* ¶¶ 83-86)

- Gibson Dunn, "a hardly unbiased firm" with a "long history of opposition to shareholder claims in litigation, special investigations and otherwise" (*id.* at ¶¶ 71-72), was "pre-selected by the Board's counsel, in collaboration with Duke's in-house counsel," before the

10

Committee was formed (D.I. 50 at 11). This selection was made because Gibson Dunn "would likely do as expected; *i.e.*, direct its efforts unfavorably to shareholders' demands and the best interests of Duke." (Compl. ¶ 71)

- The Board's failure to appoint a special litigation committee. (*See* D.I. 50 at 12)

- The Board's "decision to appoint a [Committee] composed entirely of directors accused of breaching their fiduciary duties." (D.I. 50 at 13)

- The Company's "admitted wrongdoing and course of . . . egregious conduct" could not have occurred without some "wrongdoing or culpability on the part of the senior executives who actively managed the Company's operations" or a "failure of oversight" by the Board. (D.I. 50 at 14; *see also id.* at 15 ("[A] determination that ***none*** of the [Director Defendants] breached any of their fiduciary duties was [not] possible.")) In other words, a Committee and Board acting independently and in good faith would ***necessarily*** have approved Bresalier's demand because of the gravity of the "illegal conduct acknowledged and admitted to by the Company." (*Id.* at 14)

- The Rejection Letter's inclusion of "other fact-based 'factors' supporting the demand refusal," such as the costs of litigation and

11

low likelihood of success, was unreasonable, particularly because
the letter did not sufficiently explain and quantify these factors.
(*Id.* at 19 n.24)

- The Rejection Letter's opacity, "conclusory nature," and failure to
provide "any information about the investigation." (*Id.* at 15)
Bresalier also appears to charge the Board and Committee with
over-reliance on "the record in the government's investigation."
(*Id.* at 17) The Complaint essentially alleges that the Committee
abdicated its role to its counsel, and that "Gibson [Dunn] made
sure that there was as little evidence as possible that would be
uncovered." (Compl. ¶ 76) Bresalier further alleges that the
Committee and its counsel failed to interview certain Board
members as part of the investigation, and that Gibson Dunn
"avoided taking any testimony of witnesses under oath and,
incredibly, even intentionally avoided having transcripts made of
the testimony of witnesses." (*Id.*) Bresalier also has not been
provided with the Committee's report and recommendation to the
Board. (*See* D.I. 50 at 6 n.13)

For the reasons that follow, the Court is not persuaded that these allegations contain the
sort of "particularized facts" necessary for Bresalier to meet his burden of pleading that the Board
was grossly negligent and/or failed to act in good faith. *See Andreotti*, 2015 WL 2270673, at

12

*24. Therefore, the Court is of the view that Bresalier has failed to show that the refusal of his Demand was wrongful.

As an initial matter, Bresalier contends that the Demand did not "conced[e] the disinterestedness or independence of any of the Company's directors for all purposes and for all time." (Compl. at ¶ 69) Bresalier is correct that his demand does not amount to a concession that the Board in fact acted independently. It is, however, a concession that the Board was *capable* of evaluating his demand in a disinterested, independent manner. Yet, inconsistent with that concession, Bresalier now contends that the same Board members' personal exposure to potential liability helps him meet his burden to show wrongful refusal of his Demand. (*See, e.g.*, D.I. 50 at 5 ("Plaintiff has alleged that his demand was wrongfully rejected by . . . individuals exposed to substantial personal liability for the wrongdoing alleged.")) To the extent that this argument is aimed at the Board as a whole, it lacks merit, as Bresalier waived it by serving a demand on the Board.[7] *See generally Scattered*, 701 A.2d at 75.

Bresalier's allegations regarding the selection of Gibson Dunn as counsel to the Committee and the Board's motivation for doing so, are also unavailing. These contentions are unsupported by any specific factual allegation that Gibson Dunn failed to uphold its professional obligations to its client, the Committee. *See generally Levine v. Liveris*, 2016 WL 6092731, at *9 (E.D. Mich. Oct. 19, 2016) (rejecting argument similar to Bresalier's). Bresalier's allegation

---

[7]While the potential personal liability of the Board as a whole may not be asserted as a basis for finding demand was wrongfully refused, Bresalier's Demand did not waive his opportunity to contend that the members of the Committee might face potential liability. Bresalier did not know which directors were on the Committee at the time he filed his Demand.

that the Board "pre-selected" Gibson Dunn is insufficient to overcome the business judgment rule's presumption of good faith. *See id.*

Similarly, there is no "prescribed procedure that a board must follow" in forming a review committee and responding to a demand, and the Board's decisions with respect to the Committee's composition and to not appoint a special litigation committee are presumptively valid. *See Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991), *overruled on other grounds by Brehm*, 746 A.2d 244. Bresalier cites no persuasive basis for the Court to hold that the Board was required to "appoint a committee consisting solely of individuals who were not implicated in any of the wrongdoing." (D.I. 50 at 12) *See also Liveris*, 2016 WL 6092731, at \*9 ("Even though . . . the Board could have created an entirely independent special litigation committee to review the demand, it was not required to do so. . . . [T]he fact that the composition of the investigation committee resembled that of Dow's Board as a whole is not evidence of wrongful refusal.").

The Court is also unpersuaded by Bresalier's suggestion that the Board's refusal to pursue litigation after the Company's affiliates had admitted criminal negligence is self-evidently a decision made in bad faith. This *res ipsa loquitur*-style argument cannot be viewed as a particularized allegation that the Board was grossly negligent or acted in bad faith in rejecting the Demand. *See Andreotti*, 2015 WL 2270673, at \*24. The Board provided multiple, plausible reasons for deciding not to pursue litigation, and Bresalier's conclusory allegations do not provide a basis to question the Board's exercise of its business judgment. Beyond unsupported assertions, Bresalier provides nothing to persuade the Court that the "practical factors" identified

14

in the Rejection Letter "that weighed against pursuing" Bresalier's demand (D.I. 47 at 2-3) are "self-serving" or "unreasonable and entitled to no deference whatsoever" (D.I. 50 at 20 n.24).

Similarly unavailing is Bresalier's claim that Defendants unreasonably "insist[ed] on keeping the process opaque and provid[ed] no information regarding the investigation," in a way that "casts significant doubt on the good faith of the [Committee] and the Board." (D.I. 50 at 15) One reason Bresalier does not know more about the process that was followed is that Bresalier's counsel made the "possibly wrong . . . strategic judgment" to wait until after his motion to convert was denied before seeking records from the Company pursuant to 8 *Del. C.* § 220. (Tr. at 40-41)[8] *See Andersen v. Mattel, Inc.*, 2017 WL 218913, at *4 (Del. Ch. Jan. 19, 2017) ("Plaintiff's argument that the investigation was inadequate because the report was kept secret might carry more weight if Plaintiff had made a Section 220 demand. Instead, [Plaintiff] knowingly avoided accessing that source of potentially valuable information.") (internal quotation marks omitted); *see generally Grimes v. Donald*, 673 A.2d 1207, 1218 (Del. 1996) ("A stockholder who makes a serious demand and receives only a peremptory refusal has the right to use the 'tools at hand' to obtain the relevant corporate records, such as reports or minutes, reflecting the corporate action and related information in order to determine whether or not there is a basis to assert that demand was wrongfully refused."), *overruled on other grounds by Brehm*, 746 A.2d 244.

"[T]here is no single blueprint a board must follow to fulfill its duties, including

---

[8]When Defendants offered to provide the Committee's report and recommendation to the Board, counsel for Bresalier made another "strategic judgment . . . not to accept the tender of the report in a vacuum" because the "report standing by itself . . . is a self-serving document." (Tr. at 41)

with respect to stockholder demands." *Andreotti*, 2015 WL 2270673, at *26 n.254 (internal

quotation marks and citations omitted).  While the Complaint contains allegations suggesting the

Board's demand review process may have been imperfect and/or could have been carried out in a

manner that would inspire more confidence in its propriety, that is insufficient under Rule 23.1

and Delaware law.  Accordingly, as to the derivative claims that seek litigation against the

Director Defendants as a result of the Dan River coal ash spill, Defendants' motion will be

granted, and Bresalier's claims will be dismissed.[9]

### B.    Merger-Related Claims

In refusing Bresalier's Demand as it relates to the Duke-Progress merger and the hasty

termination of the combined company's new CEO, the Rejection Letter cited the expiration of

the statue of limitations "on any claims for breaches of fiduciary duty the Company could bring."

(Rejection Letter at 2 n.2)  Bresalier disputes that the statute had run.  (*See* D.I. 50 at 20-23)  But

the Court need not resolve this dispute.

---

[9]At oral argument, counsel for Bresalier, citing *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del. 2011), asked for "leave to amend . . . [and] to pursue the [8 *Del. C.* §] 220 proceeding" to the extent that the Court finds "some aspects of [the Complaint] needing further particularization." (Tr. at 49)  While leave to amend "should [be] freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), the Court may exercise its discretion to deny a request for leave where the record shows (1) the moving party's "undue delay, bad faith or dilatory motives"; (2) amendment would be futile; or (3) prejudice to the non-moving party. *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000).  The Court declines to grant leave to amend, as all three of these conditions are present.  Bresalier unduly delayed, under the circumstances, by making a strategic choice not to use § 220 at the outset.  Absent allowing leave sufficient to allow Bresalier to pursue a § 220 action, any amendment would likely be futile.  And Defendants would be unfairly prejudiced (including in terms of time and money expended) by potentially having to put before the Court for a third time, at some indeterminate date in the future, disputes as to the sufficiency of Bresalier's pleadings.

On November 28, 2016, Bresalier's counsel informed the Court of an "agreement in principle" to settle a related case pending in the Delaware Court of Chancery. (D.I. 54 (citing *In re Duke Energy Corporation Derivative Litigation*, Del. Ch. C.A. No. 7705-VCG)) The Chancery settlement "contemplates the release of all Merger-related claims, including those alleged in the instant action, and the withdrawal of [Bresalier's] merger-related allegations from his complaint in this action." (D.I. 55 at 1; *see also* D.I. 54 at 1 (claims to be "settled and released in the Chancery Case" overlap with the claims "set forth in ¶¶ 39-46" of Complaint in this case)) The Court then agreed to the parties' proposal that it proceed with the scheduled hearing on Defendants' motion to dismiss but not address the "merger-related issues," in light of the parties' confidence that the settlement in the Chancery case would eventually be finalized. (D.I. 60 at 8-9) The November 28, 2016 letter from Bresalier's counsel advised the Court that the process was likely to take "approximately three months." (D.I. 54 at 1) The Court has not been apprised of any further developments. Hence, with respect to Bresalier's merger-related claims, the Court will deny Defendants' motion without prejudice to Defendants' ability to renew the motion should it become necessary.

### C.     Improper Political Contributions/DUKEPAC

Bresalier's Demand faults the Board for "put[ting] into place . . . apparently innocuous but ambiguous" criteria for selection of DUKEPAC's Board of Trustees. The Demand goes on to state that "any direct or indirect political contributions" made with Duke funds that "can have no conceivable benefit for the Company *would be* demonstrably improper," would serve only the Board and senior management's political motivations, and "*would* clearly be a waste of the company's corporate assets" and an "[im]proper use of DUKEPAC." (Demand at 9 (emphasis

17

added)) Based on these sentiments, the Demand suggests "there must be a culture of complete transparency of the Company's use of its funds" for political purposes. (*Id.*) According to the Demand, however, such a culture did not exist. (*Id.* ("Most of the Company's political contributions are not readily visible to . . . shareholders . . . [and] can only be determined, if at all, after extensive research.")) Bresalier demanded that the Board "disclose to [Duke's] shareholders the details of the Company's political contributions," independently review Duke's political contributions, cease any activities that lack "direct actual or potential benefit to Duke," formulate policies, and disclose Duke's contributions in proxy statements, "in order to avoid illegal or otherwise improper political contributions." (Demand at 10)

The Rejection Letter did not substantively address any of these allegations or demands. Instead, counsel for the Board informed Bresalier that "this portion of [the Demand] does not constitute a formal demand under Delaware law," so the Committee "was not required to, and did not, make any recommendation regarding it." (Rejection Letter at 1 n.1) Bresalier appears to allege that the Committee and Board acted in bad faith in refusing to address this demand on its merits. (Compl. ¶ 58 ("[A]fter plaintiff brought this wrongdoing to the Board's attention . . . , the Board would not even address the issue."); *see also id.* ¶ 78 ("[T]he [Committee] and Gibson [Dunn] intentionally did not address substantively all of plaintiff's claims as set forth in the Demand."); D.I. 50 at 23-24) Defendants maintain that Bresalier's claims must be dismissed because "the Committee's decision not to investigate the vague and amorphous allegations regarding political contributions was reasonable." (D.I. 47 at 16)

The Court agrees with Defendants. Although there is no "all-inclusive legal formula" or "magic words" that define whether a communication is a formal demand, Delaware courts

require that a demand (1) identify the alleged wrongdoers; (2) identify the alleged wrongdoing
and the resulting injury to the corporation; and (3) specify the legal action the shareholder wants
the board to take. *See Khanna v. McMinn*, 2006 WL 1388744, at *13 & n.66 (Del. Ch. May 9,
2006) (internal quotation marks omitted).  Measuring Bresalier's complaints regarding the
Company's political activities shows that he has not met his "burden of demonstrating that [his]
communication was a demand." *Id.*  Instead, the Demand complains of *potential* wrongdoing
and a *potential* injury rather than actual wrongdoing and injury to the corporation.  Despite
language in the Complaint that is arguably less conditional in nature than that used in the
Demand,[10] counsel for Bresalier acknowledged at oral argument that "we don't know and have
not alleged that there were any specific wrongful political contributions." (Tr. at 46)  To the
extent that the Demand identifies a concrete problem in the difficulty of getting information
about the Company's political contributions, it fails to identify an actual – rather than potential –
injury to the Company as a result. (*See generally* Demand at 9-10 ("Gaps in transparency and
accountability *may* expose [Duke] to reputational and business risks that *could* threaten long-
term shareholder value." (emphasis added)))

Accordingly, the Court will grant Defendants' motion to dismiss Bresalier's claims
relating to the Company's political activities and DUKEPAC.

---

[10](*Compare* Compl. ¶ 50 (pleading upon information and belief that "contributions . . .
that have no conceivable benefit" for Duke "have been and are being made") *with* Demand at 9
("As I am sure you would agree, any . . . contributions using Duke's funds and those in
DUKEPAC . . . [with] no conceivable benefit . . . *would be* demonstrably improper." (emphasis
added)))

19

### D.        Breach of Duty of Candor, Corporate Waste, and Unjust Enrichment

Bresalier's Complaint included allegations that the Director Defendants breached their

duty of candor "by providing materially false and misleading statements in . . . proxy statements"

(Compl. ¶ 92; *see also id.* ¶¶ 58-62), wasted corporate assets in forming the Committee and

orchestrating an investigation that was "in fact, a scheme to place form over substance in dealing

with plaintiff's pre-suit demands" (*id.* ¶ 93), and unjustly enriched themselves at Duke's expense

(*see id.* ¶¶ 97-100). The Complaint also appears to assert fiduciary duty breaches and corporate

waste through "direct or indirect political contributions . . . made using Duke's funds . . . that

have no conceivable benefit for the Company." (*Id.* ¶ 50) Defendants contend that these claims

were not raised in the Demand and must be dismissed for failure to plead demand futility under

Rule 23.1 and for failure to state a claim under Rule 12(b)(6). (*See* D.I. 47 at 17-20) Bresalier

has since withdrawn these claims. (Tr. at 48-49) Defendants' motion as to these claims is

therefore moot, and will be denied for that reason.

### IV.    CONCLUSION

For the reasons given, Defendants' motion to dismiss will be granted in part and denied in

part. An appropriate Order follows.

20